UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

JOSEPH MANUEL HUNTER,                          S7 13 Cr. 521 (LTS)
    a/k/a "Frank Robinson,"
    a/k/a "Jim Riker,"
    a/k/a "Rambo,"

                    Defendant.


## THE GOVERNMENT'S OPPOSITION TO
## THE DEFENDANT'S PRETRIAL MOTIONS


PREET BHARARA
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Michael D. Lockard
Anna M. Skotko
Emil J. Bove III
Assistant United States Attorneys
    *Of Counsel*

# **TABLE OF CONTENTS**

BACKGROUND ............................................................................................................ 1

   I. Hunter's Security Team................................................................................... 2

   II. Hunter and His Team Gather in Phuket, Thailand..................................... 3

   III. Counter-Surveillance in Koh Samui, Thailand......................................... 4

   IV. Security and Surveillance in Mauritius .................................................... 5

   V. Drug Trafficking and Murders-For-Hire .................................................. 5

CHARGES AND PROCEDURAL HISTORY ......................................................... 8

DISCUSSION ............................................................................................................. 9

   I. There Was No Outrageous Government Conduct....................................... 9

      A. Applicable Law .................................................................................... 9

      B. Discussion ......................................................................................... 12

   II. The Search Warrant Affidavit Was Not Misleading............................... 19

      A. Relevant Facts ................................................................................... 20

      B. Applicable Law ................................................................................. 22

      C. Discussion ......................................................................................... 23

CONCLUSION......................................................................................................... 29

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

JOSEPH MANUEL HUNTER,                                     S7 13 Cr. 521 (LTS)
    a/k/a "Frank Robinson,"
    a/k/a "Jim Riker,"
    a/k/a "Rambo,"

                    Defendant.

        The Government respectfully submits this memorandum of law in opposition to the pretrial motions filed by defendant Joseph Manuel Hunter, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo."  For the reasons set forth below, Hunter's motions to dismiss the Indictment and to suppress evidence seized from a hard drive obtained by the Drug Enforcement Administration ("DEA") from Thai law enforcement should be denied without a hearing.[1]

## BACKGROUND

        Following the September 2012 arrest of an individual who became a cooperating witness ("CW-1"), the DEA initiated a sting investigation of Hunter, who had previously performed and overseen contract killings and other violent crimes for CW-1.  At the request of CW-1, Hunter helped to recruit and vet a team of former soldiers to provide security and perform "specialist" or "bonus" jobs, *i.e.*, murders-for-hire and drug trafficking, for three purported

---

[1]   Hunter's motion for severance was mooted by the January 9, 2015 guilty plea of Timothy Vamvakias.

Colombian drug traffickers who were in fact confidential sources working at the direction of the DEA (the "CSes"). In March 2013, Hunter's team, consisting of his four co-defendants, assembled in Phuket, Thailand, after which they participated in criminal activities around the globe until their arrests in September 2013. Hunter directed his team as they provided surveillance and security to support drug- and weapons-trafficking activities described to them by the CSes, including assisting in a purported 300-kilogram cocaine transaction in the Bahamas. Hunter monitored each operation closely, drew on his prior military experience to critique his co-defendants' performance, and provided status reports of their activities to CW-1 and the CSes. Following the sham cocaine transaction in the Bahamas, Hunter, Vamvakias, and Gogel agreed to murder a DEA agent and a DEA source in Liberia. The defendants requested sophisticated weapons and counter-surveillance equipment, and they planned the killings meticulously, including at an extensive debriefing session in Thailand with one of the CSes. On September 25, 2013, Hunter was arrested in Thailand, Vamvakias and Gogel were arrested in Liberia after they traveled there to conduct the murders, and Soborski and Filter were arrested in Estonia.

## I. Hunter's Security Team

As set forth in Superseding Indictment S7 13 Cr. 521 (LTS) (the "Indictment"), after leaving the U.S. Army in 2004, Hunter began to work for CW-1 and successfully arranged for the murder of a number of people and other acts of violence in exchange for pay. (*E.g.*, Indictment ¶ 12(d)(iii); *see also* Hunter Decl. ¶ 6). In the fall of 2012, at the direction of the DEA, CW-1 asked Hunter to assemble a team that could provide security and was willing to perform "specialist jobs." Between late 2012 and early 2013, Hunter sent resumes provided by

prospective members of the team to CW-1.[2]  In January 2013, Hunter participated in a recorded

meeting with two of the CSes ("CS-1" and "CS-2") in Bangkok, Thailand.  (Indictment ¶ 12(a)).

During the meeting, the CSes purported to be members of a Colombian drug trafficking

organization.  Hunter spoke with the CSes about providing security for drug-trafficking

activities, and provided the CSes with the resumes of the individuals whom he recommended.

(*Id.*).  Acting at the direction of the DEA, CW-1 and the CSes selected Hunter's co-defendants

from the candidates Hunter proposed:  Timothy Vamvakias, a former sergeant in the U.S.

Army;[3] Dennis Gogel, a former sniper in the German armed forces; Slawomir Soborski, a former

member of the Polish armed forces with sniper training and counter-terrorism experience; and

Michael Filter, a former member of the German armed forces who, like Gogel, received sniper

training.  (*Id.* ¶¶ 6-10).

## II.  Team Meetings in Phuket, Thailand

In March 2013, Hunter, Gogel, Filter, and Soborski traveled to Phuket, Thailand,

where they stayed at a house owned by CW-1 (the "Phuket House").  On March 8, 2013, Hunter

again spoke with CS-1 and CS-2, during a recorded meeting in the Phuket House, about

providing security for the CSes' purported drug-trafficking organization.  (*Id.* ¶ 12(c)(i)).  Hunter

---

[2]    Hunter sent numerous e-mails to CW-1 at an e-mail account that CW-1 had used to
communicate with Hunter prior to CW-1's arrest, which was under the control of the DEA by
October 2012 (the "CW-1 Account").  During the investigation, the CW-1 Account was covertly
controlled by DEA agents and used to exchange e-mails with Hunter.

