UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                           :

UNITED STATES OF AMERICA

                                         :

          - v. –                       S7 13 Cr. 521 (LTS)

                                         :

JOSEPH MANUEL HUNTER,
  a/k/a "Frank Robinson,"          :
  a/k/a "Jim Riker,"
  a/k/a "Rambo,"                :

                       Defendant.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## GOVERNMENT'S SENTENCING MEMORANDUM


                                 PREET BHARARA
                                  United States Attorney for the
                                  Southern District of New York

Emil J. Bove III
Michael D. Lockard
    Assistant United States Attorneys,
    Of counsel

# **TABLE OF CONTENTS**

Page

BACKGROUND ........................................................................................................... 1

   A.  The Indictment ................................................................................................ 1

   B.  The Offense..................................................................................................... 3

         1.  Hunter Joins a Transnational Criminal Organization ........................... 3

         2.  Hunter's Assembly of a Mercenary Team of Former Soldiers ............. 3

         3.  Surveillance in Furtherance of Drug-Trafficking Activities in
             Koh Samui, Thailand ......................................................................... 6

         4.  Drug- and Weapons-Trafficking Negotiations in Mauritius ................ 7

         5.  Vamvakias Joins the Security Team .................................................. 8

         6.  Surveillance of a Purported 300-Kilogram Drug Flight From the Bahamas
             to the United States ........................................................................... 8

         7.  The Operation to Murder a DEA Agent and DEA Informant ............. 9

   C.  The Charges and Hunter's Guilty Plea .......................................................... 13

DISCUSSION ........................................................................................................... 14

   A.  The Applicable Law and Appropriate Sentence ............................................ 14

   B.  A Sentence Within the Applicable Guidelines Range Is Sufficient But Not Greater
      than Necessary to Serve the Purposes of Sentencing...................................... 16

   C.  The Defendant's Entrapment and Duress Arguments Are Meritless.............. 17

         1.  Applicable Law .................................................................................. 18

         2.  Discussion ......................................................................................... 19

   D.  The Defendant's Arguments Based on Posttraumatic Stress Disorder
      Do Not Warrant Leniency.............................................................................. 22

CONCLUSION ........................................................................................................... 24

The Government respectfully submits this memorandum in connection with the sentencing of the defendant, Joseph Manuel Hunter, a/k/a "Frank Robinson," a/k/a "Jim Riker," a/k/a "Rambo," scheduled for December 16, 2015, at 2:30 p.m.

## BACKGROUND

After participating in and orchestrating numerous acts of violence for a transnational criminal organization, including murders, shootings, and torture, Hunter participated in a plot to murder an agent of the Drug Enforcement Administration ("DEA") and a DEA informant. A former United States Army sergeant with over 20 years of military experience, Hunter demonstrated an extraordinary sophistication and capacity for violence as he exploited his military training to lead like-minded mercenaries and to satisfy his greed and thirst for violence. Hunter not only chose this life free from duress or coercion, he was proud of it. The recordings in this case reveal him boasting to his co-defendants about his violent resume without any sense of the abhorrent nature of his actions. He told them, "it's easy to kill." Based on the extraordinary nature of this offense conduct, the Government respectfully submits that a term of imprisonment within the applicable Guidelines range of 292 to 365 months' imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.[1]

### A. The Indictment

The indictment in this case arises out of an investigation conducted by the DEA of an international mercenary network of former military members, including former members of the United States armed forces, who are willing to hire themselves out to criminal organizations for unlawful security work and murders. In approximately 2009, Hunter became an employee and later a head of security of a transnational criminal organization. In that role, he participated in acts

---

[1] This range is based on the Court's prior sentencing rulings in this case and is below the Stipulated Guidelines Range of 360 months to life imprisonment in the parties' plea agreement, as well as the range of 324 to 405 months' imprisonment calculated by the Probation Office.

of violence, including torture and shootings, and he recruited and supervised mercenary hit squads. In late 2012, Hunter began organizing a security team for individuals that he believed to be representatives of a South American drug cartel in partnership with a Philippines-based criminal organization, but who were in fact confidential sources working at the direction and under the supervision of the DEA (the "CSes"). Hunter assembled a team that would be hired by the CSes to provide security for the purported drug cartel, conduct surveillance and counter-surveillance for drug meetings and the transportation of narcotics, and execute murders for hire. The members of the mercenary squad, assembled from former members of the United States, German, and Polish militaries, relocated to Thailand as the base of operations for their work, which included: surveilling a boat docked in Thailand that the defendants believed to be loaded with narcotics in March 2013; providing security for a meeting between the CSes and representatives of an actual drug trafficking organization in Mauritius in April 2013; performing countersurveillance for a meeting between the CSes and international weapons traffickers during the same time period; providing security for the loading and departure of a purported cocaine-laden airplane flying from the Bahamas to the United States in June 2013; and preparing for the murders of a DEA agent and a DEA informant in September 2013.

