UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                              13 cr. 521 (LTS)

      - against -

JOSEPH HUNTER,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


### SENTENCING MEMORANDUM


MARLON G. KIRTON, ESQ
DIANE FERRONE, ESQ.
Attorneys for Defendant
JOSEPH HUNTER
230 Park Ave., Suite 1000
New York, New York 10169
(646) 435-5519 ph

1

## Marlon G. Kirton, P.C.

Marlon G. Kirton, Esq.

New York City:
230 Park Ave. Suite, 1000
New York, N.Y. 10169
Tel # (646) 435 - 5519
Fax # (212) 808 - 3020

Nassau County:
175 Fulton Ave. Suite 305
Hempstead, N.Y. 11550
Tel # (516) 833 - 5617
Fax # (516) 833 - 5620

September 29, 2015

VIA ELECTRONIC FILING

Hon. Laura Taylor Swain
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007

Re: *United States v. Joseph Hunter*, 13 cr. 521 (LTS)

Dear Judge Swain:

　　We represent Joseph Hunter in the above referenced matter. Mr. Hunter pled guilty and is scheduled to be sentenced on October 13, 2015.  The defense recommends a non guidelines sentence of ten (10) years.

## SENTENCING FACTORS

　　The United States Supreme Court in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), focused on sentencing factors that impact the defendant. *Apprendi* requires that, "any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury and

2

proved beyond a reasonable doubt." 530 U.S. at 490. The Supreme Court extended the logic of *Apprendi* in the landmark *Blakely* case. *Blakely v. Washington*, 124 S.Ct. 2531 (2004). The Court reviewed the constitutionality of a Washington State statute similar to the United States Sentencing Guidelines (U.S.S.G.). In *Blakely*, the trial court sentenced the defendant to more than three (3) years above the 53 month statutory maximum for his offense. The basis of the enhanced sentence was based on a finding made solely by a judge without input of the jury. *Blakely* held that the Washington State sentencing guidelines violated the defendant's Sixth Amendment right to a jury trial. The Court reasoned that the statutory maximum is any fact found by a jury or admitted by a defendant. However, *Blakely* did not expressly apply to the U.S.S.G. *Blakely, supra* at footnote 9.

The Supreme Court then applied its Sixth Amendment analysis to the U.S.S.G. *United States v. Booker*, 125 S.Ct. 738 (2005). In *Booker*, (also included is the companion case of *United States v. FanFan*) the Court applied the reasoning and holding of *Blakely* to the U.S.S.G. The Supreme Court held that a statutory maximum for purposes of the Sixth Amendment was any fact proved by a jury or admitted by a defendant. The Court reasoned that in order for the U.S.S.G. to be constitutional they had to be advisory rather than mandatory. 18 U.S.C. 3553(b) directs that the court, "shall impose a sentence of the kind and in the range" established by the Guidelines. *Booker, supra.* To the extent that this section of the statute was mandatory, the Court severed section 3553(b) and made the U.S.S.G. advisory rather than mandatory on federal judges. Furthermore, the Court also severed 18 U.S.C. 3742(e) as unconstitutional and held that the standard of review for appellate courts reviewing sentencing issues is "reasonableness." *Booker, supra.* Finally, Courts of Appeal were no longer entitled to review downward departures de novo,

the standard for review is reasonableness. *Booker, supra*.

The Second Circuit's first attempt at applying *Booker* came in *Crosby. United States v. Crosby*, 397 F.3d 103 (2nd Cir. 2005). In that case, the defendant plead guilty and was sentenced to ten(10) years. He appealed and the court had to decide whether or not his sentence was unreasonable in light of the *Booker* decision. The court remanded the case for the district court to apply the new standards in *Booker* but it gave guidance to that court as well as all district courts. It held that a district court must consider the U.S.S.G. when rendering a judgment. While acknowledging that the U.S.S.G. had become essentially advisory the court cautioned against returning to a pre-guidelines world of marked sentencing disparities. The Circuit gave a checklist for district courts to apply when implementing *Booker*, 1. The U.S.S.G. is no longer mandatory, 2. The district court must consider the U.S.S.G. as well as the other factors in section 3553(a), 3. The application of the U.S.S.G. will normally require determination of the applicable range for a particular case, 4. The district court after considering the U.S.S.G. and all of the applicable factors in section 3553(a) must decide whether to impose a guidelines sentence or a non-guidelines sentence and 5. The district court is entitled to find all of the facts appropriate for rendering either a guidelines or a non-guidelines sentence

## APPLICABLE GUIDELINES RANGE

Given the guidance of *Crosby*, it is necessary to determine the appropriate guidelines range for Mr. Hunter. Mr. Hunter pled guilty to Counts One (1), Two (2) and Four (4) of the indictment.[1] Count One (1) carries a maximum sentence of life, a minimum sentence of 10 years imprisonment, a minimum of 5 years supervised release up to life, a fine of up to $10,000,000

