G5VFHUNS                        Sentence

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        13 CR 521 (LTS)

5   JOSEPH HUNTER,

6               Plaintiff.

7   ------------------------------x

8                                   New York, N.Y.
                                    May 31, 2016
9                                   10:00 a.m.

10

    Before:
11
                    HON. LAURA TAYLOR SWAIN,
12
                                    District Judge
13

14                      APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
    MICHAEL LOCKARD
17  EMIL BOVE
        Assistant United States Attorney
18
    MARLON KIRTON, ESQ.
19      Attorney for Defendant

20  DIANE FERRONE, ESQ.
        Attorney for Defendant
21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

G5VFHUNS                          Sentence

1          (Case called)

2          (In open court)

3          THE DEPUTY CLERK:  United States v. Joseph Hunter.

4   Counsel, please state your appearances for the record.

5          MR. BOVE:  Good morning, your Honor, Emil Bove and

6   Michael Lockard for the government.

7          THE COURT:  Good morning, Mr. Bove and Mr. Lockard.

8          MR. KIRTON:  Marlon Kirton and Diane Ferrone for

9   Mr. Hunter.  Good morning, your Honor.

10         THE COURT:  Good morning, Mr. Kirton.  Good morning,

11  Ms. Ferrone.  Good morning, Mr. Hunter.

12         Mr. Hunter, are there any family members or friends of

13  yours here today?

14         THE DEFENDANT:  Yes, ma'am.

15         THE COURT:  Who is here?

16         THE DEFENDANT:  That's my sister.

17         THE COURT:  Good morning.  Thank you for coming to

18  court today.  And greetings as well to the other members of the

19  teams here and also to the other spectators and members of the

20  press.

21         We are here today for sentencing.  I have received and

22  reviewed the presentence investigation report which is dated

23  May 7, 2015, including the recommendation and addendum.  I've

24  also received and reviewed voluminous submissions by defense

25  and counsel for the government as follows:  The opening defense

1    submission dated October 3, 2015, which was originally filed

2    with redactions, but without its accompanying exhibits and then

3    refiled with redacted versions of its exhibits on October 26,

4    2015.  An unredacted version of the entire defense submission

5    will be filed under seal.  The defense submission contains ten

6    exhibits; the defense objections to the presentence report, a

7    report by Dr. Neil Blumberg dated September 12, 2014,

8    Mr. Hunter's military discharge papers, Mr. Hunter's military

9    service records, a news article relating to one of Mr. Hunter's

10   friends in the military who was killed during a live fire

11   exercise, Mr. Hunter's medical records, a list of Mr. Hunter's

12   awards and commendations, a record of Mr. Hunter's employment

13   history, an affidavit from counsel to defendant in another case

14   who was also associated with the criminal enterprise to which

15   Mr. Hunter belonged and a United Nations report dated July 18,

16   2011 which also discusses the criminal enterprise to which

17   Mr. Hunter belonged.

18          The publicly filed defense objections and Bloomberg

19   report are partially redacted where the defense has withdrawn

20   certain arguments and also redacted for other reasons approved

21   by the Court.

22          Mr. Hunter's records are also partially redacted, as

23   approved by the Court.

24          The defense has also submitted a memory stick

25   containing seven video statements by members of Mr. Hunter's

1    family and his friends.  Defense counsel has been directed to

2    file a copy of the video statements in the public file.

3    Redaction of third party medical information has been

4    authorized.  The unredacted version will be filed under seal.

5           The Court has received and reviewed the government's

6    opening sentencing submission which was filed in redacted form

7    on December 9, 2015.  The unredacted version of the submission

8    will remain under seal.

9           The Court has received and reviewed the defense's

10   February 2, 2015 supplement to its sentencing submission which

11   included a second report by Dr. Blumberg dated January 28,

12   2016.  The Court has also reviewed and received, received and

13   reviewed a letter from Mr. Hunter that was submitted by the

14   defense on March 3, 2016 which was accompanied by certificates

15   relating to classes and work that Mr. Hunter has undertaken

16   while at the MCC.  The Court directed the defense to file that

17   report, Mr. Hunter's letter and the attachments to Mr. Hunter's

18   letter on the public docket and I understand that that has been

19   done.

20          MR. KIRTON:  Yes, it has.

21          THE COURT:  Thank you.  The parties also filed a

22   number of sentencing submissions under seal as approved by the

23   Court.  The government filed sealed letters on December 9,

24   2015, March 10, 2016, April 25, 2016 and May 18, 2016.  The

25   defense filed sealed letters on February 2, 2016, April 15,

1    2016, May 7, 2016 and May 23rd, 2016.  The Court conducted a

2    closed hearing on sentencing-related issues on April 28 and 29,

3    2016.  The transcript of that hearing is sealed for the reasons

4    stated on the record and in certain orders of the Court.

5            To the extent that sentencing-related materials have

6    been filed under seal in whole or in part the reasons for such

7    sealed filings have been stated in sealed orders or on the

8    record in the sealed proceedings as the case may be.

9            Are there any other written submissions that the

10   parties intend to have me consider in connection with the

11   sentencing?

12           MR. BOVE:  Not that I'm aware, your Honor.

13           MR. KIRTON:  No, your Honor.

14           THE COURT:  Thank you.  Mr. Bove, would you state the

15   Government's position as to whether there are victims of the

16   crimes of conviction who are entitled to notice under the

17   Justice for All Act?

18           MR. BOVE:  There are not, your Honor.

19           THE COURT:  Mr. Kirton, have you read the presentence

20   investigation report and discussed it with Mr. Hunter?

21           MR. KIRTON:  Yes, I have, your Honor.

22           THE COURT:  And, Mr. Hunter, have you reviewed the

23   presentence report yourself?

24           THE DEFENDANT:  Yes, your Honor.

25           THE COURT:  And have you discussed it with your

1   attorneys?

2         THE DEFENDANT:  Yes, your Honor.

3         THE COURT:  Mr. Kirton, do you have any objections or

4   other issues with respect to the content of the report that you

5   wish to address at this time that have not already been

6   resolved?

7         MR. KIRTON:  No, your Honor.

8         THE COURT:  Are you still pressing the objection to

9   the probation department's guideline computation?

10        MR. KIRTON:  Yes, your Honor.

11        THE COURT:  All right.  I've read your written

12  submission on that.  Is there anything further that you want to

13  say to that?

14        MR. KIRTON:  No, your Honor.

15        THE COURT:  All right.  After I hear the government I

16  will rule on that.

17        I believe that we do need to address a couple of

18  housekeeping corrections to the presentence report, so as I

19  understand it, I have approved the deletion of the final

20  sentence of paragraph 18, footnote 1.  Mr. Kirton, is the

21  defense still asking for that deletion?

22        MR. KIRTON:  Yes.

23        THE COURT:  All right.  I will direct the probation

24  department to delete the final sentence of footnote 1 to

25  paragraph 18 and am I still being requested to delete in its

1  entirety the footnote to paragraph 30?

2          MR. KIRTON:  That's correct.

3          THE COURT:  All right.  And I take it -- this is

4  consistent with earlier rulings, so the government doesn't want

5  to be heard on these?

6          MR. BOVE:  That's correct, your Honor.  Thank you.

7          THE COURT:  Very well.  So the footnote to paragraph

8  30 will also be deleted.

9          Mr. Bove, does the government take any position on the

10  issues raised by the defense or do you have any other

11  objections and, here's a compound question, is the government's

12  position on the guidelines computation the same as was set

13  forth in the December 9, 2015 sentencing submission?

14          MR. BOVE:  The government doesn't have any issues to

15  be addressed with respect to the PSR except the guidelines

16  calculation as your Honor noted and our position is set forth

17  in our opening sentencing memorandum.

18          THE COURT:  Thank you.  All right, and so I will now

19  rule on the guideline computation issues.  First, the

20  presentence report applies a two-point enhancement relating to

21  the use of an aircraft to the Count One computations and Count

22  One is properly treated as a separate group.

23          As the Court has already found in earlier sentencings,

24  the guideline enhancement for use of a non-commercial aircraft

25  for the import of controlled substances, which is Section

1   2D1.1B3A of the guidelines, requires the actual importation of

2   a controlled substance.  Here the crime of conviction was a

3   conspiracy to import narcotics but no narcotics were actually

4   imported.  Because the harm contemplated by the guideline

5   provision is the actual importation, not the intent to import,

6   I will not apply the two-point guideline enhancement for use of

7   an aircraft.  Therefore, the guideline calculation for Count

8   One is a base level of 36, plus three points for a leadership

9   role resulting in a final level of 39 for Count One.

10          I adopt the grouping analysis from the PSR.  Count

11  Two, which involves conspiracy to murder two different

12  individuals, is grouped separately with Count Four, which is

13  the firearms conspiracy two times with an adjusted offense

14  level of 40 for each group, that being one group for each of

15  the murder objects of the conspiracy.

