UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

JOSEPH HUNTER, ADAM SAMIA, and
CARL DAVID STILLWELL,

Defendants.

No. 13-CR-521 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

# INTRODUCTION

Before the Court are Rule 29 and 33 motions filed by Defendants Hunter, Samia, and Stillwell.[1] For the reasons set forth herein, these motions are denied.

# BACKGROUND

Trial in this action commenced on April 2, 2018. The government rested on April 12, at which point each of the defendants orally lodged a Rule 29 motion, with the Court reserving judgment pursuant to Rule 29(b). Tr. 1474: 24, 1475:7–21. At the close of all the evidence, the parties argued the motions. Tr. 1777:18–1792:7. On April 18, the jury found the defendants guilty of all five counts of the indictment, which charged conspiracy to commit murder-for-hire, murder-for-hire, conspiracy to commit murder abroad, using and carrying a firearm in relation to a crime of violence constituting murder, and conspiracy to commit money laundering. After the verdict, the defendants timely submitted moving papers supplementing their motions.[2] On August 31, 2018, the Court held oral argument regarding Stillwell's motion.

---

[1] Stillwell moves only pursuant to Rule 29.
[2] Samia has not submitted any papers to the Court, but informed the government that he was joining in those submitted by his co-defendants.

## DISCUSSION

### I. Rule 29

Rule 29 requires a court, "on the defendant's motion," to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When a court reserves its decision until after the jury returns a verdict, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b).[3]

On such a motion, a court "must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government." *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (citation omitted). A court further "defer[s] to the jury's evaluation of the credibility of the witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence." *United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006). If "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the Court must deny the motion. *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This strong "deference . . . to a jury verdict is especially important when reviewing a conviction of conspiracy" because conspiracies "by [their] very nature" are "secretive" and thus are "rare[ly] . . . laid bare in court." *Anderson*, 747 F.3d at 72–73 (citation omitted).

Each of the defendants' motions centers on the same count contained in the indictment: count three, which charges conspiracy to commit murder and kidnapping abroad, in violation of

---

[3] The defendants have not specified whether they move solely pursuant to Rule 29(a) and (b), or also—or instead—pursuant to Rule 29(c), which would permit the Court to consider the entire record rather than just the evidence introduced on the government's case-in-chief. *See United States v. Atilla*, No. 15-CR-876 (RMB), 2018 WL 791348, at *2–3 (S.D.N.Y. Feb. 7, 2018). Stillwell initially notes in his papers that he is moving pursuant to Rule 29(c), but this seems to be in error as both in his submission and at argument he emphasized that the Court may not consider evidence introduced on the defense case. *See* Stillwell Reply 3 n.3, ECF No. 613; Tr. 11:15–25, ECF No. 632. The Court, therefore, has proceeded only under Rule 29(b), which specifies that the motion be assessed as of the time the Court reserved judgment, in this case when the government rested. In any event, the outcome under either Rule 29(b) or (c) would be the same.

2

18 U.S.C. § 956(a)(1).[4] Specifically, 18 U.S.C. § 956 (a)(1) provides that, "[w]hoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy [be guilty of a crime]."

The Court instructed the jury that this charge includes four elements, each of which the government was required to prove beyond a reasonable doubt with regard to each defendant: (1) "from at least 2008 up to and including July 2014, there existed a conspiracy to commit murder or kidnapping in a foreign country"; (2) the defendant "knowingly and willfully became a member of that conspiracy"; (3) the defendant "conspired with one or more members of the conspiracy while that defendant was physically present in the United States"; and (4) "at least one member of the conspiracy committed an overt act while in the United States in furtherance of that conspiracy." Tr. 2011:1–15. Each defendant challenges only the third element, which concerns jurisdiction.

With respect to this contested jurisdictional element, the Court further instructed the jury that a defendant must "have knowingly joined or participated in the conspiracy to commit murder or kidnapping in a foreign country while he was physically present in the United States. . . . [A] defendant cannot have knowingly joined or participated in a conspiracy prior to having the requisite knowledge of its unlawful purpose or objective. Thus, for a defendant to be convicted of [count three], he must have known that the purpose of the conspiracy was to commit murder or

---

[4] The parties agreed that the third count of the indictment is a necessary predicate to the defendants' guilt on counts one, two, and four. Accordingly, the jury was instructed that were it to find any of the defendants not guilty on count three, they were to proceed to assess that particular defendant's guilt only on count five, which charged conspiracy to commit money laundering. In light of this relationship between the counts, the third count of the indictment was re-numbered as count one on the verdict form.

