```
          J1AKHUNC
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   UNITED STATES OF AMERICA,
 4              v.                              13 CR 521 (RA)
 5   JOSEPH MANUEL HUNTER,
 6                  Defendant.
 7   ------------------------------x
 8                                              New York, N.Y.
                                                January 10, 2019
 9                                              11:50 a.m.
10   Before:
11                      HON. RONNIE ABRAMS,
12                                              District Judge
13
                             APPEARANCES
14
15   GEOFFREY S. BERMAN,
          United States Attorney for the
16        Southern District of New York
     REBEKAH DONALESKI
17   EMIL BOVE
          Assistant United States Attorneys
18
     ARNOLD JAY LEVINE
19        Attorney for Defendant
20
     ALSO PRESENT:
21
     DAVID BERTAN, CJA Counsel
22
23
24
25
                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

1       (Case called)

2       THE DEPUTY CLERK:  Counsel, please state your names
3  for the record.

4       MS. DONALESKI:  Good morning, your Honor.  Rebekah
5  Donaleski and Emil Bove, for the government.

6       THE COURT:  Hi.

7       MR. LEVINE:  Good morning, your Honor.  Arnold Levine,
8  for Mr. Hunter.

9       THE COURT:  Good morning, Mr. Levine.

10      Good morning, Mr. Hunter.

11      We are here today because I received a letter from
12 Mr. Levine back in December asking for a change-of-counsel
13 hearing as soon as possible.  I also received a letter from
14 Mr. Hunter's sister, which seemed to indicate that the primary
15 dispute -- I don't know if this is accurate or not -- was about
16 the return of firearms and personal property.  The government
17 responded with its position with respect to the property,
18 subsequent to that.

19      So, Mr. Levine, do you want to tell me where we are
20 now, from your perspective?  If you think at any point that you
21 need the government to leave the room, just let me know that,
22 or if Mr. Hunter wants to talk about something that he thinks
23 the government shouldn't be present for, let me know.

24      MR. LEVINE:  Your Honor, as you know, Mr. Hunter
25 emailed me back in the beginning of December telling me he

wanted a change-of-counsel hearing as soon as possible. I wrote the letter to your Honor. Your Honor scheduled it. I was going to be away for the week your Honor scheduled it, so we put it on today.

After the last court appearance, I went and visited Mr. Hunter. The discussions with Mr. Hunter seemed to focus on the same three or four issues every time I go. One of them is the return of property. That's a very big issue for him.

As I brought up before, it looks to me like, from 41(g), that that motion has to be brought in the district where the property was seized, which is in Kentucky. The property was not used as evidence in this case. As far as I knew, the property at issue was still in Kentucky or Tennessee.

THE COURT: Did you ever talk to David Patton? I think you mentioned you were going to reach out to him last time.

MR. LEVINE: I left two messages for him. I never heard back. I know Mr. Patton is very busy, has his own very high-profile death penalty case he's working on, plus running the Federal Defenders, and the jobs as CJA, and speaking around the you country, so I don't want to sound like I'm denigrating Mr. Patton whatsoever --

THE COURT: No, I understand.

MR. LEVINE: -- but I did try to reach out to him twice, and I didn't hear back. I think I may have emailed him

1  also and didn't hear back.

2  But in the meantime, the government had responded, and
3  let me know, and let the Court know, they were going to be
4  seeking forfeiture of that same property.

5  THE COURT: Right.

6  MR. LEVINE: It seemed to me that it could be
7  addressed as part of the forfeiture in responding to their
8  forfeiture when they actually filed it.

9  THE COURT: The government also indicated that it
10 intended to give back all the evidence that didn't have
11 evidentiary value, including the pink firearm and other items.

12 MR. LEVINE: Right. My understanding is that the main
13 focus of Mr. Hunter's concern was everything that was seized --
14 the other stuff that was seized in Kentucky that was never
15 considered as evidentiary. I was expecting that we would just
16 focus on and respond when the government actually sought
17 forfeiture of it, that we can address it in that circumstance.

18 I don't know what the basis for the forfeiture is. Of
19 course, they haven't filed any papers for forfeiture, as far as
20 I know, regarding that property. Mr. Hunter doesn't want to
21 wait until then. I think he's unhappy also with things that
22 I've told him, about issues I see in the case and preservation
23 issues and other things. I haven't visited him very often, for
24 the same reasons I told your Honor before, that I didn't think
25 it was necessary -- one, when we speak, it tends to be about

1    the same three or four issues every time; and, second, this is

2    not preparation for trial, this is me having to review

3    everything that's already in the record in preparation for

4    appeal.  The sentencing, unfortunately, is, as far as I can

5    tell, set in stone, without any discretion, so I'm focusing not

6    really on creating a sentencing submission but on trying to

7    look at everything and prepare things for appeal.