[3]    Although Vamvakias had worked with Hunter and CW-1 previously, he was not explicitly
selected to join the security team that Hunter assembled to work with the CSes until
approximately April 2013.

also confirmed during the meeting that he had previously done "bonus work," and that certain of

the members of his security team were interested in performing "bonus jobs."  (*Id.* ¶¶ 12(c)(ii)-

(iii)).

Later on March 8, 2013, Hunter met with Gogel, Filter, and Soborski in the

Phuket House.  (*Id.* ¶ 12(d)).  During the meeting, which was recorded,[4] Hunter told his co-

defendants that they would be working for Colombian drug traffickers and could expect to "see

tons of cocaine" and "millions of dollars."  (*Id.* ¶ 12(d)(i)).  Hunter also indicated that the other

defendants would have the opportunity to participate in "bonus work," including

"assassination[s]," and he described two contract murders that he had previously overseen.  (*Id.*

¶¶ 12(d)(ii)-(iii); *see also* Ex. A at 1 (draft transcript of the recorded March 8, 2013 meeting)).[5]

### III.  Counter-Surveillance in Koh Samui, Thailand

On March 10, 2013, Hunter, Gogel, Filter, and Soborski met with the CSes in the

Phuket House to discuss performing surveillance of a boat on behalf of the CSes' purported

drug-trafficking organization.  Hunter later explained that the job would entail "counter-

surveillance" designed to determine, among other things, whether "the police know about the

boat."  (Indictment ¶¶ 12(e)-(f)).  Between March 21 and March 26, 2013, Gogel, Filter, and

---

[4]    At the direction of the DEA, the CSes wore recording devices during each of their meetings with one or more of the defendants.  In addition, Thai law enforcement conducted video and audio surveillance in the vicinity of a house in Phuket, Thailand owned by CW-1—referred to herein as the "Phuket House"—using equipment that was paid for by the DEA, installed in the Phuket House by Thai law enforcement, and used between March and September 2013.

[5]    The references in the draft transcript to "Benny" are references to an alias used by CW-1.

Soborski conducted surveillance of a boat in Koh Samui, Thailand.  (*Id.* ¶ 12(g)).  On March 24 and March 28, 2013, Hunter sent reports of the surveillance to the CW-1 Account.  (*Id.* ¶¶ 12(g)-(h)).

## IV.  Security and Surveillance in Mauritius

While Gogel, Filter, and Soborski were in Koh Samui, Hunter exchanged additional e-mails with the CW-1 Account regarding a second surveillance operation in support of the CSes' purported drug-trafficking activities.  (*Id.* ¶ 12(j)).  Based on those e-mails and other planning, in April 2013, Gogel, Filter, and Soborski traveled to Mauritius to conduct surveillance and provide security for the CSes, including at meetings at which drug- and weapons-trafficking activities were discussed.  (*Id.* ¶¶ 12(k)-(m)).  Hunter sent e-mails to the CW-1 Account describing the other defendants' activities and transmitting reports of their surveillance.  (*Id.* ¶¶ 12(p)-(q)).

## V.  Drug Trafficking and Murders-For-Hire

On May 18, 2013, during a recorded meeting at a hotel in Phuket, Hunter introduced Vamvakias to CS-1, CS-2 and a third confidential source ("CS-3") purporting to be another member of the same Colombian drug-trafficking organization.  (*Id.* ¶ 12(s)).  After Gogel, Filter, and Soborski joined the meeting, the CSes told the defendants that they were needed in the Bahamas to assist in the transportation of a "big load" and that they would also be offered a "bonus job" relating to a "leak" within the CSes' purported drug-trafficking organization.  (*Id.* ¶ 12(s)(iv)).  Following the May 2013 meeting with the CSes in Phuket, in response to an e-mail from the CW-1 Account asking whether Hunter's team would be willing to

murder a DEA agent and a boat captain acting on behalf of the DEA as a confidential source,

Hunter sent e-mails to the CW-1 Account that stated, in part:  (i) "My guys will handle it"; and

(ii) "They will handle both jobs.  They just need good tools."  (*Id.* ¶¶ 12(t)-(u); *see also* Ex. B).[6]

    In June 2013, Vamvakias, Gogel, Filter, and Soborski traveled to the Bahamas in

order to assist the CSes with a drug transaction.  On June 25, 2013, they participated in a

recorded meeting with CS-3 at a hotel in the Bahamas.  (Indictment ¶ 12(x)).  During the

meeting, CS-3 asked Vamvakias, Gogel, Filter, and Soborski to conduct surveillance of a U.S.-

registered airplane that, according to CS-3, would be loaded with 300 kilograms of cocaine being

shipped to New York.  (*Id.*).  On June 26, 2013, Vamvakias, Gogel, Filter, and Soborski

conducted surveillance at an airport in the Bahamas specified by CS-3.  (*Id.* ¶ 12(y)).  Hunter

sent an e-mail to the CW-1 Account approximately one hour after the airplane identified by CS-3

departed, which stated:  "Mission Complete."  (*Id.* ¶ 12(z)).

    Later on June 26, 2013, Vamvakias and Gogel participated in a recorded meeting

with CS-3 at a hotel in the Bahamas.  (*Id.* ¶ 12(bb)).  Vamvakias and Gogel discussed their

surveillance and informed CS-3 that they had watched the "product" get loaded on the plane.

(*Id.*).  CS-3 then explained that the next "job" was to kill a DEA agent and a DEA "source" in

Liberia.  (*Id.*).  Vamvakias and Gogel discussed different types of weapons that could be used to

commit the murders, including machine guns, cyanide, a grenade, as well as the need for other

---

[6] Hunter used several accounts to communicate with CW-1 and others during the course of the investigation, including the e-mail addresses mrrambo2@yahoo.com and mrtiberius2@yahoo.com.

equipment such as masks and silencers.  (*Id.* ¶ 12(bb)(iii)).  Vamvakias later used his phone to send messages to Hunter advising that he been "debriefed" about the murders and had questions about the job, including whether the whole security team needed to participate and "whether our pay will be the same."  (*See id.* ¶ 12(cc)).