Hunter was arrested in September 2013 in Thailand. Defendants Timothy Vamvakias and Dennis Gogel, who were tasked with actually carrying out the murders, were arrested at the airport in Monrovia, Liberia, where the two men had flown in order to carry out the murders. Defendants Slawamir Soborski and Michael Filter were arrested in Estonia, where they had traveled in connection with another drug-related mission from the CSes.

### B. The Offense

#### 1. Hunter Joins a Transnational Criminal Organization

In late 2012, Hunter began soliciting résumés on behalf of the criminal organization for additional security personnel who would be willing to commit murders-for-hire – referred to as "bonus jobs" or "specialist jobs" because they paid extra money. Hunter screened numerous résumés, using his own military skills and violent experience to assess several of the candidates' qualifications. For example, Hunter wrote in an email in 2013 that two of his co-defendants, Soborski and Gogel, were "highly qualified individuals that will get alot of stuff done for us. They need to be kept no matter who the other guys choose."

In January 2013, Hunter met in Bangkok, Thailand, with the CSes, who purported to represent a South American drug cartel. (May 7, 2015 Presentence Investigation Report ("PSR") ¶ 26). Hunter described his military experience and boasted of his close relationship with the leader of the criminal organization:

> I tell him everything straight forward . . . because I don't want any doubt . . . especially with me . . . if the guys do something, I go directly to him and I tell him what happened . . . and then he tells me what he wants to be done . . . but I don't lie to him.
>
> We had a close relationship . . . and that's how I am with him . . . and that's why I'm still working with him.

#### 2. Hunter's Assembly of a Mercenary Team of Former Soldiers

In March 2013, Hunter assembled Soborski, Filter, and Gogel in Phuket, Thailand. In a discussion captured on March 8, 2013 by a security camera installed in the residence where the defendants met, Hunter told the security team that they would see "tons of cocaine" and "millions of dollars," and also have the opportunity to do "bonus work, that is, assassination" for which they would be paid $25,000, and "depending on the threat level, the price goes up." (PSR ¶ 29).

Hunter told the group that "most of the bonus work is up close . . . you don't get long-range shots." (PSR ¶ 29).

Hunter spoke at length during the meeting regarding his prior experiences working with the criminal organization. He told the group that he approached this work in the same way that he had approached military operations:

> It's just like a military mission. Right. This is a real shit. You know, you see everything. You see James Bond in the movie and you're saying, "Oh, I can do that." Well, you're gonna do it now. Everything you see, or you've thought about you're gonna do. It's, it's real and it's up to you. You know how the government says, "if you work through the government, ah, if you get in trouble we don't know you?" Same thing with this job. No different right? So, that's how it is. Same thing you do in the military except you're doing for these guys now? If you get caught in war, you get killed, right? Unless you surrender if they let you surrender or if you get you know, the same thing. This is--everything's just like you're in war enemy territory now. . . . This is real stuff. This is as high as it gets.

Hunter described in detail weapons trafficking, using grenades to conduct an attack, and shootings:

> I did it. I've done this and, uh, they already know, but I used to do bonus work. . . . When we did it, we did it all. . . . We, uh, not kidnapped a guy, but we conned him to come with us. We put him in the ocean, shot at him; he gave us the money back, uh, assassinated people. Uh, what else we did? We smuggled gold. We smuggled weapons. Uh, we took weapons from Jakarta to the Philippines on the ship.

> We've done everything. One time I went to . . . Sri Lanka to buy hand grenades. We have guys in Somalia buying weapons that are making an army. They were. They was making a army in Somalia because we were gonna invade an island, Maldives, just--you can't make it up. Not even in a movie. This is real stuff.

He elaborated on the organization's grenading of a residence:

> Chris, he did one mission. I told you he threw hand grenades in the house, right? Well, he had the car waiting on the highway which is very close to the house. Which is good and he went to the house. He climbed over the wall. It was at night time. He threw them in--the window--he did everything right. But, I said when I went to the house, like three days later to make sure it was done, um, 'cause the house next door had a guard, a uniformed guard.

Hunter described participating in the kidnapping of someone believed to have stolen from the organization, whom Hunter shot in the hand as a warning:

So . . . he pulled over.  I shot him in the hand.  We wrapped it up.  He drove me to the airport.  He went inside with me.  He had to have his hand in his shirt like this. . . . He waited 'til the plane left.  And then I was thinking, "Aw, man.  The plane is gonna turn around or they're gonna be waiting for me in South Africa."  You know?  But there's nothing I could do.  I'm just waiting.  I got to South Africa and left the airport.  He never told the police, but that was the hardest because he could have went to them.  If he told the police, you know, they're gonna arrest me, but he didn't so it worked.

That's probably--you know, that was the hardest thing.  It's easy to kill because they can't talk.  But when they can talk, you worry. . . .

Hunter also casually described two murders-for-hire that he orchestrated for the criminal

organization by supervising the two separate hit teams:

Another job we did was ah--there was a lady--she was a Customs agent.  I guess that they had some kind of business with him [*i.e.*, the leader of the organization], with her when they get stuff through Customs right?  But she didn't--they paid her and she didn't do it.

[. . .]