---

[1] Mr. Hunter pled guilty pursuant to a plea agreement.

and a $100 special assessment. Count Two (2) carries a maximum sentence of life imprisonment, a maximum of 5 years supervised release, a fine of up to $250,000 and a $100.00 special assessment. Count Four (4) carries a maximum of life imprisonment, a maximum of 5 years supervised release, a fine of up to $250,000 and a $100.00 special assessment. According to the Pre sentence report (PSR)[2], Mr. Hunter has a total offense level of 41 and a Criminal History Category of I. Therefore, his applicable guidelines range is 324-405 months. The defense filed objections to the (PSR) on May 1, 2015.[3] The defense suggested the applicable guidelines range is 292-365 months.[4] We rely on the points previously expressed in support of this position.

## NON GUIDELINES SENTENCE

Mr. Hunter faces a guidelines sentence of 292-365 months. The defense argues for a non guidelines sentence of ten (10) years.

## FACTORS UNDER 18 U.S.C. 3553(a)

District courts may consider a number of factors when rendering a sentence including: 1. The history and characteristics of the defendant 3553(a)(1), 2. To protect the public from future crimes of the defendant 3553(a)(2)( C ), and 3. Any pertinent policy statement 3553(a)(5).

## HISTORY AND CHARACTERISTICS OF DEFENDANT

### POST TRAUMATIC STRESS DISORDER

Mr. Hunter has been diagnosed with Post Traumatic Stress Disorder (PTSD) by defense

---

[2]PSR pp. 7-9.

[3]Exhibit A.  Defense objections to the PSR.

[4]Exhibit A, p. 3.

psychiatrist Dr. Neil Blumberg.[5] Mr. Hunter served in the United States Army for 20 years. He was honorably discharged in July of 2004 at a rank of Sergeant First Class. Afterwards, he spent several years in Iraq while working for private security firms. *PSR paragraphs 130-131.* This occurred during the U.S. led invasion of Iraq that started in 2003. Mr. Hunter experienced a number of traumatic events during his military service.

First, the defense believes that Mr. Hunter participated in classified missions for the United States government for up to five (5) years. This combat trauma was a contributing factor to Dr. Blumberg's diagnosis of PTSD. Mr. Hunter never divulged any information either directly or indirectly to confirm such information. However, Mr. Hunter has a fairly detailed skill set that makes him uniquely qualified to act in that capacity. He is fluent in Spanish and his wife, Diana, is originally from Panama. Mr. Hunter has a number of glowing commendations regarding his capacity to lead other men.[6] The defense has personally spoken with several persons that served with him, in the Army, and they confirmed that Mr. Hunter was an excellent soldier and a leader. He was stationed at Fort Buchanan, Puerto Rico from 1999-2004.[7] Mr. Hunter claimed to be, " a special reaction team commander, serving high risk warrants, (doing) law enforcement training and providing security for doctors and nurses in the region."[8] This appears to be a cover story. We have never heard of United States military personnel serving warrants and protecting civilian personnel in this manner. Surely the FBI, DEA and ATF all have highly mobile, highly trained

---

[5]Exhibit B.

[6]Exhibit D-Military Records.

[7]Exhibit D.

[8]Exhibit B.

and heavily armed personnel to effectuate warrants and make arrests. Mr. Hunter was arrested by the DEA in Thailand by highly trained, highly mobile and heavily armed personnel. They worked with local Royal Thai police to effectuate the arrest of a highly trained U.S. soldier for a conspiracy to murder charge. We are not aware of them using United States military personnel to assist them in this case. Given Mr. Hunter's skill set, fluency in Spanish and his general familiarity with South and Central America, he would make an ideal candidate for classified missions involving a small group of highly trained, heavily armed and mobile troops. Finally, Mr. Hunter was diagnosed with onchocerciasis, otherwise known as river blindness.[9]  This condition is mostly found in Sub Saharan Africa and portions of the Middle East.[10]  However the condition does exists in parts of Central and South America.[11]  Mr. Hunter never visited Africa or the Middle East prior to 2004. The defense has found no literature that suggests that this condition is common to Puerto Rico. This condition is a tropical disease transmitted by the repeated biting of blackflies.[12]  The flies leave a parasite that may lead to blindness if it is untreated.[13]  The defense has no direct proof of his involvement in any classified missions. Mr. Hunter, if he were ever involved, would never tell anyone. However, the defense believes, based on circumstantial evidence,  he was involved for up to five (5) years in these operations. These situations most certainty created the battlefield trauma that directly contributed to his present

---

[9]Exhibit F.-Medical Records.

[10] www.cdc.gov/parasites/onchocercias

[11] *See id.*

[12] *See id.*

[13] *See id.*

diagnosis of PTSD.