16          Because the level for Count One is now 39 and the

17  level for each of the other groups is 40, the result of the

18  grouping analysis is a base level of 40 plus three units, which

19  brings us to 43, which is then reduced for acceptance of

20  responsibility to a final offense level of 40.

21          And so just a couple of further remarks in response to

22  the defense objection.  The objection that the firearm count

23  should have been grouped with the narcotics conspiracy count is

24  overruled.  The firearms offense very clearly related to the

25  murder conspiracies and so is properly grouped with the murder

conspiracy counts, and because there were two separate

individuals to be murdered, there are properly two separate

groups for each of the murder conspiracy counts with their

accompanying firearms component.  And that firearm count is

related to a crime of violence, which is the murder conspiracy

as to each individual.  Under guidelines section 1B1.2D, a

conspiracy to commit multiple offenses is treated as separate

offenses for grouping purposes and so since the murder

conspiracy in question involved two intended victims, it's

treated as separate counts within the grouping analysis.  And

so I will order the following changes to the PSR in this

connection:  Paragraph 76 will be deleted, paragraph 80 will

reflect a total level of 39 instead of 41.  In paragraph 93,

group 1 will have an adjusted offense level of 39.  The offense

level number for paragraph 94 will be 40 rather than 41.  The

offense level number for paragraph 96 will be 43 instead of 44.

The offense level number for paragraph 100 will be 40 instead

of 41 and in paragraph 138 the total offense level will be

stated as 40 with the resulting guideline range of 292 to 365

months of imprisonment.  And paragraph 141 will be revised to

refer to a total offense level of 40 rather than 41.

Are there any objections to these changes or any

additional changes that the parties would need to be made?

MR. BOVE:  No, your Honor.  Thank you.

MR. KIRTON:  No, your Honor.

1        THE COURT:  Thank you.  I assume that the full

2   three-point acceptance of responsibility credit should be

3   given, but I now ask the government formally.  Are you applying

4   to have Mr. Hunter credited for that third point for acceptance

5   of responsibility?

6        MR. BOVE:  Yes.

7        THE COURT:  That application is granted.

8        Are there any restitution issues here?

9        MR. BOVE:  No, your Honor.

10        THE COURT:  What is the government's position as to

11   forfeiture?

12        MR. BOVE:  Your Honor, we're going to ask that the

13   Court enter an oral order of forfeiture today.  The government

14   estimates that we will submit a proposed order of forfeiture to

15   be applied jointly and severally with respect to the other

16   defendants in this case in the amount of approximately between

17   400 and $450,000.  We're going through some calculations and

18   going through the evidence to finalize that calculation right

19   now.

20        THE COURT:  And so today you would be asking me to

21   order Mr. Hunter to forfeit the proceeds of his crimes up to

22   $450,000?

23        MR. BOVE:  Yes, your Honor.  Thank you.

24        THE COURT:  Any objection to that iteration,

25   Mr. Kirton?

1          MR. KIRTON:  Yes, your Honor.

2          THE COURT:  I'll hear you.

3          MR. KIRTON:  Ms. Ferrone will --

4          MS. FERRONE:  We understand it's up to 450.  We just

5    wanted the record to be clear that we had asked for some

6    additional information on the calculation and are awaiting that

7    information and there's also some proposed language in the

8    proposed forfeiture order that we received at the time of the

9    plea that counsel, defense counsel has some questions about.

10   So while I don't think we have an objection to a proposed

11   forfeiture order forthcoming, the defense does have some issues

12   with the proposed order that we received at the time of the

13   plea agreement.

14         Thank you, your Honor.

15         THE COURT:  Thank you.  And so, and let me ask

16   Mr. Bove a question about the joint and several number.  I

17   don't have the numbers right in front of me, but I think

18   co-defendants had lower numbers than what you're proposing for

19   Mr. Hunter?

20         MR. LOCKARD:  Yes, your Honor.  I'll address the

21   forfeiture question.  So the numbers that had been discussed

22   with respect to the other defendants concerned the funds

23   received by those defendants.  Mr. Hunter received the gross

24   amount of funds and then parceled them out to the others, so

25   the numbers that the government will propose will be different

1    but the total amount of joint and several liability will come

2    out to be approximately the same when you add up the other

3    individuals and compare to it Mr. Hunter's figure.

4           THE COURT:  And so it will be joint and several in the

5    sense that Mr. Hunter would get credit for payments by the

6    other defendants.  This, of course, doesn't raise the liability

7    of the other defendants --

8           MR. LOCKARD:  Correct.

9           THE COURT:  And is it the government's intention with

10   respect to this joint and several language that any payments by

11   Mr. Hunter would be credited dollars for dollars against the

12   individual liabilities of the other co-defendants?

13          MR. LOCKARD:  That's one of the issues we want to work

14   out and make sure that the mechanics work out in a manner

15   that's appropriate and don't unfairly benefit or detriment any

16   particular defendant but that is the idea that this joint and

17   several liability the other individual joint and several

18   obligations will be capped at a certain level and that's part

19   of the calculation we'll be going through.

20          THE COURT:  All right, so I will say that he will be

21   ordered to forfeit the proceeds of his crimes in an amount to

22   be determined up to $450,000 and the liability will be joint

23   and several with those of his co-defendants.  And, Ms. Ferrone,

24   I recognize there are matters of the language of the order as

25   well as quantification that still need to be worked out.

1          MS. FERRONE:  Thank you, your Honor.

2          THE COURT:  Before I invite counsel to speak further

3     to sentencing issues I want to note for your attention that I

4     intend to impose an additional special condition on

5     Mr. Hunter's supervised release that would prohibit him from

6     all foreign travel during the term of supervised release.

7     Probation has already proposed a condition prohibiting foreign

8     employment.  This would be intended to close the loop on

9     opportunities to engage in surreptitious activity abroad.  And

10    so if you have any objection or would like to be heard on that,

11    you could include that in your sentencing remarks.

12         Counsel, is there anything we need to take up at the

13    sidebar before I hear your sentencing arguments?

14         MR. BOVE:  No, your Honor.

15         MR. KIRTON:  No, your Honor.

16         THE COURT:  Thank you.  Mr. Kirton, whenever you're

17    ready, I'll hear from you first.

18         MR. KIRTON:  Thank you, your Honor.  Your Honor,

19    first, before I start my actual remarks, I just want to point

20    out one issue that was raised in our prior filing.  We argued

21    that my client did not try to escape from his handcuffs at the

22    time he was processed at the MCC at the time he was first

23    brought to the Southern District.  It's our position that it

24    didn't happen.  I had a conversation with the government about

25    this.  They did not reference that in any of their filings,

1    it's not in the probation report, there's no BOP report or DEA

2    report that that happened.  It's our view that that incident

3    never happened.

4              THE COURT:  It was my understanding through some prior

5    communications that the government said it was not going to

6    press that as a relevant fact.

7              MR. BOVE:  That's correct and remains accurate, your

8    Honor.

9              THE COURT:  All right.  And so the attempted escape

10   from handcuffs issue is not one that's in the factual record

11   here and not one that I am taking into account in any way.

12             MR. KIRTON:  Thank you, your Honor.

13             Good morning.  It's our position that the Court should

14   sentence my client to a reasonable non-guidelines sentence of

15   ten years of incarceration.  It's also our view that Mr. Hunter

16   should serve his sentence at the federal facility in Lexington,

17   Kentucky, that would allow for visits from his friends and

18   family who live in both Evansville, Kentucky and Luisville,

19   Kentucky and it's also five miles from a VA Medical Center.

20             I'm just going to focus on three areas.  PTSD, post

21   traumatic stress disorder arrest as relates to 18, United

22   States Code, 3553(a), also the probation report and weave in

23   information from my client's military history as well as

24   information from his friends and family that are located on the

25   flash drive of the videotape.

1     So last night there was a show on PBS.  It's a

2   recurring series called POV, Point of View, and last night's

3   topic was called "Men of Valor," which details the accounts of

4   veterans returning from overseas, in this case Iraq.  In that

5   piece the men lived in a veteran's home somewhere in the United

6   States and were going through counseling.  The counseling

7   involved them getting counseling from a counselor and also

8   involved their family members and loved ones being involved in

9   that process also.

10     So there was a conversation with one of the veterans

11   and his wife, and she started out by saying, and when you came

12   home -- and he finished the sentence and said and when I came

13   home, I was completely different.  And that's what happens when

14   people suffer from PTSD.  The person that they knew, the person

15   that they loved, after they come down, become afflicted with

16   this condition, they become different.  I've had conversations

17   with my client's niece who said that Mr. Hunter was like a big

18   brother to her.  He treated her like they were brother and

19   sister, took her out, used to babysit for her, they played,

20   they went out, they had conversations and she really

21   appreciated Mr. Hunter's presence in her life at that time.