3

kidnapping abroad when he entered or participated in the conspiracy while he was in the United States." Tr. 2022:19–2023:7. Each defendant's argument thus turns on whether there was sufficient evidence that he joined or participated in the conspiracy with knowledge of its unlawful objective while physically present in the United States.

### A. Joseph Manuel Hunter

Contrary to Hunter's assertions, there was ample evidence from which the jury could have concluded that the government proved, beyond a reasonable doubt, that he conspired to commit murder or kidnapping abroad while physically present in the United States. It was undisputed that during the conspiracy, Hunter resided outside the United States but visited on a number of occasions. At trial, much of the evidence centered on a trip Hunter allegedly made to the United States in December of 2011, which is one of the overt acts specified in the indictment. This particular trip took on great import for all three of the defendants because it was the occasion on which Hunter was allegedly in the United States that most closely preceded when Samia and Stillwell traveled to the Philippines in January 2012 to commit murders on behalf of Paul LeRoux.[5]

The government specifically alleged that Hunter was a passenger on Korean Airlines Flight 35 from Seoul to Atlanta on December 10, 2011. The government's proof at trial relied largely on the testimony of Yoon-Soo Nam, a senior manager with 30 years' experience at Korean Air, Tr. 1102:25–1103:12, through whom the government introduced a document that Mr. Nam specified was the manifest for passengers onboard Flight 35 and which listed Hunter's name, Tr. 1103:15–1104:4, 1105:2–3, 1105:8–10, 1110:8–15. Mr. Nam also explained that in 2014 the airline migrated data to a new system and some information was lost, which was why the manifest omitted

---

[5] LeRoux, a cooperating witness, was the head of the organization that employed all three of the defendants and it was he who selected the murder targets for Hunter, Samia, and Stillwell. *See* Tr. 308:17–18, 468:3–14

4

certain information with respect to Hunter, such as his ticket number. Tr. 1109:20–1110:3; 1111:15–1114:11.

The government further introduced documents through Steven Wnorowski, a Customs and Border Protection ("CBP") officer. These records came from several databases. CBP manages one database, TECS, formerly an acronym for Treasury Enforcement Communication Systems, which includes information on those passengers aboard airplanes entering the United States. Tr. 1057:17–1058:3, 1076:13–14. At least some of the information contained in TECS comes from a separate database, the Advance Passenger Information System ("APIS"), which is instead maintained by air couriers. Tr. 1058:4–20.[6] APIS is similarly the source of at least some information in yet a third database called the Automated Targeting System Passenger ("ATSP"). Tr. 1058:23–1059:11.

Mr. Wnorowski produced records from TECS that listed Hunter's name associated with Flight 35. Tr. 1085:14–1086:11; GX 101-1. On cross-examination, however, counsel for Stillwell elicited the fact that air couriers transmit certain information to APIS *prior* to a given flight's departure. Tr. 1073:20–1074:15. Therefore, rather than relying on a roster of those passengers actually onboard a plane, the data is derived from reservation information. Tr. 1074:1–15; 1078:1–5. The critical point, and the inference urged by the defendants, was the following: the records could incorrectly indicate that a person was a passenger because he purchased a ticket but for whatever reason did not board the aircraft. This argument was bolstered by information contained in the ATSP database, which indicated that Mr. Hunter was "not onboard" Flight 35. Tr. 1068:15–1069:5; GX 607. Moreover, a separate set of records—the "Person Encounter Detail"—specified that no CBP personnel encountered Mr. Hunter at customs on December 10, 2011, through which

---

[6] On direct, Mr. Wnorowski testified that APIS stands for *Automated* Passenger Information System before correcting himself on cross-examination. *Compare* Tr. 1058:5–6 *with* 1073:2–21.

5

he should have passed upon disembarking Flight 35 in order to gain entry to the United States. Tr. 1069:14–1070:5; GX 601-2.

The government urged the jury to draw the opposite inference, relying primarily on those scenarios in which a person's entry to the United States would not be reflected in the Person Encounter Detail, namely if the individual were able to evade inspection by the CBP or entered the country using fraudulent documents. Tr. 1070:6–23. This was an especially strong inference, in the government's view, in light of the fact that Hunter possessed at least two fraudulent passports. GXs 205, 206. While plausible, the Court views this theory as less compelling given that Hunter made the flight reservation in his own name. The government also emphasized, however, the loss of certain information cited by Mr. Nam when Korean Air migrated data to a new system. As previously noted, the information in APIS, which was the source of the relevant data in both TECS and ATSP, would have been provided by the airline.