8               Mr. Hunter's unhappy.  I have no interest in imposing

9    myself on him if he doesn't want me, your Honor.  If he'd like

10   new counsel, if your Honor is inclined to appoint new counsel,

11   I certainly have no objection to it.

12              THE COURT:  All right.

13              Mr. Hunter, do you want to be heard?

14              THE DEFENDANT:  Yes, ma'am.

15              THE COURT:  All right.  I'm happy to hear you out.

16              THE DEFENDANT:  Ma'am, this issue, as far as the

17   property and the firearms, goes back three and a half years.

18   This is not an unknown issue.  It has been brought up to the

19   Court several times.  So I don't understand what the problem

20   is.  But I'm going to go through the history so you're well

21   aware of it.

22              First of all, the prosecution was told about this

23   issue, person to person, in March 2015, maybe '16.  It's been

24   brought up to Judge Swain.  I personally wrote Judge Swain over

25   two years ago.  She sent a letter back and directed it to my

1  attorney to take care of.
2           My attorney, at that time, Mr. Kirton, he again
3  addressed the issue with the government in person, by emails,
4  received no response.  He then, after I wrote Judge Swain, he
5  sent them a memorandum, received no response.  Three months
6  after that, he sent them another memorandum, received no
7  response.
8           The last hearing, the government states they were
9  unaware of any requests.  That is ridiculous.
10          I asked Mr. Levine, the first 20 seconds that I met
11 him, to work on this issue.  He hasn't worked on it.  I brought
12 that to your attention in the last hearing, when he said he was
13 going to talk to some guy.  I sent him follow-up emails.  He
14 told me he left two messages that weren't returned.  That was
15 the extent of his service.
16          Also -- and you directed Mr. Levine to come and see
17 me.  He came to see me to hear my issues.  I asked him for
18 other things pertaining to my case, that I need for my defense.
19 I have never heard anything else from Mr. Levine, from that
20 day.
21          THE COURT:  Let me just stop you for one second.
22          Let me ask the government:  In your October 12th
23 letter, you said you notified defense counsel that the
24 government is willing to return all nonevidentiary personal
25 effects to Mr. Hunter's designee.  The government is willing to

1    return a pink firearm belonging to Mr. Hunter's wife.  Finally,
2    the government intends to seek to forfeit the firearms
3    belonging to Mr. Hunter.
4             Have you actually returned any of this property?
5             MS. DONALESKI:  We provided the contact information
6    for the agent that Mr. Hunter says we need to contact in order
7    to effectuate that transfer, and no one has reached out to the
8    agent.
9             THE COURT:  Mr. Levine, did you reach out to the
10   agent?  You know that this is obviously very important to
11   Mr. Hunter.  And if you got that information -- put aside the
12   firearms that the government is seeking to forfeit, and that
13   will be part of the sentencing proceeding in this matter.
14   Agreed?  I think we all agree on that.
15            So, with respect to the other evidence, did you get
16   that information, contact information about the agent, and
17   reach out to the agent?
18            MR. LEVINE:  I have the letter, but my focus has
19   been -- well, Mr. Hunter's focus has always been on the other
20   items, not those evidentiary items.  His sister implied to me
21   that she had done something to get those items back, the ones
22   that -- the pink firearm and --
23            THE COURT:  That she has gotten them back since she
24   wrote the letter?
25            MR. LEVINE:  His sister implied to me she had done

1   something to get that back, she had been contacting people, but
2   the focus had been on all the other firearms, not -- that
3   doesn't seem to be an issue for Mr. Hunter.  Mr. Hunter is
4   primarily concerned with all those other firearms that are in
5   Kentucky that were seized, not the things that are in New York.
6             THE DEFENDANT:  Your Honor, my issue is all of my
7   property, period.  That's --
8             THE COURT:  What the government had -- look, some of
9   it, as you understand, is in Kentucky, and a motion needs to be
10  filed there to get that back, but some of it, the government
11  has just indicated and indicated back in October, it's willing
12  to give back now.  It seems like it's not particularly
13  difficult to have someone reach out to the agent.  Maybe your
14  sister already did that.
15            THE DEFENDANT:  My sister has contacted the agent that
16  did the inventory, who, by the way, left the firearms off the
17  inventory sheet for some unknown reason.  But she contacted the
18  agent, and he says he has no idea where they are.