On July 6, 2013, Hunter sent an e-mail to the CW-1 Account and a second e-mail account associated with CS-3 that included a "list of items needed for the job."  (*Id.* ¶ 12(dd)).  Hunter's list included:  "Two Submachine Guns with silencers (Mac 10, MP5, P90, MP7,,,something small)," "Two .22 pistols with Silencers (these are a must)," "One 308 Rifle with Scope and Case for it," and "Two Level 3A Concealment Vests."  (*Id.*; *see also* Ex. C).

On August 15, 2013, Hunter, Vamvakias, and Gogel participated in a recorded meeting with CS-3 at a hotel in Phuket.  (Indictment ¶ 12(ee)).  At the beginning of the meeting, Hunter directed Gogel to search CS-3.  (*Id.* ¶ 12(ee)(i)).  The search did not have its desired effect, as Gogel failed to identify the recording devices worn by CS-3.  The meeting continued—recorded—as Hunter, Vamvakias, and Gogel reviewed purported surveillance photographs of the two targets of the murder-for-hire job and discussed the execution of the plot.  (*Id.* ¶ 12(ee)(iii)).  During the conversation, Hunter asked CS-3 about how to dispose of the weapons following the murders:

> For equipment recovery, do you want the stuff back or is it disposable? . . . What I think probably will happen is, though, they will put it in a pre-determined place and it will be there and you can have somebody pick it up . . . You see, going from the kill zone to wherever, of course they got to get rid of whatever it is.

(*Id.* ¶ 12(ff)(xiv)).

7

In September 2013, Hunter sent a series of e-mails to the CW-1 Account regarding plans for Gogel and Vamvakias to travel to Liberia in order to kill the DEA agent and the source. (*Id.* ¶¶ 12(jj)-(kk)). Gogel and Vamvakias traveled to Liberia to commit the murders on September 25, 2013, where they were arrested. (*Id.* ¶ 12(mm)). On the same day, Hunter was arrested in Thailand, and Soborski and Filter were arrested in Estonia, where they had traveled at the direction of CW-1 and Hunter in order to provide security at meetings regarding weapons-trafficking.

## CHARGES AND PROCEDURAL HISTORY

On September 9, 2013, Hunter was charged in the following five counts: (i) conspiracy to import cocaine into the United States, in violation of Title 21, United States Code, Sections 963, 960(a)(3), 960(b)(1)(B), and 959; (ii) conspiracy to murder a law enforcement agent and a person assisting a law enforcement agent, in violation of Title 18, United States Code, Sections 1117, 1114, and 3238; (iii) conspiracy to kill a person to prevent communications to law enforcement agents, in violation of Title 18, United States Code, Sections 1512(k), 1512(h), 1512(a)(1)(C), and 3238; (iv) conspiracy to possess a firearm in furtherance of a crime of violence, in violation of Title 18, United States Code, Sections 924(o), 924(c)(1)(A)(iii), 924(c)(1)(B)(ii), and 3238; and (v) conspiracy to distribute cocaine on board an aircraft owned by a United States citizen and registered in the United States, in violation of Title 21, United States Code, Sections 963, 960(a)(3), 960(b)(1)(B), and 959. Vamvakias and Gogel were charged in the same five counts, and Soborski and Filter were charged in Counts One and Five.

Vamvakias and Gogel pleaded guilty, pursuant to plea agreements, to Counts One, Two, Four, and Five of the Indictment, on January 9 and January 13, 2015, respectively. Soborski is scheduled to plead guilty to Count One on February 6, 2015.

The trial of Hunter and Filter is scheduled to commence on March 9, 2015.[7]

## DISCUSSION

### I.  There Was No Outrageous Government Conduct

Hunter argues that the Indictment should be dismissed for outrageous government conduct because "to use a former boss who previously threatened the subject with death, who has killed others associate [sic] and who clearly communicated this to the subject 'shocks the conscious' [sic]." (Def. Mem. at 3).  The contention is meritless.

#### A.  Applicable Law

The theory that government misconduct could warrant dismissal of an indictment traces back to the Supreme Court's remark in *United States* v. *Russell*, 411 U.S. 423, 431-32 (1973), that it "may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction."  *Id.*  Three years later, in *Hampton* v. *United States*, 425 U.S. 484 (1976), a plurality of the Court appeared to reject such a concept, noting that "[i]f the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in

---

[7]    The Court set a second trial date of June 1, 2015 should the trial of Hunter and Filter be severed.

9

prosecuting the police under the applicable provisions of state or federal law." *Id*. at 490

(plurality opinion).  In an opinion concurring in the judgment, however, Justice Powell preserved

the idea that due process might set some outer limit on government involvement in criminal

conduct.  *See id*. at 491-95.  But he emphasized that "[p]olice overinvolvement in crime would

have to reach a demonstrable level of outrageousness before it could bar conviction." *Id*. at 295

n.7.

        Since *Hampton*, only one Court of Appeals has ever invalidated a conviction on

the basis of outrageous government conduct.  *See United States* v. *Twigg*, 588 F.2d 373 (3d Cir.

1978); *see also United States* v. *Lakhani*, 480 F.3d 171, 181 (3d Cir. 2007) (noting that *Twigg* is

the only appellate decision to have "recognized a violation of due process as set out by Justice

Powell in *Hampton*").  As the Second Circuit has observed, outrageous government conduct is

"an issue frequently raised that seldom succeeds." *United States* v. *Schmidt*, 105 F.3d 82, 91 (2d

Cir. 1997); *accord United States* v. *LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) ("Such a claim

rarely succeeds."); *see also United States* v. *Santana*, 6 F.3d 1, 4 (1st Cir. 1993) ("The banner of

outrageous misconduct is often raised but seldom saluted.").  In light of this record, the defense

has been called "moribund," *United States* v. *Santana*, 6 F.3d at 4; "hanging by a thread," *United

States* v. *Nolan-Cooper*, 155 F.3d 221, 230 (3d Cir. 1998); and even "[s]tillborn," *United States*

v. *Boyd*, 55 F.3d 239, 241 (7th Cir. 1995).  Courts have questioned whether the doctrine still

exists, *see United States* v. *Tucker*, 28 F.3d 1420, 1425-26 (6th Cir. 1994), and one court has

gone so far as to reject it altogether, *see United States* v. *Boyd*, 55 F.3d at 241 (holding that "the

doctrine does not exist" in the Seventh Circuit).