So they went back to the house, they, they shot her.  They didn't even go inside.  They shot her at the door.  Left her there, but it was raining that day so no, there was no people out and, um, they did it perfect, no problems.

Now . . . I . . . had . . . two other guys that wanted bonus work.  They did the job, but they did it sloppy and I fired them.  I sent them back home 'cause these guys . . . the same thing.  Another real estate agent and, um, when they was planning initially, they did the same thing.  They called her, said, "I wanna see houses," and they told--they came back.  They said, "Yeah, she's gonna meet, meet us and, uh, take us to show some houses."

I said, "O.K. guy, this is I how you do it."  I said, "Have her meet you at McDonald's."  They call it Jolly, like a Jo, Jollibee.  It's like McDonald's, right?  I said, "Have her meet you in the parking lot at Jollibee.  Get her into your car and take off so nobody saw you guys together.  Maybe a couple of people in the restaurant that they won't remember.  Right?"  I said, "As soon as she gets in the car, drive down the road."  I said, "Drive down the road maybe a quarter mile, a half kilometer.  Turn around and shoot her.  It's done.  Nobody saw anything."  They have a silencer, so [*unintelligible*], right?  "Just kill her in the car."  I said, "Take a blanket with you and wrap her up."  And then, just keep driving and find a place to dump her.

Before the meeting was concluded, Hunter encouraged the team to ask any questions they had about the work, because "tomorrow basically is your verbal contract so before you say yes, you get specific . . . ."  The following day, Hunter introduced each of Soborski, Gogel, and Filter to be further briefed about the activities of the organization and to ensure that they wanted to participate.

### 3. Surveillance in Furtherance of Drug-Trafficking Activities in Koh Samui, Thailand

During the March 2013 gathering in Phuket, one of the CSes told the team that they planned to use a boat to "bring a big load to China."  (PSR ¶ 31).  Hunter later explained that the job would entail "counter-surveillance" designed to determine, among other things, whether "the police know about the boat."  (PSR ¶ 32).

On March 20, 2013, Hunter provided a report regarding the status of the mission:

> Somewhere along the line, there has been misscommunication.  The guys have been in Pattaya looking for the boat as discussed with the clients.  They also told us it was renamed Cpt Fog and watch the Captain.  They could not find the boat and they contacted the Cpt today.  The Cpt is in PI, and says there is no boat in Pattaya.  He says Cpt Fog is in PI [*i.e.*, Philippines] and the moh mon tai is in [Koh Samui]. So, I have the guys waiting in Pattaya until you clarify the situation.

Between March 21 and March 26, 2013, Gogel, Filter, and Soborski conducted surveillance of the boat in Koh Samui.  (PSR ¶ 33).  On March 24, 2013, Hunter transmitted a report of the security team's activities:

> The guys are continuing to watch the boat.  No detection of any surveillance as of yet.  Have pictures of all the damages to the boat and repairs needed as per Captain.  There is no work being performed on the boat that they can see.  No one comes out of the cabin during the days.  The Captain is going to another boat everynight and picking up some guys and then they go out partying every night.  Believe the other guy is also South African also.  I need the money Western Unioned as per previous email to Michael Filter at Koh Samui as per previous email. Also, need to know how long you want them to stay there and continue to pull counter surveillance.

(PSR ¶ 33).  On March 28, 2013, Hunter provided photographs of the boat taken by the security team.

### 4. Drug- and Weapons-Trafficking Negotiations in Mauritius

On March 19, 2013, while the security team was conducting surveillance in Koh Samui, Hunter was directed via email to send members of the team to Mauritius in order to conduct "counter surveillance of several important meetings taking place." Hunter subsequently proposed an operational plan with a budget of approximately $15,000, including travel dates, accommodations, a request for international drivers licenses, and the need for a camera with a "telephoto lens[] that can reach 100 meters for facial recognition and plate numbers." Hunter was provided further details regarding the mission on March 28, 2013: one of the taskings involved "counter-surveillance" of weapons traffickers involved in "a deal for tools" (*i.e.*, weapons) and the other involved security at a meeting with "a different group (2 serbs) from south america regarding some product [*i.e.*, narcotics] we lost recently in the south pacific . . . ." (*See* PSR ¶ 34).

In April 2013, at Hunter's direction, Filter, Gogel, and Soborski traveled to Mauritius to complete the assignments. (PSR ¶ 35). In Mauritius, the CSes told the team that they would be providing security for meetings "involving armament" and drug trafficking negotiations and that the members of the team would have to "spy" on their counterparties. (PSR ¶ 35). On approximately April 12 and 13, 2013, Filter, Gogel, and Soborski provided security for meetings between the CSes and representatives of an actual international drug trafficking organization, while they discussed potential narcotics ventures. (PSR ¶ 36). Between approximately April 11 and 13, 2013, the three defendants also conducted surveillance of targets with whom the CSes would meet to discuss international arms trafficking, and provided counter-surveillance during the meetings. (PSR ¶ 37).