Second, in May of 1986, his friend, Michael Rudess was killed in a live fire exercise.[14] Mr. Hunter was in the Army Rangers at the time. He was traumatized by the incident and it led to him getting a medical discharge from the Ranger Battalion shortly thereafter. This is another traumatic incident that was likely a contributing factor to his current diagnosis of PTSD.

Third, between 1994 and 1997, he worked as a drill instructor while stationed at Fort Knox, Kentucky. Mr. Hunter was tasked with molding the lives of basic training recruits. It was a very stressful position. He was up by 3:45 a.m. and worked until 10:00 p.m. He spent a significant amount of time standing and yelling. His wife, Diana, noted that there was a significant change in their marriage during this period. *PSR paragraph 117.* He became irritable short tempered and moody. This was also confirmed by his sons during the defense interview of his sons. He was short tempered and exhibited explosive anger at them during this period of time. This tour created a significant amount of service related stress that was likely a contributing factor to his current diagnosis of PTSD.

Fourth, Mr. Hunter served as a private security specialists for two (2) years during Operation Iraqi Freedom. He worked for DynCorp from January 2006 to May 2008. PSR paragraph 131. He worked for Triple Canopy from October 2008 to May 2009. *PSR paragraph 130.* His job included collecting biometric information for those entering and leaving the "Green Zone" in Baghdad. Furthermore, he was a site security supervisor at the U.S. Embassy in Baghdad. He was tasked with helping to safe guard employees of the U.S. State Department. He also investigated in investigated suicide bombings. During this time he experienced significant

---

[14]Exhibit E- News Article.

combat related trauma. His section was subjected to regular mortar fire, sniper fire and suicide bombings. He developed restlessness, was sleep deprived and became startled easily by loud noises. These are classic symptoms of combat related PTSD. This tour created a significant amount combat related stress that was a likely contributing factor to his current diagnosis of PTSD.

## THE BUREAU OF PRISONS NOT PREPARED TO TREAT PRISONERS SUFFERING FROM COMBAT RELATED PTSD.

The Bureau of Prisons (BOP) is not prepared to treat combat veterans diagnosed with PTSD. *United States v. Allen Morgan*, 13 cr. 390 (KOB) (PWG)(N.D. Alabama (2014); *United States v. Kevin Erickson*, 10 cr. 0006-01 (REP)(E.D. Virginia) 2011. Mr. Hunter has been diagnosed with PTSD and is going to spend the next decade or more in a federal prison because of his guilty plea. The defense has argued that the Veteran's Administration offers a dedicated protocol for Veterans suffering from PTSD. *Defense letter, dated October 29, 2014, PACER #89.* The defense moves to clarify that statement. The Veterans Administration offers a dedicated protocol for veterans suffering from combat related PTSD that is not offered in the BOP. The VA offers over 200 PTSD treatment programs throughout the country. *PACER #89.* The VA has PTSD specialists on staff to deal with these issues. Each PTSD program offers education, evaluation and treatment. Program services include 1. One to One mental health assessment and testing, 2. Medications, 3. One to one psychotherapy and family therapy, 4. Group therapy (covers topics such as anger and stress and combat support, partners, etc or groups for **veterans of specific conflicts or specific traumas.** *PACER #89.* The BOP has no persons dedicated or trained in treating veterans suffering from PTSD. They offer no counseling for family members

or group therapy with other PTSD afflicted persons. They offer no therapy that is able to distinguish among different combat situations. *PACER #89, Morgan, supra, Erickson, supra.*

The defense requests that Mr. Hunter serve his sentence at Federal Medical Center (FMC) located in Lexington, Kentucky. It is close to Mr. Hunter's home in Owensboro, Kentucky. This will help facilitate visits from Mr. Hunter's family. He has two (2) close relatives that live in Louisville and the balance of his family live in Owensboro. FMC Lexington is located two (2) miles from the Lexington VA Medical Center. This hospital is a Veterans Administration Hospital that offers treatment for veterans suffering from PTSD.[15]  The defense requests that Mr. Hunter receive dedicated PTSD treatment at the Lexington VA Medical Center during his incarceration at FMC Lexington.

## MILITARY HISTORY[16]

Joseph Hunter was a member of the United States Army for 20 years nine months and 27 days. He enlisted in 1983 and was honorably discharged at the rank of Sergeant First Class in July of 2004. During his time in the military he attended and graduated from Columbia College with a Bachelor of Arts Degree. He was a PV1 in October of 1983. He was a PV2 in March of 1984. He was a PFC in September of 1984. He was a SP4 in May of 1985. He was a SGT in October of 1987. He was a SSG in July of 1989. Finally he attained the rank of a SFC in February of 1994. He served four (4) overseas assignments. He was stationed in Germany from January 1984 to January of 1986. (24 months) He was stationed in Panama from February 1990

---

[15] www.lexington.va.gov.