22     And when I asked her to be a character witness when I

23   thought we were going to have this trial, she hesitated.

24   Because one of the problems she had was she couldn't reconcile

25   the person she grew up with, the person that she loved, the

1    person who was like a big brother and the person who was facing

2    the charges in this case.  It's just something she couldn't

3    reconcile.  So she had a conversation with her boss, she had a

4    conversation with her pastor, she spoke with her husband and

5    eventually she agreed to be a character witness at the trial,

6    had the trial taken place she submitted a video for the Court's

7    consideration.  This is what happens to people with PTSD, they

8    become different people.  It affects their behavior.

9           It's our position, your Honor, that Mr. Hunter has

10   PTSD, there's no denying it.  Dr. Blumberg said that on two

11   reports, he tested Mr. Hunter twice on two occasions with two

12   separate criteria, no malingering, he wasn't lying, Mr. Hunter

13   tested positive for severe PTSD as well as depression.  He has

14   it.

15          Now, the government submitted reports by one of their

16   experts that called into question some of the findings made by

17   Dr. Blumberg, but it's our position that analysis was flawed.

18   Number one, their expert never viewed the video submitted to

19   the Court as well as to the government which details my

20   client's life before he was arrested.  Also, the expert never

21   viewed the letter submitted to the Court about his experiences

22   in the service and why, how he contracted PTSD.  Now, the video

23   statements as well as the letter to the Court were handed over

24   to the government before their expert submitted their report.

25   So I'm not really sure why she didn't look at those documents,

1    but it's in our view that their criticism of Dr. Blumberg's

2    report is flawed.  Had she looked at those videos it would have

3    given her some information about how long Mr. Hunter had PTSD.

4            My client's wife said that at some point he was

5    stationed, I forget which base, but he was a drill sergeant.

6    So he had to work with those people coming into basic training.

7    It was a very, very difficult position for my client to have,

8    to get up three or four in the morning, working until ten or

9    eleven at night, it was very trying.  And she noticed there

10   were changes to his behavior.  He became irritable and moody,

11   used to yell a lot at the kids, yell a lot at her and then

12   became withdrawn.  So this was many, many years before he was

13   arrested in this case, many, many years before he served in

14   Iraq, that he started to show signs of PTSD.

15           Thirdly, my own observations.  I was assigned to this

16   case October 1, 2013.  I believe Mr. Hunter came into the

17   Southern District sometime that weekend, maybe that Friday or

18   Saturday, and I saw him for the first time that Monday before,

19   a conference before this Court.  I spoke to him, gave him the

20   conversation about the case, the normal conversation, the

21   normal conferences.  Then we came upstairs.  Before the Court

22   came out I had about five minutes to speak to my client and I

23   noticed that he was weeping.  Now, I've been practicing for a

24   while, I've seen people cry.  But this was a bit different.  It

25   seemed as if he had no control over his emotions, couldn't help

G5VFHUNS                        Sentence

himself.  So I put on the record during that conference that I was concerned about my client's mental and emotional health, that he may need medical attention.  Based on the objective reports from Dr. Blumberg, based on the information given by my client's wife and sons about my client's behavior and based on my own observations, I think it's pretty clear that Mr. Hunter has PTSD.  That's important because it's our position that the Bureau of Prisons has no protocol to treat persons afflicted with PTSD and certainly not military veterans suffering from PTSD, unlike the Veterans Administration which has a dedicated PTSD protocol.  It's also battle specific and it also involves friends and family members of the veteran to assist in their treatment.

        So the BOP, I didn't submit this, but there's -- I want to use the right phrase.  There's a psychology treatment program that was part of -- there was an e-mail, part of the Department of Justice website, Federal Bureau of Prisons, which outlines the psychological treatment protocols that are in effect as of May 26, 2016.  It's a pretty long document and there's nothing in there that offers treatment for PTSD and there's certainly nothing in there that offers PTSD for veterans who have been in conflicts.

        We submit to the Court as we stated in our sentencing memorandum that because Mr. Hunter's a veteran, he's suffering from PTSD, it's a factor that the Court can take under

1    consideration under 18, United States Code, 3553(a).  All the

2    cases we cited in our submission are cases with veterans who

3    have PTSD, who received substantial prison terms and all

4    received below guidelines because of the BOP's inability to

5    treat PTSD and as of May 26, 2016 it's still our position that

6    they still don't have the ability to treat persons afflicted

7    with PTSD like Mr. Hunter.

8            THE COURT:  I will just say, there were two particular

9    cases that were referred to in the footnote in your

10   submissions.  One of those cases is entirely under seal so I

11   can't ascertain what happened and the other we found a

12   transcript of the sentencing where the PTSD issue was mentioned

13   but I did not, at least in that transcript, come across as a

14   particularized ground for an extraordinary adjustment of the

15   sentence, although there was what seemed to be below-guidelines

16   sentence at the end of the day.

17           MR. KIRTON:  Is that the John Erickson case?

18           THE COURT:  There was one we could find nothing and

19   one we could find a little something on, so this is the one we

20   found something.

21           MR. KIRTON:  The John Erickson case was an extremely

22   extended factfinding by the Court as to what ability the BOP

23   had to treat Mr. Erickson for his condition.

24           THE COURT:  I believe that was the one.

25           MR. KIRTON:  Now, in terms of the issue of the arrest.

1    Again, Mr. Hunter accepted responsibility for everything he's

2    done in this case.  So when I say duress, I'm talking about

3    sentencing duress.  It's clear in our filings and in other

4    documents --

5              THE COURT:  I'm sorry, before we leave PTSD, I just

6    want to make sure that I am accurately apprehending the thrust

7    of your 3553(a) argument.  You're arguing not that PTSD was a

8    mentally incapacitating or compromising driver in the

9    commission of the crimes or something that would relieve,

10   warrant leniency in terms of lesser responsibility for the

11   crimes, but rather you're saying that the effective provision

12   of correctional or medical treatment aspect of 3553(a) would

13   counsel both a reduction of the sentence because your position

14   is that the BOP can't effectively provide needed treatment and

15   also would counsel a particular designation recommendation to

16   Lexington, Kentucky for particular involvement even during the

17   period of custody in the VA's program?

18             MR. KIRTON:  I'm saying yes to the second query.  The

19   first one I'm going to address now, actually.  So I'm making a

20   separate argument regarding that part of it.

21             THE COURT:  Thank you.

22             MR. KIRTON:  So the next subject would be duress.  And

23   this is where the PTSD/duress intertwine.  It's our position in

24   our filings that the government's chief cooperator in this

25   case, Paul LeRoux, is a bad person.  He's just a bad person.

G5VFHUNS                         Sentence

1   Mr. LeRoux, as noted in the case of United States v. Moran Oz,

2   has admitted to killing multiple people.  Mr. LeRoux has

3   admitted to the selling technology to the Republic of Iran

4   while that country was under U.S. and U.N. sanctions.

5   Mr. LeRoux admitted to selling prescription pills illegally.

6   Mr. LeRoux admitted to selling illegal drugs.  And that's just

7   in that case.  We've submitted other documents that show that

8   Mr. LeRoux bribed government officials.  Mr. LeRoux arranged

9   for someone to be arrested falsely because he thought that

10  person stole from him.  Mr. LeRoux engaged in threats of

11  people.  In fact, in the affidavit submitted by Moran Oz's

12  attorney he said at some point Mr. LeRoux and his associates

13  showed a photograph of a person that worked for him, of that

14  person's family, and said, "You see this?  I can get to them."

15          Mr. LeRoux, I submit to the Court, Mr. Hunter's former

16  boss, the head of the LeRoux organization, is a bad person.

17  Mr. LeRoux threatened Mr. Hunter.  It was a gold deal at the

18  beginning of Mr. Hunter's employ and it didn't go well.

19  Mr. LeRoux called Mr. Hunter and threatened him and his family.

20  And why is that important?  It's important because at the

21  beginning of his employ, Mr. LeRoux would pay Mr. Hunter via

22  wire transfer.  And when you send money back from Asia to the

23  United States, you have to have someone to receive it, so he

24  had the name of my client's wife, the name of my client's son,

25  my client's home address.  So the threat that was made to

1    Mr. Hunter was made with Mr. Hunter's express knowledge that at

2    the time the threat was made he knew where Mr. Hunter lived, he

3    knew where his wife lived, he knew his wife's name, he knew his

4    son's name and he knew where his son lived.  So we submit to

5    the Court that these were threats made directly to Mr. Hunter.

6    This shows and it's clear that Mr. Hunter was afraid and this

7    is an issue regarding duress that the Court could take into

8    consideration.  Now, on top of that --

9             THE COURT:  And temporally you're placing this

10   particular incident in the beginning of the relationship, the

11   2009 time frame with the gold-related work?