In light of this conflicting evidence and the need to assess both the strength of the documentary evidence and the credibility of witnesses, it was for the jury to decide whether the government had sufficiently established Hunter's presence on Flight 35. Their conclusion, if they in fact credited the government's evidence on this point, would not have been unreasonable as a matter of law. *See Jones*, 482 F.3d at 68. But more importantly, in the Court's view, the government's case against Hunter did not rise or fall on his presence on this—or any—particular flight. Indeed, the government was under no obligation to prove the precise manner of Hunter's entry to the United States. The jurisdictional element instead turns simply on whether he was physically present in the country at a time when he was participating in the conspiracy. Particularly in light of Hunter's extensive international travel and history of using fraudulent travel documents, it is not at all implausible that he could have entered the country on an occasion not reflected in the salient government records.

Critically, Hunter's presence in the United States during the relevant period was supported by Timothy Vamvakias, a cooperating witness who testified that sometime between October and December of 2011 he spoke with Hunter on the phone.[7] According to Vamvakias, Hunter called from a Kentucky area code to inform Vamvakias that he was home in Owensboro, Kentucky and had to "meet with Adam and his guy about the bonus job." Tr. 1209:6–1210:11.[8] At trial, and again in his moving papers, Hunter attempts to discredit Vamvakias.[9] It is well-established, however, that the uncorroborated testimony of a single witness, even one cooperating with the government, may be sufficient to sustain a conviction if the jury deems him credible. *See, e.g.*, *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990). If the jury found Vamvakias credible on this point, even if it concluded that Hunter did not enter the United States on Flight 35, the government would have sustained its burden in establishing the jurisdictional element as to Hunter by virtue of the fact that he was in the United States and attempting to meet Samia and Stillwell about the planned murders on behalf of LeRoux.[10]

Even if Hunter's arguments were credited by the jury, however, the government had ample other bases for establishing jurisdiction as to him. In particular, Hunter takes too narrow a view of the temporal scope of the alleged conspiracy. According to the indictment, the conspiracy to

---

[7] Vamvakias was also a member of LeRoux's organization. He and Hunter had served together in the U.S. Army. Tr. 1145:22–24. Vamvakias briefly left the organization in 2008 but returned in 2011 to work under Hunter. Tr. 1149:7–14, 1181:4–13.

[8] The conspirators used the phrase "bonus job" to refer to murders-for-hire. Tr. 1199:6–11; 1206:21–22.

[9] The points raised by Hunter, Mot. 20, ECF No. 602, are not inconsistent with Vamvakias' testimony. For instance, he points to Vamvakias' explanation that he and Hunter frequently changed their phone numbers, which actually supports Vamvakias' testimony regarding the purported 2011 call with Hunter in explaining why Vamvakias did not recognize the number from which Hunter called. Tr. 1190:22–1191:5, 1209:13–20. As Hunter notes, Vamvakias also testified that during this period he was sending money received from Hunter overseas to Kentucky. Tr. 1194:12–21; 1200:19–22. According to Hunter, he would not have sent money to Vamvakias if he were planning a trip to the United States. But this argument is dubious, particularly in light of the fact that he had previously expressed concern about being caught on an occasion in which he was bringing at least $60,000 of criminal proceeds into the United States. Tr. 1195:13–1196:4.

[10] At trial, Samia elected to testify in his defense and stated that Stillwell did not meet Hunter until 2012. Tr. 1745:16–18. As previously discussed at note 3, the Court is proceeding by way of Rule 29(b) and thus is precluded from considering this evidence. In any event, it would have been for the jury to assess the credibility of Samia's statement. Notably, Samia unequivocally denied being involved in a murder-for-hire plot and thus the jury appears not to have credited his testimony.

commit murder or kidnapping abroad lasted from 2008 until July 2014. Tenth Superseding Indictment ¶ 9, ECF No. 446. Given this duration, there is other credible evidence from which the jury could have reasonably concluded that Hunter was conspiring while physically present in the United States.