19            Now, I thought there would be a chain of evidence log
20  or something in the federal government, but, apparently,
21  there's not.
22            But there are two other issues:  First of all, the
23  Supreme Court has ruled that the firearms will be returned to
24  my family, and that case was -- my previous attorney had that
25  case.

1        Second issue:  You previously ruled that one of my
2   codefendants' firearms be returned to him.  So why aren't my
3   firearms being returned to me, along with my other property,
4   when the Supreme Court has already upheld that issue?
5        THE COURT:  All right.
6        So, Mr. Levine, what would you propose now?
7        Look, Mr. Hunter, as you know, this is a complicated
8   case, and I think we want to move forward with it.  I
9   understand that you want to deal with these issues with respect
10  to your property, but we have a sentencing coming up, you have
11  an appeal after that, you've got a new attorney for trial.  I
12  appointed Mr. Levine after trial, and it's going to take a lot
13  of time for someone new to get up to speed.
14       So the question is:  Does it really make sense?  Is
15  there such a breakdown between you and Mr. Levine, that he
16  can't remain on as your attorney at this point?
17       THE DEFENDANT:  Mr. Levine has wasted five months of
18  my time.  I haven't seen Mr. Levine.  Mr. Levine hasn't
19  addressed any issues with me.  He does not discuss anything
20  he's doing with me, other than saying that he's reviewing the
21  case and taking notes.  That is not proper counsel.  He wasted
22  five months of my time.  Not only that, he didn't do the
23  first -- I asked him to do one thing.  He didn't do it.  He
24  left two phone messages.
25       THE COURT:  Mr. Levine, again, I don't want to delay

1   this and get someone new, but do you feel like you could
2   address Mr. Hunter's issues in the next few weeks?  We have a
3   sentencing coming up.  I believe it's February 15th.  Have you
4   worked on the sentencing submission?  Have you been working on
5   the appeal?  Are you in a position to represent him?
6             MR. LEVINE:  Oh, I'm sorry, I thought --
7             THE COURT:  Yes.
8             MR. LEVINE:  Your Honor, certainly, working on the
9   appeal involves reviewing the record and the transcripts and
10  all that.  So I'm drafting a brief.  He hasn't even been
11  sentenced yet.  Of course, once he is, I'll file what needs to
12  be filed, and then request from the Second Circuit the amount
13  of time I need to file the principal brief.
14            As for taking care of the property that's in Kentucky,
15  as I said before, if it needs to be filed in Kentucky, I'm not
16  admitted to practice in Kentucky.  I don't know how to get a
17  motion filed in Kentucky right now, since I'm not admitted
18  there and I don't know anybody who is admitted there.
19            I was going to address the government's position on
20  the forfeiture, and Mr. Hunter doesn't want to wait till they
21  file the forfeiture.
22            THE COURT:  With respect, Mr. Hunter, to the firearms
23  that the government is seeking to forfeit, that is something
24  that is going to be part of the sentencing before me.  So we're
25  going to address that pursuant to the law, but --

1      THE DEFENDANT:  Your Honor, that's why I asked for a
2 hearing, because I want it addressed prior to that, because the
3 government has a habit of showing up and making statements that
4 aren't true, and nobody's providing any facts.  That's why I
5 wanted the information known before that time, because I'm not
6 so naive to wait until the last day, when anybody is going to
7 say whatever they want to say, and you are not going to know
8 the truth.
9      THE COURT:  All right.
10      Does the government want to be heard at all?
11      MS. DONALESKI:  Judge, this would be Mr. Hunter's
12 fourth lawyer in a year.  Nothing that we've heard at any of
13 the conferences before your Honor has established a breakdown
14 in communications.  It simply established that Mr. Hunter is
15 unhappy with how certain things are.
16      Mr. Levine has put in five months of work into
17 preparing for a sentencing, as to which your Honor has no
18 discretion, and preparing for posttrial motions, as to which
19 your Honor has denied them as to the codefendants.
20      The government's position is:  It's time for this case
21 to proceed to sentencing.  We'll deal with the forfeiture
22 issues at sentencing and, as I've stated, at this conference
23 and in the letter to your Honor in October, we are more than
24 willing to give back the --
25      THE COURT:  Is there a way you can help facilitate

1    this process?  I have to say, it's very frustrating from my
2    end.  This seems like there are certain items that there is
3    going to be an issue about with respect to forfeiture.  I'll
4    deal with them at sentencing.