The Second Circuit has recognized that, "in principle," government over-involvement in criminal activity could rise to the level of a due process violation, *United States* v. *Rahman*, 189 F.3d 88, 131 (2d Cir. 1999), but it has never found such a violation. The court has cautioned that "only Government conduct that shocks the conscience can violate due process." *Id.* (internal quotation marks omitted); *see also United States* v. *Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (only government conduct that is "so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction" will violate due process). And the Second Circuit has repeatedly observed that ordinarily such official misconduct "must involve either coercion or violation of the defendant's person." *United States* v. *Al Kassar*, 660 F.3d at 121 (citations omitted); *accord United States* v. *Schmidt*, 105 F.3d at 91; *United States* v. *Rahman*, 189 F.3d at 131; *United States* v. *Myers*, 692 F.2d 823, 837 (2d Cir. 1982).

A sting operation—even an "elaborate" sting operation—does not violate due process where it merely "creat[es] . . . an opportunity for the commission of crime by those willing to do so." *United States* v. *Myers*, 692 F.2d at 837; *see also id.* at 843 (noting that "[d]ue process challenges to an undercover agent's encouragement have been rejected when one defendant was solicited twenty times before committing an offense and when another defendant was tempted by a million-dollar cash deal and prodded by veiled threats" (citing cases)); *Schmidt*, 105 F.3d at 92 (rejecting a due process challenge even though the Government's "involvement in [the] plan was extensive"); *United States* v. *Viera*, No. 14 Cr. 83 (ER), 2015 WL 171848, at *3 (S.D.N.Y. Jan. 14, 2015); *United States* v. *Davis*, --- F. Supp. 3d ----, No. 13

11

Cr. 986 (LTS), 2014 WL 5758199, at *3 (S.D.N.Y. Nov. 5, 2014) ("Therefore, even a sting

operation that involves 'government creation of the opportunity to commit an offense, even to

the point of supplying defendants with materials essential to commit crimes, does not exceed due

process limits.'" (quoting *United States* v. *Cromitie*, 727 F.3d 194, 219 (2d Cir. 2013)).

"Especially in view of the courts' well-established deference to the Government's choice of

investigatory methods, the burden of establishing outrageous investigatory conduct is very

heavy." *Rahman*, 189 F.3d at 131 (citations omitted). Unsurprisingly, in light of this authority,

courts within the Second Circuit have uniformly rejected efforts to dismiss indictments arising

from undercover narcotics-trafficking investigations like this one on these grounds. *See Al*

*Kassar*, 660 F.3d at 121-22; *United States* v. *Mardirossian*, 818 F. Supp. 2d 775, 775 (S.D.N.Y.

2011); *United States* v. *Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720, at *6 (S.D.N.Y. July 11,

2011).

### B.  Discussion

Hunter's claim falls well short of the standard set forth above.  He offers no facts

that establish—or even suggest—that the Government engaged in conduct that shocks the

conscience, or that involved coercion or violation of his person.  In effect, Hunter argues that the

Government violated his due process rights by directing CW-1 to present him with the

opportunity to commit crimes after CW-1, previously and on his own, purportedly threatened to

kill Hunter and his family and bragged about his past criminal conduct.  According to Hunter, he

was therefore "afraid" of CW-1 and "had no choice" but to commit the charged crimes.  Hunter's

attempt to lay the foundation for a duress defense at trial wholly fails to establish outrageous

government conduct warranting dismissal of the Indictment. Accordingly, the motion should be denied.

By Hunter's own admission, he had been employed by CW-1 in "private security" since 2007, about five years before Hunter became a subject of the DEA's investigation. (Hunter Decl. ¶ 6). Hunter's uncorroborated claim that CW-1 threatened him and his family with death while Hunter was in Mali—before CW-1 began cooperating—hardly establishes outrageous government conduct. (*See id.* ¶ 8). Any such threats would have predated the onset of this investigation and been divorced from Hunter's involvement in the charged crimes. Furthermore, even after Hunter completed his "work" for CW-1 in Mali, which he described to his co-defendants as "gold smuggling," and one of his associates was murdered, Hunter did not distance himself from CW-1 or report any concerns to law enforcement. (Ex. A at 11). Rather, he "got promoted" (*id.*), continued to seek work from CW-1, and chose to pursue illegal gains from violent crimes.[8]

The allegations in the Indictment, which must be accepted as true for the purposes of this motion, also rebut Hunter's claim of outrageous government conduct. *See United States* v. *Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985). As the Indictment makes clear, Hunter was not a fearful victim who was manipulated by the Government to violate the law. To the contrary,

---

[8]    Hunter's continued solicitation of "work" from CW-1 following the purported threats in Mali, and over a period of almost a year during the course of the charged crimes, is a fatal flaw in the duress defense implied in Hunter's motions. *See United States* v. *Zayac*, 765 F.3d 112, 121 (2d Cir. 2014) ("As we have explained, an element of the duress defense is the absence of a reasonable opportunity to escape harm other than by engaging in the illegal activity." (internal quotation marks omitted)).

Hunter was an active and willing participant in the narcotics trafficking and murder-for-hire conspiracies from the beginning. Hunter does not, and cannot, claim that the alleged Government misconduct involved "coercion or violation of the defendant's person," which are typically the only scenarios where such a claim might possibly succeed. *Al Kassar*, 660 F.3d at 121; *accord Schmidt*, 105 F.3d at 91; *Rahman*, 189 F.3d at 131; *Myers*, 692 F.2d at 837. Moreover, the aspect of the investigation that Hunter claims "shocks" the conscience—*i.e.*, the Government's use of a cooperating witness with a violent criminal history—is, in fact, commonplace in sting operations targeting narcotics and violent crimes and has been routinely upheld by courts in this Circuit. *See Al Kassar*, 660 F.3d at 121-22; *Mardirossian*, 818 F. Supp. 2d at 775; *Bout*, 2011 WL 2693720, at *6.