On April 14, 2013, Hunter reported: "The guys are back, held debriefing and pointed out some minor mistakes . . . . I will send you a slide show of some surveillance they did. So, you can see their work. Will also, send the written expense report. The clients took the receipts." (PSR

¶¶ 38-39).  Demonstrating his prior experience as a member of the organization as well as the bona fides of the participants in the meetings in Mauritius, Hunter observed in the same email that he "knew two of the guys there for the meetings."

### 5. Vamvakias Joins the Security Team

In March 2013, Hunter proposed that Vamvakias join the security team.  Vamvakias had already been working for the transnational criminal organization for some time, managing a large stash of illegal tramadol stored at a house in Texas and receiving a monthly salary of $7,500.  Hunter was instructed that Vamvakias would not receive a salary increase – to $10,000 per month – unless he, too, was willing to perform bonus work, *i.e*, contract murders.  In an email dated March 27, Hunter confirmed, "Tay [Vamvakias] will join the group here, he will do bonus work. . . ."  On May 6, after Vamvakias' arrival in Thailand, Hunter re-confirmed that "I told Tay previously that his salary would be 10K starting the 1ˢᵗ of May.  I thought I had cleared that with you in previous email.  He has confirmed that he will do bonus jobs."[2]

### 6. Surveillance of a Purported 300-Kilogram Drug Flight From the Bahamas to the United States

On May 18, 2013, Hunter, Vamvakias, Gogel, Filter, and Soborski met with the CSes in Thailand to discuss upcoming work for the purported drug cartel.  Hunter advised the CSes that Vamvakias knew "[a]bout bonus work.  He knows the game.  He's done it all for us."  (PSR ¶ 41).  One of the CSes explained, in Hunter's presence, that:

---

[2] Plans were made—pursuant to instructions conveyed to Vamvakias by Hunter—for Vamvakias to transfer responsibility for the illegal tramadol stash to another individual (taking care to avoid potential law enforcement scrutiny) so that Vamvakias could travel to Thailand to meet with the CSes and join the security team.  The tramadol stash ultimately was seized by DEA agents.  On August 18, 2014, tramadol became a controlled substance on Schedule IV to the Controlled Substance Act.  Prior to August 18, 2014, tramadol was not listed but its distribution was regulated by the Food, Drug, and Cosmetic Act.

we are not the kind of an organization or, or company that we kill people just for killing people. . . . You know, I mean, our company is, it's a very serious company, you know. But when we have to get someone, I mean, we have to do it because they deserve it.

[. . .]

. . . And of course, everything is going to be supervised . . . by Joe [Hunter].

The CSes informed the group that the next assignment would involve traveling to the Bahamas to provide surveillance for the loading and departure of a purported drug flight, represented to be transporting 300 kilograms of cocaine to the United States aboard a U.S.-registered private airplane. They also described an upcoming "bonus job" involving murder-for-hire of a "leak" in the organization. (PSR ¶ 42).

In an email sent on June 24, 2013, Hunter designated Vamvakias as the "mission leader" for the drug flight in the Bahamas. (PSR ¶ 45). Hunter remained in contact with Vamvakias while the team completed the mission, and reported via email on June 26, 2013: "Mission Complete." (*See* PSR ¶¶ 46-48).

### 7. The Operation to Murder a DEA Agent and DEA Informant

As Hunter and the security team prepared for the Bahamas drug flight, they also began to ready themselves for two contract murders. On May 6, 2013, after the Mauritius job was completed and Vamvakias joined the mercenary squad in Thailand, Hunter reported in an email that "[e]veryone is ready to go, just waiting further instructions. They also, really want a bonus job after this next mission, if available." (PSR ¶ 40).

On May 29, 2013, Hunter was informed in an email about the bonus job: it was represented that someone inside the purported drug cartel – a boat captain for maritime drug loads – was providing tips to the DEA, leading to drug seizures. Hunter was asked, "is this something your team can handle? or should i assign it to [another team]?" Hunter responded the next day: "My

guys will handle it. . . . Are you talking about both the Captain and the agent or just the Captain?" (PSR ¶ 43).  A day later, Hunter inquired again about the proposed murders-for-hire: "The guys are ready to visit the Captain.  Just, let me know when, how much does this op Pay?"  In a June 3, 2013 email, Hunter was informed: "both are a problem, both need to be handled informer is 200 000 and 500 000 for the agent will your guys handle both if not i will get another team to handle the more sensitive issue[.]"  The next day, Hunter responded: "They will handle both jobs.  They just need good tools [*i.e.*, weapons]. . . ."  In the same email, Hunter also asked about his own bonus for his role in the murders-for-hire: "What about me? Do I get a small bonus for this also?"  It was later confirmed that Hunter's compensation would be $100,000.

During a telephone call on June 12, 2013, Hunter identified Vamvakias and Gogel as the team that would conduct the murders.  Later in June, during a meeting at the hotel in the Bahamas after the drug flight surveillance, a CS provided Vamvakias with, among other things, photographs of the purported DEA informant and DEA agent and background information, including that the murder would take place in Liberia.  Vamvakias and Hunter later exchanged a series of Blackberry messages about the job, with Vamvakias providing this report: "[CS] is saying that all 4 of us are to be on this bonus.  My first question is whether our pay will be the same…..second is that our other two [Filter and Soborski] will not be able to handle this bonus bro…not a chance but I'll debrief you about everything when we return."