[16] Exhibit D.

10

to August of 1991. (18 months) He was stationed in Panama again from February 1997 to May of 1999. (27 months) Finally, he was stationed in Puerto Rico from May of 1999 to June of 2004. (45 months). Mr. Hunter attended 16 different training courses during his time in the Army. Some of these included , jumpmaster school, Drill Sergeant school and special reaction training. Cite. At various times,  he was stationed at Fort Benning, Fort Buchanan, Fort Clayton, Fort Kobe, Fort Knox and Fort Bragg.

## MEDICAL HISTORY[17]

Mr. Hunter suffers from a number of ongoing ailments.  He suffers from hypertension.  He was diagnosed by the military in with this condition and received medication. He also suffers from a severe acid reflux condition. This condition was a complication from an auto accident. Mr. Hunter was involved in a serious car accident in Germany where he was stationed. The accident occurred on May 4, 1085 and he was not released from the hospital until June 10, 1985. He almost lost his life. Mr. Hunter blacked out after the accident and has little to no memory of the accident. Somehow he survived. However, his intestines and colon still do not operate properly and he suffers from severe acid reflux. He had to have surgery in 1994 in order to deal with this issue. He still suffers from related complications. Finally, he was diagnosed with onchocerciasis. Mr. Hunter was stationed in Panama twice and Puerto Rico once. It is likely that he contracted this ailment while serving overseas.

## AWARDS AND COMMENDATIONS[18]

Mr. Hunter received many awards and decorations during his service in the military. Some

---

[17] Exhibit F

[18] Exhibit G- Military and Other Awards.

of his most prominent accomplishments include, but are not limited to: medals for commendation and meritorious service; as well as a plethora of badges, pins and diplomas that exemplify his progressive growth in military ranking. Mr. Hunter's extensive knowledge and skills in military training tactics have also been recognized by numerous certifications; one of which was presented by President George W. Bush. Essentially, Joseph Hunter's involvement in the military has bestowed tenacious patriotism, educational benefits; of which he used to his greatest advantage, and distinguished training. Mr. Hunter has no record of receiving institutional discipline. It is rare for someone to serve for 20 years in the military and not receive a single infraction. Mr. Hunter also received an award from his home state of Kentucky, called the Kentucky Colonel. It is one of the highest awards bestowed in the state of Kentucky. He also received a National Defense Services Medal and a Global War on Terrorism Medal.

## SENTENCING ENTRAPMENT

We respectfully submit that the facts and circumstances of the instant case support a sentencing variance based on sentencing entrapment, imperfect entrapment and/or sentencing manipulation.

Sentencing manipulation or entrapment may "lie where the government engages in 'outrageous' conduct." *United States v. Oliveras*, 359 Fed. Appx. 257, 261 (2d Cir. 2010) (citations omitted). Imperfect entrapment is generally described as aggressive encouragement of wrongdoing. *See United States v. Bala*, 236 F.3d 87, 91 (2d Cir. 2000).

While U.S.S.G. Section 5K2.12, "Coercion and Duress," is addressed in detail above, Courts have also relied on this provision to reduce a sentence for imperfect entrapment. *See*

*United States v. Oliveras*, 798 F. Supp. 2d 319, 335 (S.D.N.Y. 2011) (Batts, J.), *vacated and remanded on other grounds*, 493 Fed. Appx. 145 (2d Cir. 2012). In *Oliveras*, the Court also noted that such a departure is "keyed" to Section 3553(a):

> In effect, § 5K2.12 reflects the sense that a defendant who is encouraged by the government to commit other crimes is less blameworthy than a defendant not so encouraged, and indeed, less likely to commit other crimes. As such it is not merely a Guidelines departure ground; it is keyed to the statutory purposes—just deserts (because he is less blameworthy), and the likelihood of recidivism (because he is not likely to reoffend with guns). 18 U.S.C. § 3553(a).

*Id.* (granting departure where there was "nothing to suggest that [defendant] would have been involved in this conduct had it not been for the [confidential witness'] encouragement and solicitation").

While we recognize that the Second Circuit has not "embraced" either sentencing entrapment or manipulation, the Court has also not rejected the doctrines. *See United States v. Floyd*, 375 Fed. Appx. 88, 90 (2d Cir. 2010) (analyzing and ultimately rejecting defendant's sentencing entrapment or manipulation challenge where prior to the government arranging for defendant to purchase an amount of drugs to trigger the ten-year mandatory minimum, the defendant had already sold informant enough drugs to trigger the five-year mandatory minimum). The Second Circuit has recognized the related concept of imperfect entrapment. *See United States v. Bala*, 236 F.3d 87, 92 (2d Cir. 2000) ("[w]e can find nothing in the guidelines to prohibit a district court from considering conduct by the government that does not give rise to an entrapment defense but that is nonetheless "aggressive encouragement of wrongdoing.").