12            MR. KIRTON:  2009, 2010.  The first year in the

13   beginning of the relationship.  On top of that, your Honor,

14   Mr. Hunter later became aware that Mr. LeRoux killed former

15   associates.  He became aware of this.  So the fact that

16   Mr. Hunter directly was threatened by Mr. LeRoux, the fact that

17   Mr. Hunter later became aware that others were killed by

18   Mr. LeRoux, falsely charged by Mr. LeRoux, that government

19   officials were bribed by Mr. LeRoux, this created a great deal

20   of fear of Mr. LeRoux by Mr. Hunter.

21            Now, add to that that Mr. Hunter was suffering

22   probably at the time from PTSD.  Now, we note that what his

23   family said about his time in the service as a drill sergeant,

24   he started to show signs then.  We also know he served two

25   tours in Iraq as a private contractor after his tour in the

military was over.  He enlisted in the Army in 1983, he was
discharged in 2004 and he served two years in Iraq after he was
discharged from the Army.  So Mr. Hunter had PTSD, which gives
you a heightened sense of fear, heightened sense of arousal.
Give you an example.  In the piece last night there was a
gentleman, a veteran who was in the program who was talking
about driving and the problems just driving in traffic.  He
said that there was someone next to him that cut him off and he
said to himself, he said this in a group, don't you know that
if I was in Iraq I would tell me gunner to take out your engine
and if you started up I would take you out.  But because he's
home, obviously he can't do that.

So someone who has PTSD is going to perceive threats,
I submit to the Court, in a heightened fashion.  So the average
person I submit to the Court would be under duress under
Mr. Hunter's circumstances in Asia, but add to that PTSD, I
think it shows the level of fear that he had of Mr. LeRoux.
Some of it was legitimate and some of it became increased
taking into account his PTSD.

I submit to the Court, obviously, you know, he has
accepted responsibility.  We're not saying that this is a
trial, we're not saying that, but it's factors in the case law
that the Court can consider under 18, United States Code,
3553(a).  So to answer the court's prior point, yes, PTSD is a
factor that plays a role in how he perceived the threat from

1   Mr. LeRoux at the time he was threatened and also later on when

2   he found out that others were threatened.

3           Well, why did he stay?  Why did he go home and come

4   back?  I'm sure the government will talk about the two

5   instances where he came home and went back and worked for

6   Mr. LeRoux.  Well, again, Mr. LeRoux knows where home is.

7   Mr. LeRoux, born in Zimbabwe, raised in South Africa,

8   Australian citizenship, worked in the Philippines, lived in

9   Thailand, he's everywhere.  Mr. LeRoux, according to the

10  government's own figures, made at least $300 million in the

11  prescription pill scheme, the case that's pending in Minnesota

12  right now.  So Mr. LeRoux is a man with money, a man with

13  international connections and more importantly, he knows where

14  he lives.  I submit to the Court, and this is what the videos

15  say, Mr. Hunter did what he had to do under certain

16  circumstances to preserve his family.

17          I would say that's the primary motivation for him

18  going back.  So I submit to the Court --

19          THE COURT:  For a higher level and more money, but

20  that was -- are you saying, is it you're representing that the

21  going back wasn't initiated by Mr. Hunter, that there was some

22  "better come back and take this position" kind of threat?

23  You're giving me all kinds of different colors on your

24  positions.  I'd like you to give me some type of color on this

25  one.

1           MR. KIRTON:  He became aware from an associate of

2   Mr. LeRoux that a person named Dave Smith was killed.  Dave

3   Smith was an associate of Mr. LeRoux and he was murdered,

4   according to a conversation Mr. Hunter had with another

5   associate, because of some fallout he had with Mr. LeRoux.  And

6   Mr. Hunter was instructed to come back.  Mr. LeRoux wanted him

7   to come back.  There was some back and forth about whether or

8   not Mr. Hunter wanted to go back.  He thought, well, if I just

9   give him an outrageously high figure for my salary and some

10  demands maybe he'll just go away and leave me alone.  It didn't

11  happen.  He met the financial demands, he met the

12  organizational demands and he went back to Asia.  This is the

13  second time he came home.  So hopefully that gives the Court

14  some context of the circumstances in which he went back and how

15  the money and organization request played into that situation.

16          Now, in terms of my client's -- the third issue is

17  weaker than the other issues, it's the probation report.  Both

18  sides agree and the Court has found that the guidelines in this

19  case is 293 to 365 months.  The probation department

20  recommended a sentence below the guidelines range and cited a

21  number of factors.  One, his untreated medical condition, his

22  state of mind, the fact that this is a distinction operation,

23  his lack of criminal history and his military service. now,

24  we've submitted a number of documents concerning my client's

25  military service.  He served from 1983 to 2004.  He was

G5VFHUNS                    Sentence

discharged honorably in 2004 as a sergeant first class.  He

received, I think it's about 58 different citations, awards,

commendations, during his time in the military and at least one

from the State of Kentucky was granted, he was given the award

of being a Kentucky colonel, which is one of the highest awards

given out by Kentucky.  He was also admitted into the New York

City Police Department.  So Mr. Hunter I believe served his

country with honor and with dignity.  That's one of the factors

cited in the probation report for a recommendation of a below

guidelines sentence.

        I've already talked about his mental state.  I already

talked about his state of mind.  I'm sure the Court knows this

was a sting operation.  No one was actually killed, no drugs

were actually sold.  I know for legal purposes it makes no

difference, just another factor cited by the probation

department in their recommendation of a below the guideline

sentence.

        Also, the probation department said something

interesting.  It said they would have recommended a lower

sentence if they could.  Now, the number that they recommended,

they had a higher guidelines range to the Court, was some 30

months, 30 months below the guidelines range that they

calculated.  Yet they argue that if they could have recommended

a lower sentence they would have.  The only reason they didn't

is because Mr. Hunter had more leadership points than Mr. Gogol

1    and Mr. Vamvakis so they cited the fact that the other two

2    co-defendants that were similarly situated in this case had

3    lower leadership points.

4            So I submit to you that there are quite a few factors,

5    quite a few factors that argue in favor of a below the

6    guidelines sentence:  My client's PTSD diagnosis.  The fact

7    that my client was under severe duress when being employed by

8    Paul LeRoux.  The fact he served this country with dignity, the

9    fact he has friends and family that talk about how loyal he

10   was, how loving he was.  Some of the videos talk about, one of

11   his friends said Joe is a very loyal person.  If you borrow

12   $100 from him on Monday and you say you're going to give it

13   back to him on Friday at 5:00, he goes to call you on Friday at

14   5:00.  He's a very bright guy.  We talked to his mom.  His mom

15   said he's a bit trusting, a bit naive.  That's how he is.  He's

16   a straight shooter.

17           Again, I'm not trying to denigrate or lessen the

18   severity of this case.  I'm talking about the testimonials of

19   people that know him, people that love him, people that have

20   seen him and been with him most of his life.

21           Your Honor, the Court takes into consideration all

22   those factors.  We would submit that a non-guidelines sentence

23   with a recommendation that he served his time in Lexington,

24   Kentucky for his sentence.

25           Now, one last story from the video, from the movie.

G5VFHUNS                        Sentence

Now, it's very difficult for me to really understand what

military service is like.  I've never served in the military,

neither has my co-counsel.  It's a different world.  It's a

different set of -- it's a different set of thinking about

things.  So there was a story by one of the veterans, who was

on a convoy in Iraq.  Apparently, convoys are supposed to go

from point A to point B, not supposed to stop, not supposed to

swerve, not supposed to ask for directions, just supposed to

go.  If anything tries to get in their way, to stop them, they

won't stop because if convoys stop they could be subject to

ambush by insurgents who are looking to destroy U.S. troops.

So he related a story about a military convoy vehicle, going

straight, apparently a little girl didn't know anything, just

being a kid, ran out into the middle.  She ran into the middle

of the convoy.  He had a choice.  He could have swerved, could

have stopped, could have done what he was instructed to, keep

going.  I don't know what I would have done.  In that instance

he kept going.  And when they got back to base, he was a

complete wreck.  He had an emotional breakdown.  Because though

he was trained to do this thing, we're all human, sometimes

things happen and it's just becoming very difficult to deal

with.

        I don't know what it's like to serve in the military.

I don't know what it's like to have somebody threaten my

family.  I don't know what it's like to have PTSD.  If you take

1    all those factors into consideration, your Honor, as well as

2    the recommendation of the probation department, I would urge

3    the Court to render a non-guidelines sentence, below the

4    guidelines sentence, ten years with a recommendation he serve

5    his time at the federal facility at Lexington, Kentucky.

6          THE COURT:  Thank you, Mr. Kirton.  Mr. Bove?

7          MR. BOVE:  Thank you, your Honor.  As the Court is

8    aware, the government's position is a guidelines sentence is

9    appropriate here and I'd like to try to address some of

10   counsel's remarks today.  I'll start with the more

11   duress-related comments and then speak a little bit to the PTSD

12   arguments.