As the government notes, the evidence adduced at trial established that by 2009 Hunter was already one of LeRoux's mercenaries, committing acts of violence around the world. On December 16, 2009, David Smith[11] contacted Samia, who had previously expressed interest in "wet work,"[12] about a job with Hunter: "[h]ey u want to work with joe 9k plus bonus I don't want to get into details if yes I will have joe contact u." Tr. 406:2–10; GX 400-20. Samia then forwarded Smith's email to Hunter. GX 400-20. Hunter responded the next day, noting that he "just got here in the US for the holidays" and that Smith was referencing "the serious thing in Africa." Tr. 406:18–23; GX 400-20. He further instructed Samia that they would "talk . . . later," in response to which Samia asked Hunter to give him a call. GX 400-20. In another email to Samia ten days later, Smith laid out the details of his compensation for this assignment: "25k bonus on each job done." Tr. 407:4–13; GX 400-21.[13] Based on this evidence, therefore, it would have been eminently reasonable for the jury to conclude that while Hunter was in the United States during December of 2009, he was conspiring with both Samia and Smith to commit murders-for-hire abroad at the direction of LeRoux and in particular was attempting to recruit Samia. *See United States v. Sanin*, 1997 WL 280083 (Table), at *4 (2d Cir. May 23, 1997) (unpublished) ("At the very least, the challenged statements were part of an effort to recruit Arredondo into the conspiracy, which is 'in furtherance' of the conspiracy because they are intended to achieve the

---

[11] Smith was a British national with military experience who was hired by LeRoux in 2005 to lead a team of mercenaries "who enjoyed killing and torturing and beating" and that would be "available" to LeRoux for "any projects [he] had in mind." Tr. 317:3–10. LeRoux helped kill him in December 2010. Tr. 407:25–408:15.

[12] "Wet work" was another term used by the conspirators to refer to murders-for-hire. Tr. 1178:11–17.

[13] It was well-established at trial that between 2009 and 2012, LeRoux paid $25,000 as a bonus for only one thing: successful murders. Tr. 407:15–17; 421:16–21; 430:16–21.

conspiracy's goals." (citing *Glenn v. Bartlett*, 98 F.3d 721, 729 (2d Cir. 1996), *cert. denied*, 117 S. Ct. 1116 (1997))).

The contested December 2011 visit aside, after this 2009 trip Hunter traveled to the United States on at least three other occasions: February 2010, February 2011, and June 2012. GXs 202, 506, 509; Tr. 1386:7–1390:2. Notably, there is no evidence that Hunter ever withdrew from the conspiracy—to the contrary. Indeed, it was well-established that beginning in early 2011, Hunter became the sole person responsible for managing the murderers-for-hire, which included hiring, overseeing, and otherwise acting as an intermediary between them and LeRoux. Tr. 409:17–410:19; 431:5–8; 432:14–433:7. There was thus a basis for the jury to conclude that Hunter was a member of the conspiracy during these three later trips, particularly the last two, at which point Hunter, as head of the operation, was actively recruiting members to the conspiracy, as well as managing the day-to-day operations of LeRoux's "kill team."

The testimony at trial was that in early 2011, after LeRoux helped kill Smith, Hunter was promoted to Smith's position as head of the mercenaries and was instructed to form a two-person team, the sole responsibility of which would be murders-for-hire. Tr. 407:25–408:4, 409:17–410:19.[14] The jury could have reasonably concluded, therefore, that during the February 2011 visit Hunter was actively recruiting the members of this newly founded kill team. Tr. 409:17–410:19; 1182:14–1183:1. Indeed, Hunter immediately went about recruiting Chris DeMeer and "Daddy Mac." Tr. 413:5–13.[15] When Samia wrote Hunter in April 2011 expressing interest in work, Hunter indicated that he "[a]lready ha[d] eight guys working for me on various things," seemingly confirming he had already recruited the new kill team, in compliance with LeRoux's instructions.

---

[14] At the same time that he promoted Hunter, LeRoux instructed him that going forward the mercenaries would be divided into two groups: the "business side" and the "ninja side," which would be responsible solely for murders-for-hire. Tr. 1182:6–13.

[15] DeMeer was a former member of the French Foreign Legion who joined LeRoux's mercenary team in approximately 2008. Tr. 317:25–318:19. Virtually nothing is known of Daddy Mac. Even LeRoux never learned his legal name. Tr. 412:23–4:13:1.

Tr. 412:8–13; GX 436. DeMeer and Daddy Mac would commit one murder for LeRoux in May or June of 2011 before promptly exiting the organization, leaving Hunter to recruit the new kill team that would eventually consist of Samia and Stillwell. Tr. 428:16–22, 1196:21–1197:15, 1199:5–11; GX 406-3.