5              But with respect to the other items, I understand that
6    there are some that are in Kentucky and need to be dealt with
7    there.  I can help you, Mr. Levine, reach out to David Patton
8    to make sure that he calls you back and sees if anyone there
9    can assist.  If there's a need for government funding in that
10   respect, just let me know.
11             But with respect to the evidence that's in the
12   government's possession that does not have evidentiary value
13   that you're willing to turn over, I just want to make sure that
14   he gets it.
15             MS. DONALESKI:  We've tried, your Honor.  There are
16   rules and regulations governing handing over firearms, and
17   handing over property.  So, in order to do that, Mr. Hunter's
18   designees need to come forward and request that.  That has not
19   happened.  I have --
20             THE COURT:  Mr. Hunter's?  Say that again.
21             MS. DONALESKI:  Designees.
22             So whoever is purported -- whether it's his wife, his
23   sister, whoever is legally the person that can help the firearm
24   and can accept the property, I will provide the contact
25   information again to Mr. Levine.

1    THE COURT:  Tell me what he needs to do to designate
2  one person as a designee.  Can he say it orally today?  Does he
3  need to submit a letter?  What does he need to do to formally
4  designate someone?
5    MS. DONALESKI:  Your Honor, I'm not personally aware
6  of, in this case, the DEA's requirements for releasing a
7  firearm or for releasing personal property.  That's why, as
8  I've suggested to the Court and Mr. Levine, it makes the most
9  sense for Mr. Hunter's designee, whether it's his wife or his
10  sister, to reach out to the agent and see what they need in
11  order to release the firearm, which I believe belongs to Diana
12  Hunter, not Mr. Hunter's sister but his wife, and then his
13  other personal property, including papers and records that were
14  seized from him.
15    So, again, I'm happy to provide that contact
16  information yet again to Mr. Levine.
17    THE COURT:  Okay.
18    MS. DONALESKI:  We're standing by willing to make this
19  work.  We just need someone to reach out to us to do it.
20    THE COURT:  So, Mr. Levine, look, I'm not convinced,
21  Mr. Hunter, that there's such a breakdown in communications
22  with you and Mr. Levine, but I understand your frustration, so
23  what I want to do is set a timeline of times things need to get
24  done so that we're not here again.
25    Mr. Levine, what I'd like you to do is, I'd like you

J1AKHUNC

1  to reach out to this DEA agent today to find out what you need
2  to do.  I want you to reach out to the DEA agent, let's just
3  say by tomorrow -- I'm going to look at the calendar -- and
4  then I want a letter from you a week from today on what the
5  progress is with respect to the property that the government
6  has in its possession that it's not seeking to forfeit, namely,
7  the firearms.  Okay?
8         I think you should be able to get that property,
9  figure out who is his designee, how you get it -- it doesn't,
10 frankly, seem that complicated -- and I want this done by next
11 Friday, the 18th, and I want you to submit a letter to me by
12 then.
13        I'll reach out to David Patton myself.  I want a
14 letter, also, updating me on what's going to happen with
15 respect to efforts to obtain the property that's down in
16 Kentucky, also by the 18th.
17        So, basically, I want you to reach out to the DEA
18 agent by tomorrow, and I want a status letter by the 18th.
19 Okay?
20        MR. LEVINE:  Yes, your Honor.
21        THE COURT:  All right.
22        Does that make sense, Mr. Hunter?
23        THE DEFENDANT:  No, ma'am, it doesn't.
24        First, my sister has reached out to all my previous
25 attorneys as well as Mr. Levine, regarding this property issue.

My sister reached out to the agent that did the inventory. For the government to say they have no -- I don't know what their position is -- they don't know who to return the firearms to, because all that information was included in the memorandum sent to the government, so that's just false. False. It is false, your Honor.

THE COURT: You want your property back, so I'm trying to help make that happen. It seems like that's your big problem with Mr. Levine.

THE DEFENDANT: No, my other problem -- I haven't had any counsel, so what Mr. Levine has done, I'm unaware of.

THE COURT: Would it be helpful if he came to visit you this week?

THE DEFENDANT: No. Why? Why would he come and visit me now, when he didn't visit me the last -- he came three times, for a total of two hours and 15 minutes in the last five months.

THE COURT: I think, from his perspective -- look, this is not pretrial, this is posttrial. There's a mandatory --

THE DEFENDANT: I have no faith in these attorneys that I've been assigned, because I've seen their performance. I know the things they didn't work on. I'm not going to sit by and not see this guy and not hear anything from him, and put all of my trust in him to defend my life, because that's what

1    it is, it's my life.  No, it's not going to work like that.