The allegations in the Indictment show, and the Government will prove at trial, that Hunter was driven to commit these crimes by financial motivations, not fear of CW-1 (or anyone else). Hunter not only helped to recruit and manage a security team to assist with the work of purported members of a Colombian drug cartel, he also used his expertise and experience to advise the CSes and his co-defendants on how to execute their illegal tasks (including the murders-for-hire) based on his own prior involvement in such illegal operations. Hunter told the CSes—who held themselves out as Colombian drug traffickers—that he himself had previously done "bonus work" (*i.e.*, contract killings) and indicated that his team wanted to do as much bonus work as possible. (Indictment ¶¶ 12(c)(ii)-(iii)). During the recorded meeting of Hunter and his co-defendants at the Phuket House on March 8, 2013, Hunter told them that they would be working for a Colombian drug cartel, that the men could expect to "see tons of

14

cocaine" and "millions of dollars," and that they would have the opportunity to do "assassination[s]." (*Id.* ¶¶ 12(d)(i)-(ii)). Hunter also explained that he had previously committed acts of violence for pay, including, among other things, overseeing the murders of two real estate agents.[9] (*Id.* ¶ 12(d)(iii)).

    As the investigation continued, Hunter actively initiated communications with his co-defendants, CW-1, and the CSes, and he reported back to CW-1 about his co-defendants' work for the CSes' purported drug trafficking organization. (*Id.* ¶¶ 12(p)-(q), (w), (z), (aa)). Hunter even solicited additional illegal work, writing to CW-1 that: "Everyone is ready to go, just waiting further instructions. They also, really want a bonus job after this next mission, if available." (*Id.* ¶ 12(r); *see also* Ex. D). In May 2013, after Hunter and his men talked with the CSes about assisting with the transportation of a large load of drugs being transported through the Bahamas, the defendants were advised that there was a "bonus job" in the offing because there was a leak in the CSes' narcotics trafficking organization. (Indictment ¶ 12(s)(iv)). On May 30, 2013, the DEA sent Hunter an e-mail from the CW-1 Account seeking Hunter's "input" regarding how to "fix" an issue involving a DEA agent and a boat captain acting as a DEA source who had, according to the e-mail, led to the seizure of a contraband-carrying vessel controlled by CW-1. (Indictment ¶ 12(t); *see also* Ex. B). Hunter responded simply: "My guys

---

[9] In describing that murder-for-hire operation, Hunter said: "They went back to the house, they shot her, they didn't even go in – they shot her at the door and left her there. But it was raining that day, so there was no people around, and they did it perfect, no problems. Now . . . I had two guys, two other guys that wanted bonus work. They did the job, but they did it sloppy, and I fired them. Sent them back home. These guys, the same thing – another real estate agent." (Indictment ¶ 12(d)(iii)).

will handle it. . . . Are you talking about both the Captain [*i.e.*, the source] and agent or just the Captain?" (Indictment ¶ 12(t); *see also* Ex. B). The DEA specified to Hunter, via the CW-1 Account, that Hunter's team would be paid $700,000 for the two murders, or alternatively could kill only the source while CW-1 got "another team to handle the more sensitive issue" of killing the agent. (Indictment ¶ 12(t); *see also* Ex. B). Hunter responded unambiguously: "They will handle both jobs. They just need good tools." (Indictment ¶ 12(u); *see also* Ex. B). At no point did Hunter reveal any reluctance about the "jobs" to the CSes, his co-defendants, or CW-1. Rather, his e-mail exchanges with the CW-1 Account, as well as his comments to the CSes, reflect his enthusiasm for the assignments and make clear the absence of duress.

In July 2013, after Hunter and some of his co-defendants had agreed to execute the murders-for-hire, Hunter sent an e-mail to CS-3 and the CW-1 Account that included a "list of items needed for the job," including "Two Submachine Guns with silencers (Mac 10, MP5, P90, MP7,,,something small)," "Two .22 pistols with Silencers (these are a must)," "One 308 Rifle with Scope and Case for it," and "Two Level 3A Concealment Vests." (Indictment ¶ 12(dd); *see also* Ex. C). In mid-August 2013, Hunter, Vamvakias, and Gogel, met with CS-3 in Thailand to discuss the details and logistics for the murders. (Indictment ¶ 12(ff)). During the meeting, Hunter and the others reviewed surveillance photographs of the targets; requested details about the vehicles driven by the targets; confirmed that the CSes would provide the weapons and disguises in Africa; and discussed how to dispose of the weapons used in the murders after the murderers left what Hunter described as the "kill zone." (*Id.* ¶ 12(ff)). Later, by e-mail, Hunter made arrangements for his co-defendants' visas and flights to Liberia execute

16

the murder plot.  (*Id.* ¶¶ 12(ii)-(kk)).

In light of the facts alleged in the Indictment, and which the Government will establish at trial, Hunter has not come close to establishing the type of "police over-involvement" in an investigation that might, at least in theory, warrant dismissal of the Indictment based on outrageous government conduct.  *See Rahman*, 189 F.3d at 131 ("Especially in view of the courts' well-established deference to the Government's choice of investigatory methods, the burden of establishing outrageous investigatory conduct is very heavy." (citations omitted)); *United States* v. *Tribble*, 320 F. App'x 85, 87 (2d Cir. 2009) ("Although the DEA concocted and executed an elaborate ruse by inviting the defendants to rob a stash house that did not in fact exist, we conclude that such conduct does not rise to the level of being 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused." (internal quotation marks omitted)).