On July 1, 2013, Hunter presented an operational budget of approximately $23,600 for the murders, indicating that "[w]e still need more information on this bonus, [the CS] said he will come in a month for another briefing and have it."  On July 6, 2013, Hunter provided a "list of items needed" for the murders-for-hire, including:  "Two Submachine Guns with silencers (Mac 10, MP5, P90, MP7, something small)," "Two .22 pistols with Silencers (these are a must)," "One

308 Rifle with Scope and Case for it," "Two Level 3A Concealment Vests," and "Stolen License plates for both motorcycles and Cars." (PSR ¶ 52). Hunter elaborated further on his weapons request on July 16:

> A 1x4 20mm scope will be fine. 1x4 is good from close to mid distance. Silencers for all weapons will be needed. That's one for the .22s, one for the tactical weapons, and one for the rifle. EOtech sights for the ass[au]lt weapons would be great. If you can get a good assault rifle with a 1x4 scope it will probably be enough. Whatever rifle you get, it must have a picatin rail for the scope or it must have scope rings that will fit the rifle and scope that they get. Nothing else is needed that was not on the list.

On the same day, Gogel met with a CS in Thailand to discuss the murders. During the meeting, Gogel indicated that only he and Vamvakias would do the murders, rather than the full squad. On August 7, 2013, Hunter confirmed in an email, "There will be two guys for the bonus job."

On August 15, 2013, Hunter, Vamvakias, and Gogel met with the CS in Thailand to continue planning the murders-for-hire. (PSR ¶¶ 53-55). Although Hunter implemented several counter-surveillance measures—including causing the CS to be searched prior to the meeting, requiring the CS to take off all electronic devices, and insisting that the meeting take place outdoors—the CS was nevertheless able to audio record the meeting. The group reviewed purported surveillance photographs of the intended victims and discussed the detailed planning that the squad already had engaged in, including their communications plan, types of weapons, possible murder scenarios, disposal of weapons, possible counter-surveillance measures by the victims or by the DEA, how to enter the country without leaving evidence of their trip in passports or visa records, and extraction plans. For example, Hunter asked:

> Hunter: Now, for equipment recovery, do you want the stuff back? Or is it disposable? How do you . . .
>
> CS: Depends on the situation. If you can, I would like to have them back, for sure.

> Hunter: Okay. Well, I think what'll probably happen is they'll put it in a predetermined place.
>
> CS: Yeah. As soon as it's done.
>
> Hunter: And it'll be there and you can have somebody pick it up.
>
> CS: Well, what I would say, if I have to pick you guys up immediately after that, you can just leave with the gun, and we put everything in a plane, and we just fuck off.
>
> Hunter: Well, see, going from the kill zone to wherever . . .
>
> CS: Yeah.
>
> Hunter: . . . anything could happen.

(*See* PSR ¶ 57). Hunter confirmed during the meeting that "cars and motor bikes" as well sophisticated latex masks would be available for the job. (PSR ¶ 56). Hunter also explained that it would be ideal, from his perspective, to use an MP-7 rifle firearm to commit the murders: "If they can't get the MP-7 it'll be like a P-90. . . . Is the best, is the next best thing. Then probably MP-5. MP-5 is kind of big for that. So even a P-90 is kind of big." A CS provided the latex masks to Gogel the following day. (PSR ¶¶ 58-59).

On August 18, 2013, Hunter confirmed in an email that Vamvakias and Gogel were ready to conduct the murders: "Everyone is on standby for the next mission, and the two guys are waiting for the bonus job." In late-August 2013, as Hunter helped Vamvakias and Gogel prepare for the murders, he also directed Filter and Soborski to help provide security for a drug shipment in Asia and a personal security job in Estonia.

On September 25, 2013, Hunter was arrested in Thailand, Vamvakias and Gogel were arrested in Liberia after traveling there to carry out the murders, and Soborski and Filter were arrested in Estonia after traveling there to participate in the security mission.

### C.  The Charges and Hunter's Guilty Plea

On September 30, 2013, a federal grand jury sitting in this District returned a five-count indictment (the "Indictment") charging Hunter with: (1) conspiracy to import cocaine into the United States, in violation of Title 21, United States Code, Sections 963 and 959(c) (Count One); (2) conspiracy to murder a law enforcement agent and a person assisting a law enforcement agent, in violation of Title 18, United States Code, Sections 1117, 1114, and 3238 (Count Two); (3) conspiracy to kill a person to prevent communications to law enforcement agents, in violation of Title 18, United States Code, Sections 1512(k), (h), and (a)(1)(C) and 3238 (Count Three); and (4) conspiracy to possess a firearm in furtherance of a crime of violence, in violation of Title 18, United States Code, Sections 924(o) and 3238 (Count Four).