Mr. Hunter currently faces a mandatory minimum of ten years imprisonment pursuant to Count One, 21 U.S.C. §§ 963, 959( c ). Mr. Hunter has no previous involvement with narcotics. Prior to the instant case, Mr. Hunter had no pre-disposition to possess, distribute or possess with intent to distribute narcotics. Rather, as part of its string operation, the Drug Enforcement Agency, through its cooperating witness (Le Roux) and confidential sources, injected the entire notion of working for a narcotics organization, including surveillance of a plane allegedly bringing narcotics to the United States. While the PSR indicates that the drug amount attributable to the offense is between 150 and 450 kilograms, see PSR paragraph 67, it is noteworthy that Mr. Hunter was in Thailand, not the Caribbean, where the narcotics on the plane were located. He was not surveilling the plane and never had knowledge of the specific amount of drugs on the plane. As stated in his plea allocution, Mr. Hunter pled guilty to conspiracy to distribute five or more kilograms of cocaine.

With respect to Count Two, conspiracy to murder a law enforcement officer and a person assisting a law enforcement agent, as with the narcotics, this entire concept was inserted by the government, during the time Le Roux was cooperating. As he had been his entire time working for Le Roux, Mr. Hunter was acting at the direction of Le Roux, who in turn was being directed by the DEA. *It was the DEA who injected the notion of killing a federal agent.* The Government used a dangerous, murdering madman – Le Roux – to ensnare Mr. Hunter in a conspiracy to murder a federal agent is certainly outrageous conduct, and at a minimum, aggressive encouragement of wrongdoing. *See Bala,* 236 F.3d at 92. The bad acts of Le Roux, described above, demonstrate the real threat he presented to those around him. In using Le Roux to plant the seed of murdering a federal agent is nothing short of "aggressive encouragement of

14

wrongdoing." *Id.*; *see also United States v. Giles*, 768 F. Supp. 101, 103-4 (S.D.N.Y. 1991) (holding that "the vice in permitting Malina, *a convicted felon*, to use his prior personal relationship and knowledge of Giles' difficulties to involve a previously innocent individual in a criminal scheme *and thereby obtain a reduction in his own sentence at virtually no risk to himself* is an appropriate sentencing consideration even though it does not rise to the level of a defense to the crime") (emphasis added).

Accordingly, we respectfully submit that the outrageous government conduct and aggressive encouragement of wrongdoing, support a reduced sentence based on sentencing entrapment, imperfect entrapment and/or sentencing manipulation. Indeed, the unique circumstances presented by this case – specifically, the manner in which Mr. Hunter was set up for these crimes by the government's murdering, sociopath cooperating witness – involve mitigating factors "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b)(1).







## DURESS

Had this case gone to trial, the defense would have requested that the Court charge the jury on the issue of duress. The defendant has the burden of proving duress by a preponderance of the evidence. *Dixon v. United States, 126 S.Ct. 2437 (2006).* The United States Supreme Court, in *Dixon* accepted the elements outlined by the 5th Circuit without expressly adopting the elements themselves. *Dixon, supra at 2240, footnote 2.* (*Citing United States v. Harper, 802 F.2d 115 (5th Cir. 1986).* The elements were as follows: 1. The defendant was under an unlawful and

imminent threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury, 2. The defendant had not recklessly or negligently placed herself in a situation in which it was probable that she would be forced to perform the criminal conduct, 3. The defendant had no reasonable, legal alternative to violating the law, that is, a chance both to refuse to perform the criminal act and also to avoid the threatened harm and 4. That a direct casual relationship may be reasonably anticipated between the criminal act and the avoidance of the threatened harm. *Dixon, supra at 2240, footnote 2.*

Upon a proper request, a defendant is entitled to a jury instruction on any defense theory for which there is a foundation in the evidence. *United States v. Paul, 110 F.3d 869 (2nd Cir. 1997); United States v. Kwong. 69 F.3d 663 (2nd Cir. 1995)* This is true even if the trial court believes the defense theory is tenuous. *See, United States v. Hurtado, 47 F.3d 577 ( 2nd Cir. 1995).* Nevertheless, district courts are given the latitude to hold evidentiary hearings in order to determine the issue as a matter of law. *United States v. Bakhtiari, 913 F.2d 1053 (2nd Cir. 1990) (citing United States v. Bailey, 444 US 394 (1979).* However, in the case at bar, the defendant plead guilty pursuant to a plea agreement. The plea agreement precludes either party from requesting a downward departure. If permitted, The defense would have requested a four (4) level downward departure for duress pursuant to U.S.S.G. 5K2.12. Nevertheless, this court may consider evidence of duress as a sentencing factor pursuant to 18 USC 3553 (a).