13         From time to time throughout this case defense counsel

14   has used the term "outrageous".  What's truly outrageous in

15   this case, your Honor, on the record before you, is the

16   defendant's conduct.  What's truly outrageous in this case,

17   your Honor, is that the day after Memorial Day in a case

18   involving this defendant with his history, defense counsel

19   makes arguments about people who honorably served their

20   country, people who were actual veterans with distinguished

21   service.

22         THE COURT:  Well, Mr. Hunter is an actual veteran with

23   distinguished service in the military and this case is about

24   what he did afterwards.  I get your bigger point, but --

25         MR. BOVE:  And that goes to my third point, your

Honor.  What's outrageous is that that service record is used

in this case as a mitigating argument.  What happened here,

your Honor, is that the defendant used the training that he

received from the United States military to commit and

facilitate incredibly serious crimes, and that's true with

respect to the offense of conviction, that is, international

drug trafficking and conspiracy to kill a DEA agent and a

confidential source.  These are crimes that go to the very core

of the law enforcement function, of the criminal justice

function that this Court administers, and those things, your

Honor, those three pieces, from the perspective of the

government, that's the outrageous part of this case.

          There were some comments made today about a movie

Mr. Kirton saw recently.  Mr. Hunter made his own movie in

Bukat in March 2013 where he described his own involvement and

the history of the organization that he was proudly a member

of.  These are a group of men who even prior to the sting

operation in this case committed actual murders and those are

facts that are set out in our sentencing submission that he

described in the video.  I'm referring now to page 5 and I'm

referring specifically with respect to one of those murders, to

the murder of Katherine Lee in the Philippines.  To the extent

that Paul LeRoux ran an organization that was dangerous, and

there's not much dispute about that, your Honor, it was

dangerous in large part, your Honor, because he had men like

1    Mr. Hunter working for him.

2            This is a man who comes to the Court as a result of

3    greed, not duress.  Your Honor touched on some of these themes

4    while Mr. Kirton was speaking and making an argument about the

5    timing of when Mr. Hunter first left the organization.  He then

6    of course returned.  He returned for a larger salary.  It's the

7    government's understanding that the salary increase that made

8    that a persuasive option to him was just a few thousand dollars

9    more per month.  It was not an outlandish amount of money

10   relative to the number and the seriousness of the crimes that

11   were being committed.

12           And again, when describing this duress argument,

13   Mr. Kirton says, well, Mr. Hunter became aware that certain

14   murders had been committed.  Mr. Hunter ultimately participated

15   and facilitated some of those murders and those are factors

16   that the Court can and should consider with respect to the

17   nature and history and personal circumstances of this defendant

18   which we submit far outweigh any of the mitigating

19   circumstances that counsel identified with respect to whether

20   there's merit to any of them.  This duress argument, your Honor

21   in light of the fact Mr. Hunter left and then returned to the

22   organization simply because he wanted to make more money, in

23   light of the fact, as the Courts is aware, that he knew that

24   Timothy Vamvakias left the organization because he didn't get

25   enough vacation time in his view and then returned and in view

1    of the fact Mr. Hunter actually turned down murders for hire

2    requested by Paul LeRoux, for those three reasons alone, your

3    Honor, there's no merit to this duress argument.

4              To get back to my theme, the accurate theme, these are

5    crimes that were committed as a result of greed.  The

6    defendant's e-mails right around the time of the conspiracy to

7    kill the agent and to kill the source really gets to the heart

8    of the matter about his state of mind and these are set out at

9    page 9 and 10 of our sentencing submission where Mr. Hunter is

10   actually, he's given the option by effectively the DEA,

11   somebody acting at the direction of the DEA to send Mr. Hunter

12   e-mails and they ask do you want this job?  Is this a job that

13   you will do?  He says effectively, my guys will handle both

14   jobs.  They just need good tools.  And here's where we get to

15   the heart of the matter after that, your Honor.  Hunter says,

16   "What about me?  Do I get a small bonus for this also?"  That's

17   what drove this crime, your Honor.  Greed.  And this continuing

18   argument about duress in the face of that record and the face

19   of the points about Mr. Hunter's departure and return to the

20   organization, the evidence that other people had done the same,

21   the evidence of murders for hire, in light of the evidence of

22   what Mr. Hunter said to his co-defendants in this case, in his

23   own movie that he made, in light of these e-mails, persisting

24   in this argument about duress it does bear on sentencing under

25   3553(a).  In our view it bears on it as follows:  This is not

1    somebody sitting behind me who has truly accepted

2    responsibility for these offenses.  This is not someone who is

3    remorseful about these crimes.  I made clear today that as a

4    guidelines matter we agreed that the three-level reduction is

5    appropriate, but this is not an acceptance of responsibility.

6    This is not remorse.  This is somebody who continues to this

7    day in the face of evidence to the contrary this argument that

8    this crime is really not his fault.

9          Now, with respect to the arguments presented today

10   about PTSD.  Again, Mr. Kirton said a lot from his perspective

11   about what happens to people who have PTSD.  I think that

12   Dr. Paradis' report makes clear that what does not happen is

13   people with PTSD go out and commit murders, engage in other

14   conduct that could serve as a trigger back to the things that

15   initially led to that diagnosis or condition in the first

16   place.  Even Dr. Blumberg has effectively acknowledged in light

17   of the government's argument and the fact he was able to

18   supplement his report several times, there's no causal

19   connection here between the diagnosis and the conduct in this

20   case.  And that your Honor from the perspective of the

21   government eviscerates that argument that the PTSD is a

22   mitigating feature at this sentencing as to the conduct.

23         In any event, Mr. Blumberg's report is not reliable.

24   It's not reliable because Mr. Hunter lied to Dr. Blumberg.

25   That's been acknowledged.  It's acknowledged in the defense's

1    opening sentencing submission.

2           Mr. Kirton also made some comments today about his own

3    observations of Mr. Hunter and how those also are consistent

4    with Mr. Blumberg's analysis or mitigating.  Mr. Hunter lied to

5    Mr. Kirton.  That is also acknowledged and I'm referring to

6    footnote 19 to the opening defense submission.  As a result

7    this report we submit is not reliable.  It's not reliable for

8    the technical reasons that Dr. Paradis identified.  It's not

9    reliable for the common sense reason that this is somebody who

10   intentionally misled Dr. Blumberg and in subsequent reports

11   very little is done to account for why that happened or what

12   the impact is on the diagnosis other than the diagnosis

13   effectively stays the same.

14          For those reasons, your Honor, our position is that

15   the PTSD diagnosis is not mitigating here under 3553(a).

16          We acknowledge that to the extent there are steps the

17   Court could take about making recommendations about housing to

18   the BOP to ensure Mr. Hunter receives treatment, that those

19   could and should be undertaken.  We have no issue with those.

20   There is a letter from the BOP attached to our submission that

21   describes the treatment programs that are in place.  It's

22   simply not true that the BOP is ill equipped or not able to

23   deal with these things.  It's a matter that's received a large

24   measure of attention in this proceeding and we expect the BOP

25   will be mindful of this, but it's not a reason to impose a

1   non-guidelines sentence in this case.

2          Your Honor, this is a case about a criminal

3   organization.  Mr. Hunter pled guilty and agreed that in

4   connection with the offense he was the acting leader of that

5   organization with respect to crimes that are incredibly grave

6   and, as I said at the outset, strike at the very core of the

7   process that is administered in this courthouse and by my

8   office.  For that conduct alone we believe that a guidelines

9   sentence would be appropriate.  But in light of all the context

10  that has become clear through the evidence phase, the

11  statements that Mr. Hunter made insofar as they bear on his

12  history and what he did prior to the onset of the sting and as

13  far as he made clear that he had every intent of carrying this

14  out just so he could make more money, so he could get a bonus,

15  it's the government's position that a guidelines sentence is

16  appropriate.

17         THE COURT:  Before you sit down I realize there's one

18  consideration that is in the Court's mix that neither of you

19  addressed directly and so I'll ask Mr. Bove to address it and

20  give Mr. Kirton the opportunity to address it as well.  The

21  Court has been considering Mr. Hunter's age, his current age

22  and his projected age in a guidelines sentence in the context

23  of post-custodial treatment and reintegration.  He was 48, I

24  believe, when he was arrested.  The bottom of the guidelines

25  sentence even as adjusted would have him coming out in his

1    early 70s, I think even with good time.  And the Court is

2    mindful of the research on recidivism reducing with older

3    people and also on all the practical considerations of someone

4    coming out at an advanced age who needs reintegration and

5    mental health treatment and probably has some practical need to

6    be able to do some work and so among the mix of considerations

7    in the Court's hands now is the question of whether some

8    reduction that would allow him to emerge before the age of 70

9    combined with a longer period of supervised release might be

10   warranted under all of these circumstances, so I wanted to give

11   you a chance to respond to that.