There was also evidence from which the jury could have concluded that Hunter was participating in the conspiracy during his June 2012 trip. This visit occurred after Samia and Stillwell had returned to the United States following the murder of Catherine Lee. By this time, Stillwell had either withdrawn from the conspiracy or had been fired, requiring Hunter to find a new member to complement Samia. In April 2012, for instance, Hunter emailed Vamvakias that he was "still" working with Samia but was trying to recruit him a new partner. Tr. 1214:21–1215:11; GX 406-18. The next month, on May 18, Hunter sent Samia an email criticizing the "sloppy" job he and Stillwell had done in murdering Lee, but with no reference to the identification of a new partner for Samia, despite Stillwell's departure. Tr. 529:8–530:24; GX 400-72. This evidence thus further bolstered the government's case that Hunter conspired while in the United States to commit murder abroad.

When the evidence adduced at trial is viewed in its entirety and every inference is drawn in the government's favor, therefore, there is simply no basis to disturb the jury's conclusion that the government satisfied its burden with respect to the jurisdictional element of 18 U.S.C. § 956.

### B. Carl David Stillwell

Stillwell is situated differently from his co-defendants. Stillwell has only ever been out of the United States on one occasion: when he traveled to the Philippines to participate in the murder of Catherine Lee. Moreover, as noted previously, it is undisputed that Stillwell was no longer a member of the kill team shortly after he and Samia returned to the country. As a result, and as the government conceded at trial, Tr. 22:14–22:21, the jurisdictional element as to Stillwell is distilled

to this question: whether the government proved that he knew the object of the conspiracy prior to boarding his flight to the Philippines.[16]

Stillwell attacks each piece of evidence pertaining to the jurisdictional element, in certain instances rightly noting its weaknesses. In particular, he highlights the flaws in the government's case with respect to Hunter's presence on Flight 35, which the Court has already addressed, and the files on Stillwell's computer detailing, among other things, how to commit murder, as discussed below. He also rightly notes that much of the evidence against him is circumstantial. There is not, for instance, a single email between him and his co-conspirators. The fatal flaw in Stillwell's argument, however, is that he views each piece of evidence in isolation. When the government's case is viewed in its entirety and every reasonable inference is drawn in its favor, as the Court must, there was sufficient evidence on which the jury could have concluded that the contested jurisdictional element was satisfied.[17]

One of the primary pieces of evidence against Stillwell was the purported December 2011 meeting that he and Samia had with Hunter. The Court has already discussed the challenges asserted by the defendants regarding the evidence of Hunter's presence on Flight 35 in December 2011 and Vamvakias' testimony about the call in which Hunter told him that he was in the United States and intended to meet with Samia and his partner. There is one additional caveat, however, with respect to Stillwell: Vamvakias "ha[d] no idea" whether the December 2011 meeting with Hunter actually occurred. Tr. 1212:24–1213:1. Nonetheless, the evidence of this meeting was far

---

[16] As to Stillwell, the jury was effectively asked only to consider whether the government had satisfied its burden with respect to the jurisdictional element. Tr. 54. Indeed, counsel for Stillwell conceded in his opening statement that Stillwell had been involved in the murder of Catherine Lee. Id. 55–56.

[17] At trial, Leroux testified that he did not know whether Samia and Stillwell were aware, prior to leaving the United States, that they were traveling to the Philippines in order to carry out murders. Tr. 596:11–15. In the course of providing this testimony, however, LeRoux explained that he lied in 2015 when he told the Government that: (i) Samia and Stillwell "did not know that they were leaving the United States to conduct a murder;" and (ii) "that the initial job in the Philippines was a surveillance job." Tr. 522:14–523:2. It is the jury's role to make credibility determinations in deciding which of contradictory pieces of evidence to accept. In any event, LeRoux's testimony at trial was not a critical aspect of the government's case as to the jurisdictional element.

from the only indication that Stillwell knew precisely why he was going to the Philippines before he ever boarded his flight.