2    They're going to counsel me, they're going to go over the
3    issues with me, and they're going to answer my questions, and
4    they're going to work on the things I ask them to work on.
5    That is counsel.  Not seeing Mr. Levine, not hearing from him,
6    not getting answers, not getting the stuff I requested, that's
7    not counsel.  The problem is not with me, your Honor.  And
8    you've seen, for a fact, the previous attorney, who just quit.
9             THE COURT:  Look, right now we're focused on whether
10   or not there is such a breakdown in your relationship with
11   Mr. Levine that he can't adequately represent you.
12            THE DEFENDANT:  I don't want to see Mr. Levine.
13            THE COURT:  You don't have a right in a criminal
14   case --
15            THE DEFENDANT:  I have the right to counsel, your
16   Honor.
17            THE COURT:  You have a right to adequate counsel,
18   absolutely, but you need someone who's going to provide
19   effective assistance of counsel.
20            Mr. Levine is working on your case.  He has
21   represented that he's reviewing the trial transcript, he's
22   preparing both for sentencing and for appeal.  That's what
23   another lawyer would do at this stage - would review the trial
24   transcript, would meet with you, would prepare for the
25   sentencing, and would prepare for the appeal.  If I appointed a

1   new lawyer today, that's what that lawyer would do as well.
2             So, again, the question is: Has your relationship,
3   your communications, with Mr. Levine broken down to such an
4   extent that he can't represent you adequately?
5             THE DEFENDANT: Mr. Levine hasn't came to see me
6   regarding the appeal issue.
7             THE COURT: Well, you haven't been sentenced yet, in
8   fairness, as to the appeal.
9             THE DEFENDANT: He hasn't came to see me about my
10  sentencing memorandum. He hasn't contacted me in any way,
11  shape or form regarding this case. That's all I can say, your
12  Honor. He hasn't.
13            Have you?
14            MR. LEVINE: Yes, I've been to visit you, and I
15  communicated with you by email.
16            THE COURT: Have you visited him since the last
17  hearing we had?
18            MR. LEVINE: I did, your Honor. I didn't visit him
19  since he last emailed me asking for the change-of-counsel
20  hearing, because I put in for the change-of-counsel hearing as
21  soon as possible, so I didn't go and see him again after that.
22  That was the second time he asked for a change of counsel.
23            THE COURT: Do you think that there is a conflict
24  between you and Mr. Hunter, that results in a total lack of
25  communication between you, such that you can't adequately

1   represent him going forward?

2           MR. LEVINE:  Judge, I think his expectations versus my
3   expectations of what needs to be done seem to be different, and
4   he seems to -- perhaps there's another attorney who will be
5   able to give him what he really wants out of this.  As I said,
6   where my focus is on this case, in not being pretrial, I'm
7   focused on what's already been done.  I have had discussions
8   with him about what issues would be raised on appeal.  It's the
9   same three or four issues basically we focus on each time.

10          I've told him there are other issues I see that I
11  don't think are preserved properly, which will change the way
12  things are examined on appeal.  And I know I got an email from
13  his sister after that, saying that I went and told him that we
14  were going to lose, which is not what I had said, but I know
15  things get lost in translations, like a telephone game three or
16  four people removed.

17          Like I said before, Judge, he seems to be adamant.  I
18  have never asked to get off cases.  I'm not asking to get off
19  the case.  If Mr. Hunter will be better served by somebody
20  else, I have no objection for him having other counsel.

21          THE COURT:  It seems, Mr. Hunter, that, in your view,
22  things have broken down to such an extent with Mr. Levine -- is
23  that right, that things have broken down to such an extent --
24  if he came to visit you more often and worked on this property
25  issue, do you think you could move forward with him as your

J1AKHUNC

1 attorney?

2 THE DEFENDANT: That's all I asked, your Honor.

3 THE COURT: All right.

4 So, Mr. Levine, I'm going to ask you to do that. I'm going to keep you on the case. I don't think it makes sense to appoint someone new. I already set a schedule for you to get back to me about the property issue. I'm going to ask you to go and visit Mr. Hunter more often. I'd like you to visit him before you write me that letter on the 18th, talk about the sentencing, which is coming up in February, talk about what you see are going to be the issues on appeal. I know the sentencing hasn't taken place yet, but I really do want you to visit him more often and try and improve communications with him. But I don't think that there's been such a breakdown that it's necessary for me to appoint a new lawyer at this time.

So I look forward to getting that letter on the 18th.

I'm going to ask the government to cooperate in whatever way you can to help facilitate this process. All right? Thank you. We are adjourned.

* * *