While Hunter's motion to dismiss can and should be denied solely based on the Indictment and the sparse declarations submitted in support of his motion, Hunter's recorded statements to his co-defendants and the CSes further undermine his claim that he was the unjustified victim of an overzealous sting operation.  *See United States* v. *Davis*, 2014 WL 5758199, at *4 ("It is clear from the proffered evidence that, although the Government designed the initial plan, [the] [d]efendants undertook significant steps to arrange the details of the plan and to attempt to accomplish the goals of the conspiracy.").  During the March 8, 2013 meeting at the Phuket House, Hunter told his crew:

I used to do bonus work. . . . When we did it, we did it all.  We, we hand grenaded, threw

17

it, hand grenaded people's houses.  We ah . . . not kidnapped a guy, but we conned him to come with us.  We put him in the ocean, shot at him; he gave us the money back ah . . . assassinated people.  Ah, what else we did?  We smuggled gold.  We smuggled weapons.  Ah . . .  We took weapons from Jakarta to the Philippines on the ship.

(Ex. A at 4).[10]

Contrary to Hunter's assertion that he "had no choice" but to violate the law, Hunter described to his codefendants how he had advised previous contract killers that "[i]f you wanna quit, you quit."[11]  (Ex. A at 15; *see also id.* at 3 ("[W]hat you agree on is what you agree to do.  If . . . there is something new, they have to ask you.")).  Hunter described the killing of other people who purportedly worked for CW-1 in terms that did not convey fear, but rather pride:  "Dave got killed for stealing money. . . . and then I took his job. . . . I got promoted to his job.  [U/I].  That's the number one thing that will get you killed.  That one year, we killed nine people."  (*Id.* at 11).  Hunter assumed ownership of many of the same corrupt connections and resources that he now claims to have been so intimidating (*see* Hunter Decl. ¶ 11), boasting "*we* got police on the payroll" and "*we* have guys that work at the airport, so they can just put stuff in

---

[10]   In recounting how he "had to shoot a guy, but keep him alive," Hunter told the men "[i]t's easy to kill because they can't talk."  (Ex. A at 6).

[11]   Hunter provided his co-defendants with the following example: "We had guys that got paid for two months and never did anything.  And then gave them a mission and they didn't do it and left.  So they took two months pay and didn't do nothing.  [U/I]. . . . [S]o I asked [CW-1] I said, 'What do you want me to do? . . . I'll go kill 'em but you have to pay me for it.'  He said 'Nah, don't worry about it.'  I don't kill anyone unless I get paid.  He wasn't worried about it so those guys are still alive.  But the boss made that decision. . . ."  (Ex. A at 15).

your luggage or say they found it in your luggage." (Ex. A at 16-17 (emphases added)).[12]  With

regard to the false-arrest incident Hunter described in his declaration (*see* Hunter Decl. ¶ 10),

Hunter bragged to his co-defendants:  "*We* had the police waiting for him.  Police arrested him,

put him in prison.  He's still in prison in the Philippines." (Ex. A at 16 (emphasis added)).

Accordingly, Hunter has not demonstrated that the circumstances of this prosecution or the

underlying investigation rise to the level of a due process violation, there was no outrageous

government conduct, and his motion to dismiss should be denied.

## II.  The Search Warrant Affidavit Was Not Misleading

Hunter moves to suppress the fruits of a search of a hard drive (the "Hard Drive")

that contained recordings of the audio and video surveillance conducted by Thai law

enforcement in and around the Phuket House between approximately March and September of

2013.  The recordings were transmitted contemporaneously to the Hard Drive, which was located

in the Phuket House during the surveillance and seized by Thai officials on September 25, 2013.

The Hard Drive was provided to the DEA and searched in the United States pursuant to a search

warrant issued in this District on January 9, 2014 (the "Search Warrant").  Hunter challenges the

validity of the Search Warrant by arguing that the underlying application misstated or omitted

material facts.  For the reasons set forth below, the motion should be denied without a hearing.

---

[12]   Hunter also reassured his co-defendants:  "*We* hurt bad guys.  They know the business
they're in and they know they ripped off the boss [U/I]. They know what's happening." (Ex. A
at 17 (emphasis added)).

### A.  Relevant Facts

In early 2013, at the direction of the DEA, CW-1 arranged for some of the defendants to travel to the Phuket House, which CW-1 owned, in order to meet the purported Colombian drug traffickers (two of the CSes).  Before the defendants arrived at the Phuket House, Thai law enforcement agents installed security cameras at the Phuket House, which were purchased using DEA funds and capable of recording audio and video.  CW-1 consented to the installation, and Thai law enforcement informed the DEA that the installation was consistent with Thai law.  Thai law enforcement set up the equipment so that audio and video from the cameras was transmitted wirelessly to—and stored on—the Hard Drive, which was placed in the attic of the Phuket House.

Several times between March 8 and March 10, 2013, CS-1 and CS-2 met with one or more of Hunter, Gogel, Soborski, and Filter in the Phuket House.  In addition to the surveillance equipment installed by Thai law enforcement, the CSes wore audio and video recording devices while interacting with those defendants.  During the meetings, Hunter and the defendants discussed participating in drug-trafficking and other "bonus jobs," including acts of violence.  (*See generally* Ex. A).  On September 25, 2013, the defendants were arrested and Thai law enforcement conducted a search of the Phuket House.  Thai law enforcement seized the Hard Drive from the kitchen counter of the Phuket House and provided it to the DEA.

On January 9, 2014, the Honorable Sarah H. Netburn, Magistrate Judge, authorized a search of the Hard Drive based on the January 9, 2014 Affidavit and Application of DEA Special Agent James J. Stouch (the "Affidavit" or "Aff.").  (*See* Def. Mem. Ex. A).  The

Affidavit summarized the detailed Indictment, which was attached to the Affidavit and

incorporated by reference.  (Aff. ¶ 4).  The Affidavit noted that "[b]ecause [it was] being

submitted for the limited purpose of establishing probable cause to search the [Hard Drive], I

have not included herein the details of every aspect of this investigation."  (Aff. ¶ 2).  In a section

labeled "Probable Cause to Search the [Hard Drive]," the Affidavit described the DEA's use of

CW-1 in connection with the investigation.  (Aff. ¶ 7).  Specifically, the Affidavit stated that

Hunter had "collected resumes at [CW-1's] request," and that CW-1 had "asked" Hunter to "put

together a team that would be willing to do 'specialist jobs' . . . ."  (Aff. ¶ 8).  In addition, the

Affidavit summarized consensually recorded calls and e-mails between Hunter and the CW-1

Account regarding Hunter's efforts to set up the team, and Hunter's January 2013 recorded

meeting with CS-1 and CS-2 in Bangkok, Thailand (where those CSes purported to be

Colombian drug traffickers and Hunter gave the other defendants' resumes to the CSes).  (Aff.