On February 13, 2015, Hunter pleaded guilty, pursuant to a plea agreement, to Counts One, Two, and Four of the Indictment.  The plea agreement included a stipulated total offense level of 42 and a Stipulated Guidelines Range of 360 months to life imprisonment.

## THE SENTENCING GUIDELINES

The Probation Office prepared a PSR calculating a total offense level of 41 and a Guidelines range of 324 to 405 months' imprisonment.  (PSR ¶ 138).  There are two principal differences between the Guidelines analysis in the PSR and the Stipulated Guidelines Range in the parties' plea agreement.  First, the Probation Office split Count Two into two groups, because there were two intended victims, based on a rationale consistent with the Court's reasoning at the sentencing of Gogel.  (*See* PSR ¶ 74).  Second, the Probation Office did not apply the special skill enhancement because of the applicable aggravating role adjustment, *see* U.S.S.G. § 3B1.3.[3]  Both

---

[3] While the special skill enhancement appears to be inapplicable under the Guidelines, there can be no reasonable dispute that Hunter brought his military training and experience—which he described in his sentencing submission as a "fairly detailed skill set" and "extensive knowledge and skills in military training tactics" (Def. Mem. at 6, 12)—to bear on his crimes.

of these applications appear to be consistent with the Court's rulings at other sentencings in this matter. In addition, the Court has previously ruled that, under the circumstances of this case, the two-level enhancement at U.S.S.G. § 2D1.1(b)(3)(A) does not apply.

If the Court adheres to these prior rulings, the following adjusted offense levels would result:

- Group One (Count One): 39[4]

- Group Two (Counts Two/Four – Intended Victim 1): 40

- Group Three (Counts Two/Four – Intended Victim 2): 40

Pursuant to U.S.S.G. § 3D1.4, three levels would be added to the highest adjusted offense level for a resulting level of 43. Following a three-level reduction for acceptance of responsibility, the total offense level would be 40, which would result in an advisory Guidelines range of 292 to 365 months. This is the same range now asserted by Hunter, albeit on different—and in several instances incorrect—bases. (*See* Def. Mem. at 5.)

## DISCUSSION

**A.      The Applicable Law and Appropriate Sentence**

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. at 264. As the Supreme Court explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable

---

[4] Although Hunter incorporates by reference an assertion that suggests he disagrees with Probation's conclusion regarding the applicable drug quantity for purposes of Count One, he stipulated to the same drug quantity in his plea agreement. (*See* Def. Mem. at 5; *id.* Ex. A ¶ 5).

Guidelines range," and that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall* v. *United States*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 128 S. Ct. at 596 n.6. Their

relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita*, 127 S. Ct. at 2464; *United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting *United States* v. *Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)). To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 128 S. Ct. at 597.

**B.** **A Sentence Within the Applicable Guidelines Range Is Sufficient But Not Greater than Necessary to Serve the Purposes of Sentencing**

A sentence within the applicable Guidelines range would be sufficient, but not greater than necessary, to comply with the purposes of sentencing. Hunter used the extensive military training and experience that he obtained from the U.S. government in an effort to facilitate large-scale drug trafficking and to orchestrate the murders of a DEA special agent and an informant whom he understood to be engaged in counter-narcotics operations.[5] Though the drug cartel and murders-for-hire in this case were investigative tools rather than the real thing, drug trafficking and violence—including violence against law enforcement and against those assisting criminal

---

[5] Defense counsel's arguments regarding purportedly "classified missions for the United States government" are speculative on their face, admittedly lacking in "direct proof," and, in any event, irrelevant. (Def. Mem. at 6, 7).

investigations—are very real problems. A significant sentence in this case would serve as a warning to those who would seek to profit from flooding the streets of this nation with illegal narcotics and who would perpetrate violence against law enforcement agents entrusted with the duty of protecting communities and against individuals assisting in criminal investigations.

Moreover, Hunter's personal characteristics are, on balance, aggravating. Before the DEA's sting investigation, he participated in actual murders, shootings, violent attacks, and torture. In his words, "[s]ame thing you do in the military except you're doing for these guys now." As a result of this violent history, Hunter is far more culpable, and dangerous, than Vamvakias and Gogel, each of whom the Court already sentenced to a 240-month term of imprisonment. Moreover, having agreed to murder individuals serving and assisting the government, Hunter is entitled to no leniency on the basis of the prior service that he used to develop the skills he later put to evil purposes. Accordingly, the Government respectfully submits that a sentence within the applicable Guidelines range is appropriate to reflect the nature of Hunter's crimes, to deter others from these kinds of conduct, and to protect the safety and security of witnesses in federal criminal investigations and federal law enforcement agents.

## C.     The Defendant's Entrapment and Duress Arguments Are Meritless

During Hunter's guilty plea, defense counsel informed the Court that he was unaware of a meritorious trial defense. (Feb. 13, 2015 Plea Transcript ("Plea Tr.") at 29). In the plea agreement, as counsel acknowledges, Hunter waived his ability to seek a downward departure on any basis, including duress. (*See* Def. Mem. at 18). Nevertheless, defense counsel argues in Hunter's sentencing submission that Hunter committed the crimes of conviction "under extreme duress," presumably as a consideration for a downward variance under Title 18, United States Code, Section 3553(a). (Def. Mem. at 18). Taking a similar tack, counsel argues that Hunter was

subject to "sentencing entrapment, imperfect entrapment, and/or sentencing manipulation." (Def. Mem. at 12). These claims are belied by the record and therefore meritless.