Joseph Hunter committed the acts in this case under extreme duress. Mr. Hunter was threatened with death by his boss Paul Calder Le Roux.  Mr. Le Roux is a white Zimbabwean with South African citizenship. He also now has Australian citizenship. Based on our

investigation, Mr. Le Roux was born and raised in Bulawayo, Zimbabwe. Mr. Le Roux has both legitimate and illegitimate business interests. Mr. Le Roux was Mr. Hunter's boss in Thailand and the Philippines. Mr. Le Roux hired Mr. Hunter to provide him with a private security team for himself and his business interests all over the world. Mr. Hunter worked for Mr. Le Roux during the time of this conspiracy. We have reason to believe Mr. Le Roux is now cooperating with the Government. We believe Mr. Le Roux used force threats and intimidation against Mr. Hunter at almost every stage of their association together. Le Roux was involved in international narcotics trafficking, illegal firearms trafficking, the raising of private militias to destabilize regimes, bribery of government officials, pornography, illegal trafficking of prescription pills and murder.  Mr. Le Roux murdered at least two (2) former associates because they did not follow through with his orders or he believed that they stole from him. He also had at least one (1) person falsely accused and prosecuted in the Philippines because they had a falling out of some kind. During our investigation, Mr. Le Roux was described to us as "Viktor Bout on steroids ."[21]

## PAUL CALDER LE ROUX  IS DANGEROUS

Furthermore, Mr. Le Roux has a habit of threatening and killing his confederates. I have conferred with attorney Joseph Friedberg the attorney for one Moran Oz. Mr. Oz is charged in a federal indictment pending in the District of Minnesota named *United States v. Alon Berkman*, 13 cr. 273 (SRN/JJK). Mr. Le Roux owned an illegal online pharmacy. Mr. Berkman was an employee of Mr. Le Roux. The indictment states that the business had revenues of over $200 million dollars annually. Mr. Leroux was the owner of the firm. Mr. Oz and others made about

---

[21]New York Times. December 21, 2014. " A Soldier of Misfortune", by Alan Feuer.

$100,000 annually.[22]  Mr. Le Roux was arrested by the DEA in 2012.  *NYT, 12/21/14.* He started cooperating against Mr. Hunter and others including Mr. Oz. *NYT, 12/21/14.* Mr. Le Roux threatened his employees in that firm. *Attorney Affidavit.* Mr. Le Roux called Mr. Oz and another co-defendant on behalf of the DEA. He was successful in "setting them up" and they were ultimately arrested as a direct result of Mr. Le Roux's cooperation. *Attorney Affidavit.* The affidavit reads in part,

> "Mr. Leroux tried to minimize the number of people who met with him. As a result, he refused to let his employees leave their positions. He told employees that no one could leave the business and made repeated reference to the fact that he "makes people disappear." One employee was threatened at gunpoint when he indicated an intention to resign. On a third occasion, Leroux gave an employee a photograph of the employee's parents who live in another country. "I can get them," Leroux told the employee." *Attorney Affidavit.*

The defense has had the occasion to speak with a number of persons who have information concerning Mr. Le Roux's dangerousness. One such person is Julian Rademeyer. Mr. Rademayer is a South African journalist who focuses on matters primarily in Southern Africa. He offers a unique perspective on Mr. Le Roux.

First, he directed us to the United Nations (U.N.) Report that mentioned Paul Calder Le Roux. A sub committee (The Monitoring Group, hereinafter TMG) of the U.N. wrote a memorandum to the U.N. Security Counsel concerning Somalia and Eritrea. The memorandum is dated July 18, 2011.[23] The memorandum is a report of the regimen of economic sanctions levied by the U.N. Security Council against Eritrea and against a number of groups an individuals in Somalia. At the time Somalia was in the midst to a civil war. *U.N. report.* Large swaths of the

---

[22] Exhibit I- Attorney Affidavit.
[23] Exhibit J- U.N. Report.

country were controlled by the terrorist group Al-Shabaab. Somalia had a transitional Government named The Transitional Federal Government of Somalia. *U.N. report.* Other parts of the country were controlled by a number of tribal clans. Most clans were allied with the transitional government and some were aligned with Al-Shabaab. *U.N. report.* At the same time, the African Union had a multinational peace keeping force inside of Somalia. There was also a great deal of piracy emanating from Somalia in the Red sea the Gulf of Aden and other areas. Finally both Ethiopia and Eritrea were backing various factions within Somalia as proxies in their ongoing border disputes. *U.N. report.* In this chaos emerged a number of private security companies. These companies were hired by various interests for protection in and around Somalia. The TMG was concerned about these groups because they often operated with no standards or accountability. *U.N. report.* In many instances they operated in violation of U.N. sanctions.  The report says in part:

"The burgeoning engagement in Somalia of private security companies whether to deter pirates or to provide security by land is of growing concern. The private security sector lacks a robust regulation framework and the operating practices of many private security companies are opaque. TMG believes that at least two such entities have committed significant violations of the arms embargo by engaging in unauthorized training and equipping of Somalia militias one with the intention of trafficking in arms and narcotic drugs." (U.N. report, p 267).