12           MR. BOVE:  If I could have one moment, your Honor.

13           (Pause)

14           MR. BOVE:  Thank you, your Honor.

15           THE COURT:  Hang on a second.  Defense counsel are

16   still consulting.  Are you ready?

17           MR. KIRTON:  Yes.

18           THE COURT:  Mr. Bove.

19           MR. BOVE:  Your Honor, the government's position is

20   that the risk of recidivism here is not one of the principal

21   aggravating features of the sentencing.  From the government's

22   perspective the nature and seriousness of this offense, the

23   history of this defendant, the need to promote respect for the

24   law, and I'll pause there because the need to promote respect

25   for the law is a feature in every sentencing as a matter of

statute, but in this case it should, from our perspective,

carry a great deal more weight in light of the incredible

disrespect for the law and law enforcement that is reflected in

this defendant's conduct.

So our position is that while we acknowledge that

research and some of the additional opinions regarding it, that

that consideration is outweighed by these other factors and

these are matters that probation will be in a position to

account for upon release from whatever sentence your Honor

determines.

THE COURT:  Thank you.

MR. KIRTON:  Your Honor, we did not specifically

address that in our filings.  I don't know if the probation

department did.  I don't think that they did.  I will say that

Mr. Hunter is now 51 years old.  If he receives even a minimum

statutory sentence he would be over 60.  We agree with the

Court that is a factor --

THE COURT:  A minimum statutory sentence would count

back to the time of arrest, that's ten years from time of

arrest minus good time credits.

MR. KIRTON:  Yes.  A guidelines sentence or something

approaching a guidelines sentence would insure that my client

would be either 70 or close to 70 years old and I think the

Court is correct that there are cases, there are

interpretations of 3553(a) that suggest that older defendants

1    have a lower risk of recidivism.  We would urge the Court to

2    take that into consideration when rendering or considering any

3    of the factors under United States Code 3553(a).  I also remind

4    you of a comment that was made by my client's mother who was

5    almost 80 years old.  She said I won't be able to come to New

6    York to speak to the judge, but I just want to be able to see

7    my son out of prison before I die.  She just did not want to

8    die while Mr. Hunter was incarcerated in this case.  So in

9    light of all the factors suggested, interpretations of 3553(a),

10   I think the Court should take into account Mr. Hunter's age in

11   the guidelines sentence or a sentence approaching the

12   guidelines in this case.

13             THE COURT:  Thank you.

14             MR. KIRTON:  There's a few other points that we wanted

15   to make.  I don't know if the Court -- it's going to take

16   actually three minutes, three minutes?  Just to respond to two

17   of the things that Mr. Bove --

18             THE COURT:  Three minutes.

19             MR. KIRTON:  First, there's a very well-known movie

20   called "American Sniper," which that character is based on a

21   true-life person.  I don't remember his name, but that person

22   was killed by a friend who had PTSD.  So what Mr. Bove said,

23   the doctor suggested that people with PTSD don't kill people,

24   that's a clear example of that happening.  Not to say that that

25   justifies or excuses anything.  He's accepted responsibility

1    for everything he's done.  He's not putting the blame on anyone

2    else in this case, but I just wanted to address that one point.

3           Secondly, the report of the government's expert

4    concurred with Dr. Blumberg that there was no malingering by

5    Mr. Hunter during those two tests.  Dr. Blumberg said he found

6    no evidence of malingering, Dr. Paradis concurred.  They both

7    said anything is possible, but there was no objective evidence

8    of malingering in the tests before Dr. Blumberg, the two tests

9    performed by Dr. Blumberg.

10          THE COURT:  Thank you.  Mr. Hunter, would you like to

11   speak for yourself before I decide your sentence?

12          THE DEFENDANT:  Yes, your Honor.  Good morning, your

13   Honor.

14          THE COURT:  Good morning.

15          THE DEFENDANT:  Much has happened in the last few

16   years, most that I would not wish upon anyone.  Nonetheless, it

17   has happened.  I've conspired for the crimes that I'm here

18   today to be sentenced of.  I apologize to you, your Honor, to

19   the Court and to the citizens of the United States for my

20   actions.  For these crimes I will be labeled, a fair label that

21   I will carry for the rest of my life, but a label that I will

22   strive to peel away bit by bit by being a good citizen and a

23   good man.

24          I've had much time to reflect on everything in my life

25   from the smallest detail to the most tragic events.  I've

G5VFHUNS                          Sentence

searched for meaning and I've searched for the reasons why, but

ultimately I've come to the conclusion that these are not the

questions to be asked, but only God knows these answers and

only He knows the path I travel and how it ends.  Instead, I've

looked at my mistakes and my weakness and my flaws.  I've

looked for a solution to fix everything within myself and I

found that the error was always with me.  Simply put, at times

I've forgotten to place God at the forefront of my thoughts and

actions.  I have failed.  I failed my God, my family and

myself.

        If I had but one thought, I would not be here today.

If I only had asked myself what God would want me to do.  If I

had placed this question at the forefront of my thoughts I

would be much safer, a better person and with my family.  It's

so simple, what would God want me to do, and so easily

forgotten.  This is my biggest crime and one that I intend to

fix the rest of my life.

        Now I address my family, friends and all those that

pray for me.  They know my heart and they know my soul.  They

are not embarrassed for me, they're not ashamed of me.  They

love me.  But I am embarrassed for them.  I have shamed them; a

good family, good friends, ones that still stand by me today,

and I am forever grateful.  I love each and every one of them.

I love you.  Thank you, your Honor.

        THE COURT:  Thank you, Mr. Hunter.  That was clearly a

 1  very difficult statement for you to make, but I am glad that

 2  you have made it publicly and I am glad to hear from you here

 3  and in your letter that you are devoting attention to examining

 4  your past and to planning for a future that is very different

 5  from your past and that you understand the hurt that you have

 6  done but the opportunity that you have going forward to lead a

 7  different sort of life.

 8          I'm going to ask that everyone just sit quietly for a

 9  few short minutes while I reflect on everything that I have

10  heard today and make my final decision as to the sentence which

11  I will then explain and announce.  I'm just going to ask my law

12  clerk to bring this cup of water to Mr. Hunter.

13          (Pause)

14          THE COURT:  Thank you all for your patience.  I adopt

15  the factual recitation set forth in the presentence report as

16  discussed earlier.  This Court has discretion subject to the

17  applicable statutory provisions in exercising its power under

18  Section 3553(a) of Title 18 to determine the particular

19  sentence to be imposed in each particular case.  That statute

20  requires the Court to consider a number of specific factors and

21  sentencing goals, including the nature and circumstances of the

22  offense, the defendant's history and characteristics, the need

23  for the sentence imposed to reflect the seriousness of the

24  offense, promote respect for the law and provide just

25  punishment, deterrence, protection of the public and the

1    provision of needed training, medical care or other treatment

2    to the defendant in the most effective manner.

3          The Court must also consider the types of sentences

4    that are available, the provisions of the guidelines and the

5    need to avoid unwarranted sentencing disparities among

6    defendants with similar records who have been found guilty of

7    similar conduct.  The Court is required to impose a sentence

8    that is sufficient but not greater than necessary to comply

9    with the statutory sentencing factors.

10         As to the sentencing guidelines I conclude that the

11   applicable guideline offense level is 40, based on the adjusted

12   calculations in the report and that the applicable criminal

13   history category is I.  I also adopt the grouping of charges

14   analysis in the report.  Accordingly, the advisory guideline

15   range for a custodial sentence is from 292 to 365 months of

16   imprisonment and I have used the November 1, 2015 edition of

17   the sentencing guidelines manual in making these

18   determinations.

19         I have considered the question of whether there is an

20   appropriate basis for a departure from this advisory range

21   within the guidelines system and I find no grounds for

22   warranting a departure within the guidelines system.  And so I

23   have continued on to consider carefully the full range of

24   Section 3553(a) statutory sentencing factors and goals and to

25   consider all of the information that has been put before me in

1    light of those factors and goals.  I will address some of the

2    factors and facts here.

3              As to the nature and circumstances of the offense, the

4    offense conduct here is extremely serious.  Mr. Hunter has

5    pleaded guilty to participating in an international conspiracy

6    to murder a DEA agent and a confidential source for the DEA for

7    which sophisticated firearms were to be used.  He has also

8    pleaded guilty to participating in a narcotics importation

9    conspiracy.  The interdiction of drug trafficking and the

10   prevention of related violence are major and very challenging

11   law enforcement priorities.  Threatening the lives of those

12   involved in this effort and the civilians seeking to assist

13   them is a very serious offense against the United States.