In particular, the substantial communications between Samia and Hunter from the spring through the summer of 2011 support the inference that Stillwell had by that point learned of the purpose of his trip. On April 9, 2011, for instance, Samia wrote to Hunter that there was "a good 2nd guy" who was "interested in going to work" for Hunter. Tr. 411:24–412:4; GX 400-36. The inference that Samia was referencing murders when he used the term "work" is supported by Samia's prior interest in "wet work" and previous efforts by Hunter and David Smith to recruit Samia to participate in murders-for-hire. Tr. 406:6–10, 406:13–407:1, 407:6–11, 407:20–23, GX 400-20. The timing of this apparent recruitment of Stillwell to the conspiracy is further supported by the May 2012 email in which Hunter complained of waiting a year for Samia to become available. Tr. 529:8–530:24; GX 400-72.

Bolstering the probative value of these communications, Stillwell worked closely with Samia to prepare for their trip to the Philippines. For instance, on September 30, 2011, Samia and Stillwell spoke on the phone and Stillwell applied for a passport—his first ever—for which Samia ultimately paid. Tr. 1452:12-1453:13; GXs 405-2, 602-7. On that same day, Samia and Hunter planned a trip for Samia to Brazil in order to meet LeRoux and discuss the murder-for-hire system he had implemented. Tr. 435:22–437:22, 439:5–12; GXs 414-4, 5. Hunter also emailed LeRoux that "I'm not going to ask for the other guy for our trips until Adam is there with you," Tr. 443:13–22; GX 414-7, which LeRoux interpreted to mean that "since Adam Samia was one of the two people assigned to the new kill team to handle the upcoming murders that [Hunter] wanted to keep Adam Samia away from the Tramadol operation," Tr. 443:25–444:4.[18] In October of 2011, Samia

---

[18] During this period, Vamvakias was operating a Tramadol smuggling operation for LeRoux on the "business side" of the mercenary team overseen by Hunter. Tr. 1183:4–11, 1184:25–1185:1.

informed Hunter that he was ready to travel to the Philippines but that his partner needed another month. Tr. 453:5–17; GX414-9. Hunter relayed this message to LeRoux, who instructed Hunter that Samia should not travel to the Philippines until his partner was ready. Tr. 453:5–454:23. Hunter accordingly emailed Samia that he was on "standby" until his partner "is ready and you guys will come here together for [n]inja stuff." Tr. 454:24–455:10; GX 400-46.[19]

There was also evidence at trial of the close relationship enjoyed by Samia and Stillwell, which supports the notion that Stillwell was not blindly helping Samia prepare for a trip to commit murders abroad. Samia and Stillwell had known each other since 2004, when Samia moved to the same town in North Carolina, and the two had worked together at a small business named Grandfather Oak, which sold custom holsters for firearms. Tr. 1392:13–18, 1396:12–18; GX400-31. This evidence makes it all the more implausible that Stillwell would not have learned from Samia why he was traveling to the Philippines, which, as previously noted, would be his first trip abroad.

Perhaps most notably, the government introduced evidence from Stillwell's laptop, which included a folder saved to his desktop labeled "Interesting Stuff." Tr. 921:23–25. In this folder, which included thousands of files, were articles detailing, among other things, how to stalk people and carry out murders with minimal weaponry. Tr. 943:18–944:12, 948:4–11. One article, entitled Hitman, recommended that murders be carried out at close range, further specifying that when using a twenty-two caliber pistol it is best practice to fire multiple shots, three to six inches from the victim, which decreases the risk of being struck by blood spatter. Tr. 950:12–19. This is precisely how Stillwell and Samia killed Catherine Lee. Stillwell accessed files in this folder in October of 2011, when he and Samia were preparing in earnest for their trip to the Philippines, and again in February of 2012, while the kill team was stalking its targets. Tr. 924:3–17; GX N226-

---

[19] The conspirators also referred to murders-for-hire as "ninja stuff." Tr. 1182:20–1183:1.

28; GX N226-30. Of the files that were accessed in October 2011, a substantial number concerned instructions for making explosives, with one article providing a list of twenty-two ways to kill a person with your bare hands. *See* GXs N226-30, N226-31.

Stillwell rightly notes that the evidence at trial did not establish definitively that he read these files in October 2011, prior to departing for the Philippines. Much of the testimony centered on the jump list, a tracking system employed by the Windows operating system. Tr. 923:4–7. The jump list indicates when a particular file is "accessed," which includes when it is opened. Tr. 923:4–7. There are a number of other instances, however, in which a file can be "accessed" that do not include it being opened. Tr. 1009:10–17. Stillwell also points out that among those files that were accessed in October 2011, most were done so within seconds of one another, supporting the notion that the files were not being read. *See* GX N226-30. Finally, the folder was created in March of 2010, more than a year prior to when the government alleges Stillwell joined the conspiracy. Tr. 939:22–940:13. Nonetheless, it is highly probative of Stillwell's intent both that he had this folder saved to the desktop of the very laptop he carried with him to the Philippines and that files in the folder, including those concerning explosives and other means of violence, were "accessed" in October 2011 and then again in February 2012, in the days preceding Catherine Lee's murder and while he and Samia tried unsuccessfully to kill several other individuals. Tr. 924:3–17; GXs N226-28, N226-30, N226-31.