¶¶ 8-11).  The Affidavit disclosed that CW-1 had been charged with a drug-trafficking offense,

began cooperating with law enforcement following his arrest in September 2012, and pleaded

guilty pursuant to a cooperation agreement.  (Aff. ¶ 7 & n.1).  The Affidavit also described CW-

1's prior criminal conduct, including:

> leadership of a long-running Internet pharmacy scheme (in violation of the federal
> drug misbranding laws, wire fraud, mail fraud, money laundering and other
> statutes); trafficking in controlled substances including but not limited to
> methamphetamine; procuring multiple murders; and multiple other serious
> criminal offenses.

(Aff. ¶ 7).

With respect to the surveillance, the Affidavit described the installation and use of

21

the cameras and the Hard Drive by Thai law enforcement, as well as information and recordings

that Special Agent Stouch obtained from the CSes—as opposed to the Hard Drive—regarding

meetings in the Phuket House between the CSes and the defendants during March 2013.  (Aff.

¶ 14).  For example, the Affidavit indicated that the CSes had told Hunter during a March 8,

2013 meeting in the Phuket House that Hunter and his co-conspirators could expect to see "a lot

of dope going back and forth, thousands of kilos," and Hunter confirmed that he had previously

done "bonus work" and had discussed "bonus jobs" with the other defendants.  (Aff. ¶ 15).

Special Agent Stouch also disclosed in the Affidavit that he had reviewed certain files that Thai

law enforcement downloaded remotely from the Hard Drive, and he asked that the Court not rely

on the content of those recordings in evaluating whether the Affidavit established probable cause

to search the Hard Drive.  (Aff. ¶ 16 n.5).

### B.  Applicable Law

A search warrant affidavit is presumed to be reliable.  *Franks* v. *Delaware*, 438

U.S. 154, 171 (1978).  "In certain circumstances, however, a defendant may challenge the

truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the

warrant and the resulting search or seizure."  *United States* v. *Awadallah*, 349 F.3d 42, 64 (2d

Cir. 2003).  "[T]he Fourth Amendment entitles a defendant to a hearing if he or she makes a

'substantial preliminary showing' that a deliberate falsehood or statement made with reckless

disregard for the truth was included in the warrant affidavit and the statement was necessary to

the judge's finding of probable cause."  *United States* v. *Falso*, 544 F.3d 110, 125 (2d Cir. 2008)

(quoting *Franks* v. *Delaware*, 438 U.S. at 155-56).  However, "the mere intent to exclude

22

information is insufficient." *Awadallah*, 349 F.3d at 67.  Thus, in order to prevail on a *Franks*

motion, the defendant must prove by a preponderance of the evidence that:  (i) the affiant

knowingly and deliberately, or with a reckless regard for the truth, made false statements or

omissions when applying for the warrant; and (ii) such statements or omissions were material to

the probable cause determination.  *See Franks* v. *Delaware*, 438 U.S. at 156; *United States* v.

*Awadallah*, 349 F.3d at 64.

        A misstatement or omission is material if it is "necessary to the [issuing] judge's

probable cause finding."  *United States* v. *Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (internal

citation and quotation marks omitted).  To determine if false information was necessary to the

probable cause determination, "a court should disregard the allegedly false statements and

determine whether the remaining portions of the affidavit would support probable cause to issue

the warrant."  *Id.* (internal citation and quotation marks omitted).  In determining whether there

is probable cause, the court's task is "simply to make a practical, common-sense decision

whether . . . there is a fair probability that contraband or evidence of a crime will be found in a

particular place."  *Illinois* v. *Gates*, 462 U.S. 213, 238 (1983).

## C.  Discussion

        The Affidavit established probable cause for the search because the Hard Drive

contained the results of surveillance of the Phuket House, where Hunter and his co-defendants

had discussed some of the crimes charged in the Indictment amongst themselves and with the

CSes.  Hunter has not established a basis for a *Franks* hearing, much less suppression.  He has

not even argued that the claimed inaccuracies and omissions in the Affidavit resulted from

deliberate falsehood or reckless disregard for the truth.  Moreover, assuming *arguendo* the accuracy of Hunter's five claims,[13] his arguments do not fatally undermine the probable cause to search the Hard Drive and are therefore immaterial.

Hunter first argues that the Affidavit omits the fact that CW-1 did not state explicitly to Hunter that the CSes were drug traffickers, and that Hunter was "informed of this fact at his first face to face meeting" with CS-1 and CS-2 in Bangkok in January 2013.  (Def. Mem. at 4).  The Affidavit does not suggest otherwise.  (*See* Aff. ¶¶ 10-11).  Moreover, Hunter's concession that the CSes discussed drug trafficking with him in January 2013 only supports the inference, reached by Judge Netburn, that the defendants had discussed similar topics with the CSes when they met in the Phuket House while being surveilled.  *E.g.*, *United States* v. *Marin-Buitrago*, 734 F.2d 889, 895 (2d Cir. 1984) ("Facts omitted from a warrant affidavit are not material unless they cast doubt on the existence of probable cause.").  Also immaterial are Hunter's claims that another individual "collected" and gave to Hunter "every single resume" submitted by the applicants for Hunter's team, and that CW-1 "rejected every applicant that was

_____

[13]  Although Hunter claims that there were "six (6) misstatements and omissions," he only identified five.  (Def. Mem. at 5).  Specifically, Hunter argues that the Affidavit:  (1) "fail[ed] to mention that Mr. Hunter was not told that" the CSes were purported drug traffickers until he met with the CSes; (2) omitted the identity of, and role played by, an associate of CW-1 who participated in the gathering of resumes submitted by individuals who wished to join the security team; (3) "fail[ed] to mention" that CW-1 "rejected every applicant that was [a] former law enforcement officer"; (4) stated incorrectly that the surveillance and search of the Phuket House by Thai officials was legal under Thai law; and (5) omitted prior criminal conduct by CW-1 and alleged threats by CW-1 to Hunter.  (Def. Mem. at 4-5).