### 1. Applicable Law

Case law interpreting duress as a basis for a downward departure pursuant to U.S.S.G. § 5K2.12 is instructive with respective to the variance sought by Hunter. "Section 5K2.12 of the Guidelines permits a district court to depart downward from an applicable Guidelines range '[i]f the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense.'" *United States* v. *Cotto*, 347 F.3d 441, 446 (2d Cir. 2003) (quoting U.S.S.G. § 5K2.12)). "The Guidelines also provide, however, that duress is a discouraged basis for departure because it is 'not ordinarily relevant [to] whether a sentence should be outside the applicable guideline range.'" *Id.* (quoting then-operative version of U.S.S.G. § 5H1.3 & pt. H intro. cmt.)). "Thus, duress must be present to an 'exceptional degree' to warrant a downward departure." *Id.* (quoting *Koon* v. *United States*, 518 U.S. 81, 93-96 (1996)).

"Sentencing manipulation has been described as occurring when the government engages in improper conduct that has the effect of increasing the defendant's sentence." *United States* v. *Caban*, 173 F.3d 89, 93 n.1 (2d Cir. 1999) (internal quotation omitted). "Sentencing entrapment normally requires that a defendant convince the fact-finder that government agents induced her to commit an offense that she was not otherwise predisposed to commit." *Id.* (internal quotation omitted). "Some circuits have determined that imperfect entrapment, described as aggressive encouragement of wrongdoing, although not amounting to a complete defense, is a proper ground for downward departure at sentencing pursuant to U.S.S.G. § 5K2.12." *United States* v. *Bala*, 236 F.3d 87, 91 (2d Cir. 2002). These doctrines apply only under circumstances tantamount to "outrageous government conduct," and their status in this Circuit is an open question. *See United States* v. *Caban*, 173 F.3d at 93 n.1; *see also United States* v. *Gomez*, 103 F.3d 249 (2d Cir. 1996)

("[T]he validity of the concept of sentencing entrapment has not been determined in this Circuit, but . . . even where it has been approved in theory, its potential application has been limited to outrageous official conduct which overcomes the [defendant's] will." (internal quotations omitted)); *id.* at 256 (rejecting "sentencing manipulation" argument where "there was no outrageous government conduct").[6]

### 2. Discussion

Hunter was not "entrapped" during the course of this investigation in any respect, and his motive for participating in the drug-trafficking and murder-for-hire conspiracies in this case was financial rather than duress. Accordingly, no variance on these bases is warranted.

Hunter began to work for the criminal organization in approximately 2009. (PSR ¶ 70). He initially worked to support the organization's mining and gold operations, such as assisting in the purchase of gold and providing security for acquired gold in the Congo. Early on, Hunter understood that these operations involved some form of illegal activity, such as smuggling, money laundering, or tax evasion.[7] Hunter stopped working for the organization and returned to the

---

[6] The Guidelines also provide for the possibility of a downward departure where "in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent . . . ." U.S.S.G. § 2D1.1 app. n.27(A); *see also id.* app. n. 5. The defendant does not seek a departure or a variance on this basis.

[7]

United States in approximately 2010, and he suffered no harm for making that voluntary choice. However, in approximately 2011, Hunter left the United States again and agreed to manage the "security" operations of the organization, which he understood based on conversations with his employer would include murders for hire and other acts of violence. Purported duress did not stop Hunter from voluntarily leaving the organization in 2010, and Hunter was not coerced into returning to the organization a year later—he took the job because he wanted to make money.

Hunter's communications with the CSes, Soborski, Filter, and Gogel further illustrate the lack of duress that he faced. In January 2013, he told the CSes, in essence, that he had a close working relationship with the leader of the organization. In March 2013, he encouraged the members of the security team to ask of the CSes any questions that they wished about what the job required so that they could make an informed decision, as he had, regarding whether they wanted to participate. Hunter also recruited his own friend, Vamvakias, to the hit squad, which he would not have done if he feared for Vamvakias' safety. Through these and other activities, Hunter continuously showed independent thought and initiative in planning for the murders-for-hire rather than deferring to the organization's leaders. In short, in no aspect of the offenses did Hunter display any fear, reluctance, or duress, and defense counsel has not identified a single piece of evidence suggesting otherwise.