One of those companies was Southern Ace, Ltd. Southern Ace was set up by Edgar Van Tonder and run by Erwin Bockstaele. *U.N. report, p 267.* However, the TMG believes that the true owner and silent partner was Paul Calder Le Roux.[24] Southern Ace raised an equipped a

---

[24]The defense has learned from a South African investigator, a source in Zimbabwe  and other sources that Edgar Van Tonder is a native South African originally from Nelspruit. He never actually owned anything of value and most likely died in 2012. He was a front man for Paul Le Roux. Paul Calder Le Roux was born in Bulawayo, Zimbabwe but grew up in Nelspruit, South Africa with his adoptive parents. Erwin Bockstaele is an associate of Mr. Le Roux and is

force of 220 Somalis mostly from the Haber Gidir clan. These militia was armed with Kalashnikov rifles, heavy machine guns, rocket propelled grenades launchers and 2000 rounds of ammunition. In support of this "army" Southern Ace provided trucks with mounted machine guns, two (2) trucks with aircraft machine guns and bullet proof vests. They were also supervised by Zimbabweans. Southern Ace and it's local affiliate started cultivating narcotics in Somalia for resale elsewhere. TMG interviewed the local affiliate leader nicknamed "Ottavio". He admitted that in support of the drug trade, he purchased opium, coca and cannabis. It was believed this initial start up investment was about $500,000. They had plans to expand in both arms and drug trafficking when the operation stopped because of a dispute between Southern Ace and it's local affiliate.   The TMG estimates that this militias was strong enough to sway the balance of power in a particular region of Somalia. This militia did engage in combat skirmishes and support one local group against another. TMG estimates that by the time ,"Southern Ace ceased operations in early 2011....Leroux and his associates spent almost $3 million dollars in Somalia including almost $1 million dollars in salaries and over $150,000 on arms and ammunition. *U.N. report p 268 - p 270.*

Second, Mr. Rademeyer reported that Mr. Le Roux was involved in a bizarre scheme to purchase land from the government of Zimbabwe to give to white farmers who were forced off their land by the President Robert Mugabe. To this end he hired a lobbyist  to lobby the Government of Zimbabwe on his behalf. Mr. Rademeyer obtained records from the U.S. State Department that showed Mr. Le Roux paid this lobbyist nearly $14 million dollars for this purpose. The deal was never done. The defense has interviewed the lobbyist he indicated that he originally from Belgium.

did what was required under their contract but that Mr. Le Roux failed to actually purchase the land as agreed upon by the Government of Zimbabwe. It was a legal transaction. Furthermore, he believed that Mr. Le Roux was beginning to have financial problems as the United States had just outlawed online pharmaceutical sales from foreign companies. This was the heart of Mr. Le Roux's business. The lobbyist believed that this may have turned Mr. Leroux toward a life of crime to make up for lost revenue. (The defense believes Mr. Le Roux's online pharmacy was an illegal business as evidenced by the pending indictment.)

Third, Mr. Rademeyer tried to get a quote or comment from Mr. Le Roux. Mr. Le Roux did not respond. A few days later, Mr. Rademeyer was threatened on the phone by an unknown male who specifically referenced Mr. Rademeyer's inquires about Paul Le Roux.

Fourth, Paul Le Roux had one of his associates killed in the Phillipines. Dave Smith was a British citizen that was an associate of Paul Le Roux for a number of years.[25] Mr. Le Roux found out that Dave Smith stole millions from him and he was killed by Mr. Le Roux.

Fifth, Bruce Jones was a British citizen who refused to do Paul Le Roux's bidding and was killed. Mr. Jones was a ship's captain that refused to deliver a cache of arms belonging to Paul Le Roux. Instead, he choose to get off of the ship before it docked in the Phillipines. The Filipinos authorities raided the ship the next day and recovered most of the weapons. (Ironically, Dave Smith took off about half of the weapons secretly a few hours after the ship docked but before it was raided.) Bruce Jones was questioned but then let go. Bruce Jones sought the protection of the Filipino Government but he was subsequently killed by Paul Le Roux.

---

[25] This based on information from a journalist in the Phillippines and other sources.

Sixth, Paul Le Roux had another associate of his arrested and falsely charged in the Phillippines because he believed this person stole from him.[26] This person was involved in a series of gold deals with Mr. Le Roux. Mr. Le Roux lost money and believed this person stole from him. This person was arrested at an airport in the Philippines after Mr. Le Roux paid someone to plant drugs in his bag. He spent several years in prison but was ultimately released and allowed to travel back home to Zimbabwe.