14   Among other things, agents and cooperating witnesses who risk

15   their lives to infiltrate violent groups outside the United

16   States in connection with these operations must be able to be

17   confident that those who seek to kill them will be captured,

18   incapacitated and punished severely so that they and others

19   with similar skills and opportunities will be deterred from

20   using them and particularly from using experience gained in the

21   military to provide security for criminal groups.

22             These crimes were not isolated events and Mr. Hunter's

23   work history with a dangerous multinational organization and

24   his surveillance records with his meetings with co-conspirators

25   shows he boasted prior violent work including overseeing the

G5VFHUNS                          Sentence

murders of two women by hit teams.  He specifically recruited

others for assassination assignments which he referred to as

bonus work and he provided specification of weapons, including

silencers and elaborate gear.  He approached this murder plot

as meticulously and thoroughly as he approached his legitimate

work in his military career.  This deadly plotting against a

DEA agent and a cooperating witness and his participation in

securing what he believed was a very massive shipment of

dangerous drugs bound for the United States are grave and

serious crimes.  The defense argues that Mr. Hunter committed

these crimes while under duress because he feared the violent

nature of the leader of the criminal conspiracy of which

Mr. Hunter was a member and that Mr. Hunter was afraid of

reprisals against himself or his family if he were to refuse to

carry out the work.

        While the Court has no doubt that Mr. LeRoux was a

dangerous and terrifying man, the Court finds no factually or

legally appropriate ground for mitigation in the defendant's

duress argument.  As a legal matter duress is an exculpatory

doctrine.  To his credit Mr. Hunter takes responsibility for

his own culpable decisions and actions here.  To the extent

Mr. Hunter is making a factual argument that he is entitled to

leniency because he felt he had to choose between killing

others or be killed himself or seeing his family members

harmed, the Court, frankly, does not find the claim credible.

Although the record indicates that Mr. Hunter had difficult

choices to make and that he perceived potential risks in

disobeying orders from Mr. LeRoux, it also demonstrates that he

had in the past found ways to separate himself from LeRoux or

to disobey LeRoux and he suffered no adverse consequences.  He

also knew that his co-defendant Vamvakias left and returned

without adverse consequences.  Mr. Hunter himself had

voluntarily left the organization in the past suffering no

adverse consequences for that decision and then rejoined the

organization in a higher-ranking position and for increased

pay.  Although the defense rightly points out that Mr. Hunter

worked for a dangerous individual, the evidence indicates that

he chose to do so voluntarily and that he did so for money

despite knowing that he had done and would do terrible things

in aid of the organization himself.

        Furthermore, even if the Court credits fear as part of

the mix of motivations, leniency is not warranted on that

account.  Mr. Hunter voluntarily associated himself with

Mr. LeRoux in the first place and stayed in Mr. LeRoux's employ

long after he knew of and had involved himself in Mr. LeRoux's

extensive criminal activity.  The safety of law enforcement

agents, those helping them, and of innocent people depend on

right choices, even if those choices are life or death choices.

As between killing someone sworn to uphold the law and risking

his own demise at the hands of people he had chosen to join in

1    criminal activity, Mr. Hunter made the dishonorable choice.

2    His was a choice that betrayed society and the honor and trust

3    that this country invested in his military career and his

4    actions must be punished and deterred in a way that is strict

5    and unequivocal.

6            The defense has also proffered expert evidence that

7    Mr. Hunter suffered at the time of his crimes and continues to

8    suffer at present from post traumatic stress disorder or PTSD

9    and major depression.  Even the defense expert acknowledges,

10   however, that Mr. Hunter's psychiatric condition did not

11   preclude him from appreciating the wrongfulness of his conduct

12   or conforming his conduct to the requirements of the law and

13   that statement is in the second Blumberg report from pages 1 to

14   2.  The Court finds no basis in the record for a finding that

15   leniency is warranted because Mr. Hunter was mentally

16   compromised at the time he committed his crimes.

17           Turning to Mr. Hunter's personal history and

18   characteristics.  Mr. Hunter is an extensively decorated

19   veteran of the United States military and served honorably as

20   both a soldier and an instructor from 1983 to 2004, receiving

21   numerous service medals and commendations.  By all accounts his

22   military service was entirely commendable.  It also took a toll

23   on him and his family, taking him away from them when he was

24   deployed for long periods of time abroad and when he served

25   domestically as a drill instructor, introducing tension and

G5VFHUNS                    Sentence

conflict into the home.  I recognize in this connection that

veterans of our armed services who served in conflict

situations and train others give immeasurable benefit to our

country.  We make extraordinary demands on them, entrusting

them to confront and engage in violence on our behalf.  We also

entrust them with the challenging and essential responsibility

of never turning that experience against us.

         Video statements by Mr. Hunter's family members and

lifelong friends demonstrate that there is deep affection,

concern and respect for him in his family and among those who

know him well.  His wife and stepchildren have relied on him

and are supportive of him now.  As I noted a moment ago, I have

reviewed reports by Dr. Blumberg that conclude that Mr. Hunter

suffers and continues to suffer from PTSD and depression.  The

government has proffered a report by Dr. Paradis, a consulting

expert whom the defense did not permit to examine Mr. Hunter

that questions Dr. Blumberg's conclusions and methodologies.

Dr. Blumberg has tendered a further report that responds to

some of Dr. Paradis' questions and criticisms.  The Court finds

it easy to accept that Mr. Hunter, given his long military

background, extensive military and post-military deployment to

the war zone in Iraq and incidents of death and injury suffered

by people close to him in the military is a troubled man who

needs help coping with traumatic incidents in his past.  It is

similarly unsurprising that he should be suffering from

1    depression or that, as Dr. Blumberg has concluded, his

2    depression has begun to improve with the treatment he has

3    received while in custody.

4           It is not necessary for the Court to resolve the

5    disputed particulars of Dr. Blumberg's assessment.  The

6    evidence before the Court is sufficient to persuade the Court

7    that a recommendation to the Bureau of Prisons of a thorough

8    mental health assessment and appropriate treatment is in order

9    and that mental health treatment must certainly be a condition

10   of supervised release.  The Court is not persuaded by the

11   defense arguments that the Bureau of Prisons is incapable of

12   providing effective assistance to Mr. Hunter.  The Bureau of

13   Prisons has provided him with helpful assistance thus far and

14   far greater resources, including outside resources that the

15   Bureau of Prisons determines that such are wanted will be

16   available to him after he is designated to an institution

17   following sentencing as well as during his supervised release

18   period.  Such resources will be crucial to his ultimate

19   successful reintegration into domestic civilian society and his

20   ability to obtain and maintain gainful legitimate employment.

21          His conduct while in custody has been honorable and

22   he's shown that he is using his time to gain skills and to help

23   others and that is documented in the certificates that he has

24   provided to the Court and the Court commends that and

25   encourages him to continue that.

1          Mr. Hunter's age is also an important factor in the

2     Court's determination of the appropriate sentence.  He was 48

3     at the time of his arrest.  The minimum guideline sentence with

4     good time in prison will have him serve until his early 70s.

5     It is well established, as noted in counsel's remarks, that

6     recidivism risk diminishes with age.  Mr. Hunter's

7     rehabilitation and reintegration to productive contributions to

8     society will necessarily be short even if the Court shows some

9     leniency in the sentence.  A lengthy custodial sentence even if

10    somewhat below guideline will serve the interests of

11    punishment, protection of the public and promotion of respect

12    for the law.  A lengthy period of supervised release will

13    provide protection of the public through oversight and

14    limitations of his activities and will insure that supportive

15    mental health and other services can be provided to him in an

16    effective manner.  Foreign employment and travel restrictions

17    will help to protect the public during his period of supervised

18    release by minimizing his opportunities to engage in covert use

19    of his military skills in connection with criminal activity.

20          The Court has also considered thoroughly the matters

21    that were discussed in the sealed hearings and submissions and

22    finds that circumstances warranting some leniency have been

23    established.

24          Turning again to the questions of punishment,

25    deterrence and promotion of respect for the law.  There is a

1    significant need of deterrence and protection of the public in

2    this case.  Mr. Hunter committed very serious crimes and did so

3    in aid of an ongoing international criminal conspiracy, some

4    members of which are still at large.  There is a need both to

5    deter those individuals as well as others who may work for such

6    organizations from engaging in similar conduct.  Mr. Hunter

7    demonstrated a willingness to use violence in aid of a criminal

8    conspiracy.  That conduct merits significant punishment.  He

9    demonstrates that he presents a danger to the general public as

10   the conspiracy also involved a civilian target in addition to a

11   law enforcement target and these matters counsel in favor of a

12   significantly lengthy incarceratory component of Mr. Hunter's

13   sentence.