Stillwell's argument is further contradicted by his behavior in the Philippines. Lee's murder did not occur until Samia and Stillwell had been there for over a month and had decided that it would be too difficult to kill their first target, Dazl Siveroi, prompting LeRoux to give them a new assignment: Catherine Lee. Tr. 463:17–464:15, 468:6–10. There was thus ample time, if Stillwell had somehow been caught off guard about the purpose of the trip, for him to leave prior to Lee's murder. Moreover, Samia and Stillwell had grander ambitions, aspiring, according to

14

Hunter, to kill one person per month for LeRoux. Tr. 465:19–23. In accordance with those plans, LeRoux gave them third and fourth targets: Fitch Penalosa and Manuel Jalos. Tr. 483:25–484:6, 485:24–486:6. Although they killed neither of these people, Samia and Stillwell undertook efforts to surveil them, both before and after killing Lee. Tr. 485:20–23, 507:4–8, GX 414-22. Indeed, following Lee's murder Hunter informed LeRoux that Samia and Stillwell "plan on doing one more and then go and come back." Tr. 501:3–18; GX414-21. Stillwell thus remained in the Philippines for approximately two weeks after Lee's death. *See* Tr. 508:8–10. Samia and Stillwell also laundered their salary and the bonus payment for killing Lee by completing wire transfers to the United States in amounts less than $10,000. GXs 400-63, 400-66, 400-67, 401-11, 401-12, 402-8, 402-9, 402-12, 402-13.[20] These actions further belie the notion that Stillwell had an innocent state of mind prior to leaving the United States.

Based on all of this evidence, therefore, it was far from unreasonable for the jury to find that the government had carried its burden of demonstrating that Stillwell knew why he was traveling to the Philippines when he boarded his flight in January 2012. When the government's case-in-chief is viewed cumulatively, as it must be, there is simply no basis to conclude that Stillwell is entitled to an acquittal as a matter of law.

### C. Adam Samia

Although he did not submit a formal motion, Samia informed the government that he joined the motions submitted by his co-defendants. His motion can be readily dismissed.

Unlike Hunter and Stillwell, there is no colorable argument that Samia was not conspiring while physically present in the United States. As the foregoing analysis indicates, there are a substantial number of communications in which Samia discusses with Hunter his interest in

---

[20] Hunter had instructed members of LeRoux's organization not to wire too much money at a single time for fear of attracting unwanted attention. Tr. 1196:8–11.

15

committing murders-for-hire. It is also undisputed that Samia was in the United States during these communications. As the government notes, the December 2009 and April 2011 communications between Samia and Hunter alone are sufficient to satisfy the jurisdictional element. Tr. 406:2–10, 406:18–23, 407:4–22, GXs 400-20, 21; Tr. 411:24–412:4, GX 400-36. Accordingly, there is no basis to disturb the jury's verdict.

## II. Rule 33

Rule 33 permits courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts have "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (ellipses in original) (citation omitted). "The test is whether it would be a manifest injustice to let the guilty verdict stand." *United States v. Guang*, 511 F.3d 110, 119 (2d Cir. 2007) (citations omitted). A new trial is appropriate if a court "harbor[s] a real concern that an innocent person may have been convicted." *Id.* (citations omitted).

The Court will not order a new trial under Rule 33. Here, there is no manifest injustice by permitting these guilty verdicts to stand. The Court does not harbor a concern that either Hunter or Samia is innocent.[21] It is abundantly clear from the trial record that they each conspired while within the United States to commit murders abroad and then successfully executed their plans on at least one occasion.

---

[21] As previously noted, Stillwell has not submitted a motion pursuant to Rule 33.

16

## CONCLUSION

For the foregoing reasons, the defendants' motions are denied. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries 601 and 602.

SO ORDERED.

Dated: October 15, 2018
        New York, New York

Ronnie Abrams
United States District Judge