24

[a] former law enforcement officer."[14]  (Def. Mem. at 4).  The Affidavit disclosed the proactive roles played by CW-1 and the CSes in the investigation, including that they "arranged for a meeting to take place in March 2013 in Phuket, Thailand, between the CSes, HUNTER, and prospective members of the security team – GOGEL, FILTER, and SOBORSKI."  (Aff. ¶ 13). Hunter's claim that he "did not make decisions as to who was in and who was out of the group" is not at odds with the information in the Affidavit and casts no doubt on the inference that the surveillance stored on the Hard Drive would reflect meetings between individuals who traveled to the Phuket House to discuss and participate in criminal conduct.  *See United States* v. *Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) ("Disregarding the allegedly false statements in [the] affidavit, the other evidence presented by the government amply supported a finding of probable cause.").  Therefore, no relief is warranted on the basis of these contentions.

Similarly deficient are Hunter's claims regarding the legality of the surveillance and the search of the Phuket House.  The Affidavit stated, in pertinent part:

> [CW-1] arranged for HUNTER and the prospective security team members to stay at a house in Phuket owned by [CW-1] (the "Phuket House") during their stay in Phuket.  Before the defendants arrived at the Phuket House, Thai law enforcement agents installed security cameras in the Phuket House pursuant to Thai legal authority.  The security cameras were purchased using DEA funds.
>
> [. . .]
>
> Thai law enforcement conducted a search of the Phuket House.  During the search, the [Hard Drive was] found on the kitchen counter of the Phuket House.

---

[14]   The Court need not address the veracity of these claims in order to resolve Hunter's pretrial motion, but the Government expects that the evidence at trial will demonstrate that neither of them is accurate.

(Aff. ¶¶ 14, 24). Defense counsel's unsworn claims regarding the basis for the search, without more, do not amount to the "substantial showing" required to warrant a *Franks* hearing. *See Franks*, 438 U.S. at 171 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."); *United States* v. *Falso*, 544 F.3d at 127 (affirming denial of *Franks* hearing where the defendant "made no offer of proof that the allegedly omitted 'facts' exist"). Special Agent Stouch reasonably relied on representations by Thai law enforcement, as well as the consent of CW-1, to conclude that the surveillance at the Phuket House was consistent with Thai law. *United States* v. *Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *58 (S.D.N.Y. Apr. 4, 2007) ("Where . . . a foreign agent represents to an American official that their activity is lawful, and the American reasonably relies on it, the exclusionary rule does not serve its purpose as a deterrent. . . . [R]equiring American law enforcement officials to make extensive pre-search inquiries about the legality of a foreign government official's conduct would be diplomatically delicate, to say the least." (internal quotation marks omitted)). And Judge Netburn was not required to address the legality of foreign surveillance performed by foreign law enforcement before resolving the application for a warrant to search the Hard Drive. *See United States* v. *Lee*, 723 F.3d 134, 139 (2d Cir. 2013) ("It is . . . well-established that the Fourth Amendment's exclusionary rule . . . generally does not apply to evidence obtained by searches abroad conducted by foreign officials."). Therefore, Hunter's arguments regarding the legality of the surveillance under Thai law do not present

26

issues that were material to the assessment of probable cause and lack sufficient record support

to require a hearing.

Finally, assuming for purposes of the motion that CW-1 had previously threatened

Hunter, the claim is not a basis for suppression of the search of the Hard Drive. The Affidavit

disclosed that CW-1's criminal history included "procuring multiple murders" and "multiple

other serious criminal offenses." (Aff. ¶ 7). Including in the Affidavit Hunter's claim that CW-1

had previously made "violent threats" against him would not negate the probable cause to search

the Hard Drive. *See United States* v. *Cromitie*, No 09 Cr. 558 (CM), 2010 WL 3025670, at *4

(S.D.N.Y. July 28, 2010) ("Defendants' reading of . . . [the] Affidavit is colored by the

defendants' belief that their prosecution is the product of, at best, government entrapment and,

worse still, outrageous government conduct."); *see also id.* at *6 ("When seeking a search

warrant or intercept order, the Government is not bound by the *Brady* doctrine." (internal

quotation marks omitted)). Moreover, even if CW-1's relationship with Hunter could somehow

negate the probable cause to believe that the Hard Drive contained evidence of *Hunter's* crimes,

the Affidavit still established probable cause to search the Hard Drive for evidence of the other

defendants' crimes. Accordingly, Hunter's last challenge to the Affidavit should also be

rejected.

In sum, because Hunter has not made a substantial showing that (i) the claimed

inaccuracies and omissions in the Affidavit resulted from deliberate falsehood or reckless

disregard for the truth; or (ii) any of the claimed inaccuracies and omissions were material to the

magistrate judge's finding of probable cause to search the Hard Drive, Hunter's motion should be denied without a *Franks* hearing.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the

defendant's pretrial motions should be denied in their entirety, without a hearing.

Dated: New York, New York
        January 30, 2015

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York


                        By:    _____/s/_____
                                        Michael D. Lockard
                                        Anna M. Skotko
                                        Emil J. Bove III
                                        Assistant United States Attorneys

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney, duly admitted to represent the United States before this Court, hereby certifies that on the below date, he caused The Government's Opposition To The Defendant's Pretrial Motions to be served on counsel for the defendants via ECF.

Dated:    New York, New York
          January 30, 2015

Respectfully submitted,

_____/s/_____

Emil J. Bove III
Assistant United States Attorney