With respect to Hunter's predisposition to participate in the offenses of conviction, in March 2013, Hunter spoke truthfully in every statement that he made to his co-defendants about his past crimes. Prior to the onset of the DEA's sting operation, Hunter had participated in murders, shootings, violent attacks, torture, and weapons trafficking. He was tasked with organizing approximately seven murders-for-hire, and two of those murders were committed in the

Philippines by individuals he managed and directed.[8]  Thus, although defense counsel goes to great lengths in arguing that the leader of the organization was violent and dangerous, that was true in large part as a result of Hunter's efforts.  (*See* Def. Mem. 19-24).  Similarly, although Hunter now claims that he "had no-predisposition to possess, distribute, or possess with intent to distribute narcotics," he coordinated with Vamvakias and other members of the organization to maintain a stash of illegal tramadol in Texas.  (Def. Mem. at 14).[9]

In light of Hunter's prolonged violent, criminal affiliation with this organization, defense counsel strains credulity in comparing Hunter to the "previously innocent individual" in *United States* v. *Giles*, 768 F. Supp. 101, 103-04 (S.D.N.Y. 1991).  (Def. Mem. at 15).  And based on, among other things, Hunter's history of criminal activities, there is no foundation for the claim that the DEA's investigation involved entrapment or manipulation, much less outrageous government conduct.  *See United States* v. *Davis*, 57 F. Supp. 3d 363, 368 (S.D.N.Y. 2014) ("[A]lthough the Government designed the initial plan, Defendants undertook significant steps to arrange the details of the plan and to attempt to accomplish the goals of the conspiracy. . .  [M]erely creating the opportunity for a crime is insufficient to raise due process concerns." (internal citations omitted)); *see also United States* v. *Cromitie*, 727 F.3d 194, 219 (2d Cir. 2013) ("[G]overnment creation of the opportunity to commit an offense, even to the point of supplying defendants with materials essential to commit crimes, does not exceed due process limits.").  As the recorded meetings with the CSes make clear, Hunter did not require "aggressive encouragement of wrongdoing" on the

---

[8] One of the murders occurred in February 2012 and is described in Superseding Indictment S8 13 Cr. 521 (LTS).

[9] ███████████████████████████████████████████████████████████████

part of the DEA; he embraced the drug-trafficking and murder-for-hire activities that led to his conviction in this case based on greed.

Finally, there was no sentencing entrapment or manipulation with respect to the quantity of cocaine involved in the Bahamas operation. Indeed, it was Hunter himself who informed three of his co-defendants that they would be participating in the distribution of "tons of cocaine." (PSR ¶ 29). Accordingly, no downward variance is appropriate on the basis of the defendant's arguments regarding duress, imperfect entrapment, sentencing entrapment, or sentencing manipulation.

**D.     The Defendant's Arguments Based on Posttraumatic Stress Disorder Do Not Warrant Leniency**

Hunter also argues for a reduced sentence based on his purportedly suffering from posttraumatic stress disorder ("PTSD"). This argument is flawed for several reasons. First, the defense evaluation is unreliable because, as counsel now concedes, Hunter withheld significant information from the defense expert. (*See* Def. Mem. at 16 n.19).

Second, even if the defense evaluation were accepted at face value, Hunter has not established a connection between his psychological condition and his commission of the charged offenses. Here, too, the pertinent departure provision from the Guidelines is instructive. Specifically, Section 5K.2.13 of the Guidelines provides that a downward departure may be warranted if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense." As elucidated further in the Application Notes, the term "significantly reduced mental capacity" means that the defendant, although convicted, "has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is

wrongful." U.S.S.G. § 5K2.13 cmt. n.1. In order to qualify for the departure, the defendant must demonstrate both that he suffered from a "significantly reduced mental capacity" and that there is a "causal link between that reduced capacity and the commission of the charged offense." *United States* v. *Kim*, 313 F. Supp. 2d 295, 298 (S.D.N.Y. 2004). Hunter has not even attempted to make these showings. There is no basis in the defense expert's report to support a causal relationship between Hunter's psychological condition and his crimes, which involved careful long-term coordination with others in connection with the planning and carrying out of international murder-for-hire conspiracies and other crimes over extended periods of time.[10]

Finally, as described in the attached letter from the Bureau of Prisons ("BOP"), the BOP is prepared to treat—and is in fact treating—thousands of inmates with PTSD. (*See* Ex. A).

---

[10] In fact, Hunter represented to the Court at his change-of-plea hearing that PTSD did not inhibit his ability to think clearly. (*See* Plea Tr. at 4).

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence within the

applicable Guidelines range of 292 to 365 months' imprisonment would be sufficient but not

greater than necessary to comply with the purposes of sentencing.

Dated: New York, New York
      December 9, 2015

                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York

By:           */s/*
                    Emil J. Bove III
                    Michael D. Lockard
                    Assistant United States Attorneys
                    (212) 637-2444/2193

cc: Counsel of record (by ECF)

The undersigned attorney, duly admitted to practice before this Court, hereby certifies that on the below date, he/she served or caused to be served the following document(s) in the manner indicated:

**Government's Sentencing Memorandum**

Service via ECF:

    Marlon Kirton, Esq.
    Diane Ferrone, Esq.

Dated: New York, New York
       December 9, 2015

                    Respectfully submitted,

                    PREET BHARARA
                    United States Attorney for the
                    Southern District of New York

By:        */s/*
                    Michael D. Lockard
                    Assistant United States Attorney
                    (212) 637-2193