Seventh, Mr. Hunter was threatened by Paul Le Roux after he lost money on a gold deal. Mr. Le Roux called Mr. Hunter and threatened him and his family with death after the deal went bad. Mr. Hunter was also aware of the murder of Dave Smith and Bruce Jones. He was also aware of the set up of the Zimbabwean in the Phillippines. Mr. Le Roux propensity for violence and his threats of Mr. Hunter are certainly factors the court may take into account pursuant to 18 U.S.C 3553 (a).

## ESCAPE ATTEMPT

The Government has claimed a number of times that Mr. Hunter escaped from his handcuffs while being processed at the Metropolitan Correctional Center (MCC) in September of 2013. The defense has consistently denied this allegation. This is likely to raise his classification within the Bureau of Prison (BOP) system. This defense request a hearing on this issue. It is relevant to the issue of sentencing designation. The defense requests that the Government retrieve any and all reports in support of this allegation as well as any witnesses that have testimony in support of this allegation.

[26] This is based on information from a source in Zimbabwe and other sources.

24

## ROLE IN THE OFFENSE

Mr. Hunter is charged in a wide ranging conspiracy to import drugs and to murder two (2) persons. Mr. Hunter was the liaison between the confidential DEA sources and the other co-defendants. He participated in the planning of the events in question. He neither originated the idea nor proposed the idea to others. He also communicated information from the co-defendants to the confidential sources. He was not in the field during the drug operations. He was also not slated to conduct the killings.

## PROBATION RECOMMENDATION

The guidelines calculation from the probation office differs from that of the plea agreement. The psr added 1 point for an additional group/calculation pursuant to 1B1.2 and 3D1.2. *PSR Page 27 paragraph 140.* The PSR removed the 2 point enhancement for special skill pursuant to 3B1.3. *PSR page 29.* The net effect is the PSR has a total offense level of 41. The parties have stipulated an offense level of 42. The parties stipulated to a guidelines range of 360 months to life. The probation office calculated the range to be 324-405 months.

The probation office recommended a below the guidelines sentence of 292 months. The PSR acknowledges the seriousness of the offense, however ,"...it is difficult to ignore his emotional state at the time of the offense." *PSR p 32.* The PSR cites the report of defense psychiatrist Dr. Blumberg. Dr. Blumberg diagnosed Mr. Hunter with PTSD and depression. The PSR also references the defense claims that Mr. Le Roux threatened Mr. Hunter, that Mr. Le Roux was a "multi millionaire" and that Mr. Le Roux was "dangerous". *PSR p 32.* The PSR also states that Mr. Hunter had no prior criminal history, served in the Army honorably for 21 years

25

and was gainfully employed after his discharge from the Army for at least five (5) years before he started working for Mr. Le Roux. *PSR p 32.* Finally, the probation office considered recommending a lower sentence.[27]

## MR. HUNTER'S FUTURE

Mr. Hunter was employed for five (5) years upon his discharge from the Army in 2004. He took the entrance exam for the New York City Police Department.[28] He passed and was accepted but he declined because he felt the cost of living would have been too high for a family of four (4) living on one (1) income. From November 2004 through January 2006, he worked as a classification treatment officer at the Kentucky department of Correction. *PSR paragraph 132.* This allowed him to move back to Owensboro. He and his family (which included 2 dogs) stayed with his sister Karen and her husband in Owensboro for a few months in 2004. They purchased their own home in 2004. He then worked at Dyncorp from January 2006 to May 2008. He worked Triple Canopy October 2008 to May 2009.

Mr. Hunter's future career option will be limited because of the felony conviction and the notoriety that has followed this case. This case has received a large amount of publicity. His life of anonymity in Owensboro is over. However, Mr. Hunter does have extensive martial arts training and experience. His clearest career option would be to train students in martial arts in Owensboro upon release from prison. He also would benefit from being reunited with his family in Owensboro. Finally, he can receive treatment for his PTSD and depression at the VA clinic in

---

[27] "While we considered recommending a lower sentence, given his role in the offense it would be unjust to recommend a sentence lower than his co-defendant." PSR p 32.
[28] Exhibit H.

Owensboro. Mr. Hunter is not likely to be a recidivist. Given the medical treatment he will receive and support from friends and family, he will remain a law abiding citizen.

## CONCLUSION

The defense recommends a reasonable non guidelines sentence of ten (10) years.

Sincerely,

s/Marlon G. Kirton

Marlon G. Kirton, Esq.

s/Diane Ferrone

Diane Ferrone, Esq.

cc: Michael Lockard, Assistant United States Attorney (via hand delivery)

Anna Skotko, Assistant United States Attorney (via hand delivery)

Emil Bove, Assistant United States Attorney (via hand delivery)