14        The Court has also considered in its deliberations the

15   need to avoid unwarranted sentencing disparity and here

16   confirms that the sentence constructed here, like the sentences

17   constructed for the co-defendants, are based on individual

18   factors and are appropriate in relation generally to other

19   similarly situated defendants and in relation to the specific

20   co-defendants.  And so, to sum up, taking as a whole, I find

21   that the serious nature of the charged offense, combined with

22   the need for punishment, deterrence and protection of the

23   public, weighs in favor of a significant incarceratory

24   component to Mr. Hunter's sentence, far lengthier than the

25   sentence requested by the defense.  However, in light of

Mr. Hunter's age, the desirability of supported and supervised

reintegration while he is still young enough to engage in

gainful, lawful employment in support of himself and his

family, his mental health treatment needs and other matters

reflected in the record as a whole, the Court finds that a

small variance from the advisory guideline custodial sentence

coupled with a lengthier than recommended supervised release

term is necessary to fashion a sentence that is reasonable,

appropriate and no greater than necessary to address the

statutory purposes of sentencing.

I will now state the sentence that I intend to impose.

Mr. Hunter, will you and your attorneys please stand?

Mr. Hunter, it is the judgment of this Court that you

are to serve 240, that is 240 months of imprisonment on each of

your counts of conviction to run concurrently for a total of

240 months of imprisonment before good time credit.  This will

be followed by ten years of supervised release on Count One and

five years of supervised release on Counts Two and Four, also

running concurrently, for a total of ten years of supervised

release.  The standard conditions of supervision 1 through 13

as detailed in the sentencing guidelines manual will apply.  In

addition, you will be subject to the following mandatory

conditions:  You must not commit another federal, state or

local crime.  You must not illegally possess a controlled

substance.  You must not possess a firearm or destructive

device.  You must refrain from any unlawful use of a controlled

substance and you must submit to one drug testing within 15

days of placement on supervised release and at least two

unscheduled drug tests thereafter as directed by the probation

officer.  You must cooperate in the collection of DNA as

directed by the authorities.

You must also meet the following special conditions:

You will be prohibited from securing employment outside of the

United States.  You will be prohibited from traveling outside

of the United States.  You must participate in a mental health

program approved by the United States probation office.  You

must continue to take any prescribed medications unless

otherwise instructed by the health care provider and you must

contribute to the costs of the services rendered that are not

covered by third party payment if you have the ability to pay.

Your probation officer will work with you on that.

The Court authorizes the release of available

psychological and psychiatric evaluations and reports to the

health care provider.  You must submit your person, your

residence, your place of business, your vehicle and any

property, computers, electronic communications, data storage

devices and our other media under your control to a search on

the basis that the probation officer has a reasonable suspicion

that contraband or evidence of a violation of the conditions of

release may be found.  Any search must be conducted at a

1    reasonable time and in a reasonable manner.  Failing to submit

2    to a search may be grounds for revocation of supervised

3    release.  You must inform any other residence that the premises

4    may be subject to search pursuant to this condition.

5           You must report to the nearest probation office within

6    72 hours of release from custody and you'll be supervised by

7    your district of residence.

8           In light of your financial circumstances I will not

9    impose any fine on you, but I will order that you pay to the

10   United States the mandatory special assessment in the total

11   amount of $300, which is $100 for each of your felony counts of

12   conviction.  This will be payable in quarterly installments of

13   $25 through the Bureau of Prisons inmate financial

14   responsibility program.

15          The Court will recommend to the Bureau of Prisons that

16   Mr. Hunter be afforded a prompt and thorough mental health

17   assessment and appropriate treatment throughout his custodial

18   term.  The Court will also recommend that Mr. Hunter be

19   designated to a suitable facility at or in the vicinity of

20   Lexington, Kentucky to facilitate maintenance of his family

21   ties and the potential viability of veterans supportive

22   services.  I'm just going to write this down so I remember to

23   put it in the judgment.

24          I believe that this sentence as a whole is reasonable

25   within the meaning of the law, sufficient, appropriate and no

 1   greater than necessary to satisfy the statutory purposes of

 2   sentencing which include punishment and deterrence.

 3             Counsel, does any of you know of any legal reason why

 4   the sentence should not be imposed as stated?

 5             MR. BOVE:  No, your Honor.

 6             MR. KIRTON:  No, your Honor.

 7             THE COURT:  The sentence as stated is imposed.

 8             Mr. Hunter, I must say something very important to you

 9   about appeal rights.  To the extent you have not given up your

10   right to appeal through your guilty plea you have the right to

11   appeal this sentence.  If you are unable to pay the cost of an

12   appeal you may apply for leave to appeal in forma pauperis.  At

13   your request the clerk of the court will file a notice of

14   appeal for you.  Any notice of appeal must be filed within 14

15   days of the judgment of conviction, so make sure you speak with

16   your attorneys about this before you part company today.  The

17   deadline is short.

18             Mr. Bove, are there any remaining counts or underlying

19   indictments that need to be addressed?

20             MR. BOVE:  There are, your Honor.  The government

21   moves to dismiss them.

22             THE COURT:  That motion is granted.

23             Mr. Hunter, I would just like to say a few more words

24   and I thank you in advance for listening.  I thank your sister

25   as well.  The crimes that you committed are serious and the

1    sentence you received today reflects that.  You have a

2    distinguished record of service to this country.  As you

3    acknowledged, you made a series of bad decisions and you held

4    yourself to the wrong standard, but although the sentence you

5    received today is a long one it remains within your power to

6    live the rest of your life, including the time you spend

7    serving this sentence, honorably and in keeping with the values

8    that you displayed for so long during your military service and

9    in keeping with the love that you have for your family and the

10   honor in which you are and continue to wish to be held by or

11   family and community.  So I urge you to continue to examine

12   yourself and to think hard about the potential consequences of

13   your actions before you take your action so that what you do

14   now and for the rest of your life will be honorable, will

15   reflect the honor that you yourself should carry and hold

16   yourself to as a human being and that your future will be one

17   of which you and your family can be proud even while you are

18   serving your sentence.

19            Your wife and your stepchildren, your close family

20   members and many friends support you and love you, and I know

21   that, I watched an hour and 40 minutes of videos that told me

22   that in many different ways from the mouths of many different

23   people.  Be an encouragement and a good example for them, even

24   while you're in prison and I wish you and your family continued

25   strength during this period and I wish you continued growth and

G5VFHUNS                          Sentence

a return to wholeness and the ability to have joy in positive,

safe and constructive activity in every day, even while you're

serving your sentence, and certainly when you return to your

family.

When you are released you will have the guidance and

support of the probation department in reestablishing your

day-to-day life during your supervised release period.  I urge

you to see supervised release, although it is difficult to live

under these restrictions, but understand that it is one of the

many building blocks for a safe and successful life and the

people in probation have resources that will be helpful to you

in this ten-year period to make sure that the mental health

resources in particular that you need can be provided as a

backup or as a primary source and the people in probation truly

are committed to helping you succeed.

That said, I do have to caution you that you have to

comply strictly in every respect with all of the conditions of

your supervised release.  If you are brought back before me for

violating any of the conditions I may send you right back to

prison, so please don't ever put me in the position of having

to make that decision.

I know that you will succeed.  You will pay the price

for your crimes by serving this sentence and all other aspects

of your life are in your hands and so, again, I commend you for

looking at what your standards should be and I encourage you in

G5VFHUNS                          Sentence

1    living to the standards that you see and you've identified and

2    set for yourself and your family and I know that you will do

3    that.

4              I will direct that counsel for the parties, the Bureau

5    of Prisons and the Sentencing Commission be provided with a

6    corrected copy of the presentence investigation report.  All

7    other copies of the report must remain confidential and if an

8    appeal is taken counsel on appeal are to be permitted access to

9    the report.  I thank counsel for their extensive work in this

10   case and for the information and assistance that they have

11   provided to the Court in making this very difficult set of

12   decisions.

13             I would ask that the marshals permit Mr. Hunter to

14   acknowledge his sister as he leaves the courtroom and also to

15   meet with counsel about the appeal issue.  Thank you for making

16   those accommodations.  Counsel, is there anything else that we

17   need to take up together?

18             MR. BOVE:  Your Honor, I would just ask the Court to

19   confirm that the oral order of forfeiture that we mentioned

20   earlier is a part of today's proceedings.

21             THE COURT:  Thank you.  I did neglect to mention that.

22   The sentence is amended as follows:  Mr. Hunter is required to

23   forfeit the proceeds of his crimes of conviction in an amount

24   to be determined up to $450,000.  This obligation will be joint

25   and several with those of his co-defendants.

1           Counsel, is there any legal reason why the sentence as

2    stated should not be amended to include this forfeiture order?

3           MR. BOVE:  No, your Honor.  Thank you.

4           MR. KIRTON:  No, your Honor.  Thank you.

5           THE COURT:  The sentence as amended is stated and I

6    apologize for having neglected to mention that.

7           Thank you.  We are adjourned.  I wish everyone well

8    and I thank you.

9           (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25