J37VHUNS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          13 CR 521 (RA)

5   JOSEPH MANUEL HUNTER,

6              Defendant.                  SENTENCE

7   ------------------------------x

8                                          New York, N.Y.
                                           March 7, 2019
9                                          11:10 a.m.

10
    Before:
11
                    HON. RONNIE ABRAMS,
12
                                           District Judge
13

14                      APPEARANCES

15
    GEOFFREY S. BERMAN,
16       United States Attorney for the
         Southern District of New York
17  REBEKAH A. DONALESKI
    EMIL J. BOVE III
18       Assistant United States Attorneys

19  ARNOLD J. LEVINE
         Attorney for Defendant
20

21  ALSO PRESENT:  MARGARET SHIELDS, Paralegal-USAO

22

23

24

25

J37VHUNS

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Counsel, please state your name for

 3    the record.

 4              MS. DONALESKI:  Good morning, your Honor.

 5              Rebecca Donaleski and Emil Bove, for the government;

 6    joined by Margaret Shields, a paralegal specialist in our

 7    office.

 8              THE COURT:  Good morning, all.

 9              MR. LEVINE:  Good morning, your Honor.

10              Arnold Levine, for Mr. Hunter.

11              THE COURT:  Good morning.

12              Can I see the lawyers at sidebar with the court

13    reporter for a moment please.

14              (Pages 3-6 SEALED)

15

16

17

18

19

20

21

22

23

24

25
```

J37VHUNS

1           (In open court)

2           THE COURT:  All right.

3           So this matter is on for sentencing.

4           Mr. Hunter was found guilty after trial last April to

5    conspiring to commit murder-for-hire, murder-for-hire,

6    conspiring to kidnap and murder in a foreign country, and

7    murder through the use of a firearm during and in relation to a

8    crime of violence.

9           In connection with today's proceeding, I've reviewed

10   the following submissions:

11          The final presentence investigation report revised as

12   of July 9th, 2018; Mr. Hunter's February 21st sentencing

13   memorandum incorporating the memorandum and exhibits submitted

14   in connection with his previous sentencing before Judge Swain;

15   the government's sentencing memorandum dated February 28th,

16   along with a forfeiture letter submitted on March 1st; and I've

17   also shown the parties a letter from Mr. Hunter's sister back

18   from December as well.

19          Have the parties received each of these submissions?

20          MS. DONALESKI:  Yes, your Honor.

21          MR. LEVINE:  Yes.

22          THE COURT:  So let's begin by discussing the

23   presentence report, which, of course, as you know, is prepared

24   by the probation office.

25          Mr. Levine, have you reviewed the presentence report

J37VHUNS

| 1 | and discussed it with your client?

| 2 |      MR. LEVINE:  I believe I did, and I think that

| 3 | Mr. de Castro had done it as well.

| 4 |      (Counsel conferred with defendant)

| 5 |      THE COURT:  As I said, it's the one that was revised

| 6 | back in July.

| 7 |      MR. LEVINE:  Yes.  I'm looking to see -- this is only

| 8 | one of several files in this case, and I'm looking for it now.

| 9 |      I know that it was the earlier report; and then, of

| 10 | course, Mr. Hunter has been incarcerated the entire time.

| 11 |      THE DEFENDANT:  Your Honor?

| 12 |      THE COURT:  Yes.

| 13 |      THE DEFENDANT:  I haven't seen a presentencing report.

| 14 | If you remember, Mr. de Castro removed himself from my case in

| 15 | July, and I hadn't seen him since trial in April.  He never

| 16 | came to me with a presentencing report.

| 17 |      THE COURT:  All right.

| 18 |      Well, if you haven't seen the presentence report,

| 19 | we'll have you review it with Mr. Levine right now.

| 20 |      MR. LEVINE:  Yes, Judge.

| 21 |      I'm looking for it among all these other things in

| 22 | this particular file.

| 23 |      Oh, thank you.  The government just was kind enough to

| 24 | give me its copy.

| 25 |      THE COURT:  So, Mr. Levine, did you go over the

J37VHUNS

1  presence report with Mr. Hunter?

2           MR. LEVINE:  I thought I did a long time ago, but

3  Mr. Hunter is now saying he's never seen it.

4           THE COURT:  Did you review the government's sentencing

5  submissions with him?

6           You've got to prepare for his sentencing.

7           MR. LEVINE:  I understand.

8           THE COURT:  Even one where there's a mandatory

9  sentence, he still has a right to review everything in advance

10 of the sentencing.  So why don't you do that right now and tell

11 me when you're ready to proceed, okay?

12          MR. LEVINE:  I'm sorry, Judge.  I'm trying to gather

13 all this documentation.  Dealing with the forfeiture issues

14 have been the priority.

15          THE COURT:  Just let me know when you're ready, okay?

16          MR. LEVINE:  Yes.

17          (Recess)

18          THE COURT:  I was just asking about scheduling.  I was

19 just asking if we should put this off to the afternoon of if we

20 should proceed now.

21          But you want to proceed now?  Do you have a sense of

22 how much longer it will take you?

23          MR. LEVINE:  Mr. Hunter would like to proceed now.

24          THE COURT:  Okay.

25          Do you have a sense of about how much longer it will

J37VHUNS

```
1    take you?
2              MR. LEVINE:  He's just about finished.
3              THE COURT:  All right.  So just let us know.
4         Thank you.
5         (Recess)
6              THE COURT:  Everyone can be seated.
7         Why don't we resume the sentencing now.
8         Mr. Levine, have you now reviewed the presentence
9    report and discussed it with your client?
10             MR. LEVINE:  Yes, your Honor.
11             THE COURT:  Do you have any objections to the report?
12             MR. LEVINE:  Judge, Mr. Hunter points out just a few
13   things in the factual recitation.
14             THE COURT:  Just bring the microphone a little closer
15   please.
16             MR. LEVINE:  I'm sorry.
17             MS. DONALESKI:  Your Honor, we don't have a copy
18   because we gave our copy to them, I'll just note.
19             THE COURT:  All right.  We'll print you one right now.
20             MR. LEVINE:  Judge, basically, Mr. Hunter disputes the
21   entire report as far as the factual allegations.  They mimic
22   the government's theory of the case, and he disputes that.  And
23   obviously there's going to be an appeal of the judgment and the
24   conviction, the verdict in the case.
25             THE COURT:  So he's disputing the factual recitation
```

J37VHUNS

1    of the offense conduct?

2              MR. LEVINE:  Yes.

3              THE COURT:  All right.

4              I'm going to keep that the same.  I'm going to

5    overrule that objection.

6              Any other objections?

7              MR. LEVINE:  No, Judge.

8              THE COURT:  All right.

9              Mr. Hunter, did you now have enough time to review the

10   presentence report and discussed it with Mr. Levine?  Because

11   if you need more time, I'm happy to give it to you.

12             THE DEFENDANT:  No, that's fine.

13             THE COURT:  All right.

14             Does the government have any objections to the

15   presentence report?

16             MS. DONALESKI:  No, your Honor.

17             THE COURT:  The Court adopts the factual findings in

18   the report.  The presentence report will be made a part of the

19   record in this matter and placed under seal.  If an appeal is

20   taken, counsel on appeal may have access to the sealed report

21   without further application to the Court.

22             Do the parties agree with the guidelines calculation

23   in the presentence report, pursuant to which Mr. Hunter's

24   offense level is 43, his Criminal History Category is II, and

25   his guideline sentence is mandatory life sentence, to be

J37VHUNS

| | |
|---|---|
| 1 | followed by a ten-year consecutive sentence? |
| 2 | MS. DONALESKI:  Yes, your Honor. |
| 3 | (Counsel conferred with defendant) |
| 4 | MR. LEVINE:  Judge, Mr. Hunter, regarding the |
| 5 | guidelines calculation, the criminal history, his point is that |
| 6 | the prior conviction was under the same indictment; it's given |
| 7 | the same indictment number, even though it's a prior |
| 8 | conviction.  Based on they simply superseded the charges under |
| 9 | the same indictment number, that he should not be in Criminal |
| 10 | History II. |
| 11 | THE COURT:  Does the government have a position on |
| 12 | that?  It obviously won't affect the sentence in the end. |
| 13 | MS. DONALESKI:  Your Honor, if I could just have a |
| 14 | moment to review the report. |
| 15 | THE COURT:  Sure. |
| 16 | (Pause) |
| 17 | THE COURT:  So he's referring to paragraph 81, which |
| 18 | is his prior conviction before Judge Swain, but in the same |
| 19 | case, conspiracy to import cocaine into the United States, |
| 20 | conspiracy to murder a law enforcement officer and a person |
| 21 | assisting a law enforcement agent, and conspiracy to possess a |
| 22 | firearm in furtherance of a crime of violence.  And he got |
| 23 | three points, criminal history points. |
| 24 | MS. DONALESKI:  Yes, your Honor. |
| 25 | Under 4A1.2(a)(1), it's counted as a prior sentence |

J37VHUNS

1   because it is conduct not part of the instant offense.  So, in

2   other words, your Honor, the conduct that led to his

3   conviction, the sting operation in which Mr. Hunter led a kill

4   team that was supposed to kill a DEA agent and a DEA source,

5   were not part of the S10 indictment, which, of course, alleged

6   separate crimes and separate offenses.

7          THE COURT:  I know this issue is raised right now, but

8   do you happen to know of any case law one way or the other with

9   respect to a prior conviction in the same case?

10         MS. DONALESKI:  I don't, your Honor.  I'm happy to

11  research and report back to your Honor.  But I believe the

12  guidelines are clear on this question.  The question is not is

13  it under the same indictment.  Your Honor can imagine a case in

14  which one indictment alleged one offense, as here, and then a

15  superseding indictment alleged a completely separate crime that

16  the defendant was subsequently convicted of.  Under

17  4A1.2(a)(1), the question is whether the conduct was part of

18  the instant offense in the new case.  And here it's simply not.

19         THE COURT:  I think that's right.

20         MS. DONALESKI:  And your Honor, if I could direct your

21  attention to the application note.

22         THE COURT:  No. 1?

23         MS. DONALESKI:  Yes.

24         THE COURT:  Yes.  So Application Note No. 1 reads that

25  "prior sentence" means a sentence imposed prior to sentencing

J37VHUNS

1    on the instant offense, other than a sentence for conduct that

2    is part of the instant offense.  A sentence imposed, and then

3    it goes on.

4             I think the government is right.

5             Mr. Levine, I'm happy to hear you out.

6             MR. LEVINE:  Your Honor, well, I guess a couple

7    things.  One is they had -- they could have -- in fact, it's

8    all under the same indictment number.  They could have indicted

9    them all together and disposed of everything together, and they

10   didn't, of course.  And that's been a very soar spot, I think,

11   given the way everything has proceeded, that he ended up

12   pleading guilty to something and then being superseded on the

13   same indictment number for charges that really are -- they are

14   related, they are not -- it's not completely separate conduct

15   in that they are both done under Leroux's direction; they are

16   both done as part of this overarching conspiracy of working for

17   Leroux and Echelon, and carrying out hits for Leroux.  So --

18            THE COURT:  But those specific crimes where the

19   conspiracy to import cocaine into the United States were just

20   not charged in this case.  It was charged in the overall case,

21   but it wasn't what was tried before me.  It wasn't one of the

22   four counts in the superseding indictment.  I believe it's S10

23   that was tried before me.

24            The second crime was conspiracy to murder a law

25   enforcement officer and person assisting a law enforcement

J37VHUNS

1     agent.  We didn't have that in this case.  And then to possess

2     a firearm in furtherance of a crime of violence, namely, Count

3     Two of that.

4             MR. LEVINE:  I guess the point is in how you define

5     "this case," given that they have the same indictment number.

6     It's both about working for Leroux and part of his team and his

7     conspiracy and his organization; and that the government simply

8     chose to take a plea on one and then come back and indict him

9     for other charges that they could have charged him with

10    originally.

11            THE COURT:  Look, I've never gotten a motion on that

12    issue.  And right now we're at sentencing with respect to the

13    four counts in S10 for which he was found guilty after trial.

14    I think the government's reading of the rule is accurate.  It

15    wouldn't make a difference anyway in this case, so I'll just

16    note that for the record that it can't affect the sentence.

17            So I think the government is right that he has a

18    Criminal History Category of II.  But even if he had a Criminal

19    History Category of I, he would still be facing a mandatory

20    life sentence followed by a consecutive ten-year sentence.

21            Do you agree, Mr. Levine, with that?

22            MR. LEVINE:  Yes.

23            THE COURT:  Do the parties also agree that there's no

24    legal basis for a departure here?

25            MS. DONALESKI:  Yes, your Honor.

16

1          MR. LEVINE:  Yes.

2          THE COURT:  All right.

3          I've considered whether there's an appropriate basis

4     for a departure from the advisory range within the guidelines.

5     And while recognizing that I have the authority to depart from

6     the guidelines, I don't find any grounds warranting a departure

7     under the guidelines.  And in any event, as we've discussed,

8     it's a mandatory sentence.

9          So now do the parties wish to be heard with respect to

10    sentencing?  Does the government wish to be heard?

11         MS. DONALESKI:  Yes, your Honor.

12         A life sentence is legally required here, but it is

13    incredibly appropriate and just under Section 3553(a),

14    regardless of the statutory requirement.

15         Your Honor sat through the trial.  You know the

16    evidence.  You know that the defendant was a U.S. soldier.  He

17    used the training that he received in the military, and he

18    turned his back on all of those values and everything that the

19    U.S. military stands for he turned his back on.  And he became

20    a mercenary killer.

21         He traveled around the world torturing, shooting, and

22    killing people for one reason:  For money.  The lives of those

23    people meant nothing to him.  He was indifferent to the crimes

24    that he committed.  And perhaps the best evidence of how the

25    defendant approached the reprehensible things that he did for

J37VHUNS

1   money is the video of the defendant in Thailand holding court,

2   bragging about the people that he has kidnapped, the people he

3   shot, the murders that he's arranged.  That video is sickening.

4   These are human lives that the defendant is talking about, and

5   he describes it as like a movie, like a James Bond movie.

6          The defendant has shown no remorse for Catherine Lee's

7   family, for Catherine Lee's life, for Noemi Edillor's life, for

8   her family.

9          What did the defendant do after he had arranged for

10  Noemi Edillor to be shot in the back of the head?  He sent an

11  email to Leroux saying, Here's your fucking proof.  Have my

12  guy's money.  This was all about money to the defendant.

13         It is a disgusting comment on the type of man that

14  Joseph Hunter is; a former soldier who would turn his back on

15  that and take people's lives for money, for thousands of

16  dollars.

17         Life imprisonment is required by statute, but it is

18  the only sentence that provides justice for the defendant's

19  victims, for their families, and it adequately sends the

20  message that murdering people for money will not be tolerated,

21  and the defendant deserves a life sentence for that conduct.

22         Thank you, your Honor.

23         THE COURT:  Thank you.

24         Mr. Levine, would you like to be heard?

25         MR. LEVINE:  Briefly, your Honor.

J37VHUNS

1          Obviously there's a mandatory sentence here that

2     there's no way I can persuade the Court not to give him.

3          However, Mr. Hunter served in the military for many

4     years for this country, fighting for this country.  And it took

5     a toll on him.  There's evidence in that from the prior case

6     that was here before Judge Swain and which is in the docket

7     reports.  The country in that sense owed something to

8     Mr. Hunter and still owes something to Mr. Hunter.

9          Insofar as what kind of man Mr. Hunter is, the

10    government got in bed with the person who actually financed

11    this and many, many other things.  The government is going to

12    be all about getting somebody like Mr. Leroux not a life

13    sentence.  It's like getting in bed with Manson so that you can

14    prosecute Ms. Van Houten or Tex.  It just boggles the mind that

15    they were able to do that, they thought that it was right to do

16    that; and that they come in here and say -- can say what they

17    did about Mr. Hunter.

18         Paul Leroux is the devil.  Paul Leroux took advantage

19    of people and offered people money.  And, yes, Mr. Hunter

20    engaged in conduct.  I don't know about going around the whole

21    world killing people and torturing people, I didn't read that

22    in the transcript that I had.  I didn't see that in the

23    paperwork that I had.

24         This case was about a murder that happened in the

25    Philippines.  And I think that Mr. Hunter is in the records

J37VHUNS

| | |
|---|---|
| 1 | that I provided.  You know about medical attention that he |
| 2 | needs, PTSD he suffered. |
| 3 | And unfortunately, your Honor's hands are tied; |
| 4 | otherwise I would be asking you obviously to give -- to take |
| 5 | that into account in sentencing.  I'd ask you to take that into |
| 6 | account in determining -- in making a recommendation about what |
| 7 | kind of services he should receive while incarcerated; I'd ask |
| 8 | that he be -- |
| 9 | (Counsel conferred with defendant) |
| 10 | MR. LEVINE:  Your Honor, so we all have something to |
| 11 | say about the forfeiture, which is part of the sentencing.  Do |
| 12 | you want to bring that up later? |
| 13 | THE COURT:  Yes, I want to bring that up in a little |
| 14 | bit. |
| 15 | MR. LEVINE:  All right. |
| 16 | THE COURT:  All right. |
| 17 | Mr. Hunter, would you like to be heard today? |
| 18 | THE DEFENDANT:  Not with regards to this issue, no. |
| 19 | THE COURT:  All right. |
| 20 | Is there any reason why sentence cannot be imposed at |
| 21 | this time? |
| 22 | MS. DONALESKI:  No, your Honor. |
| 23 | MR. LEVINE:  No, your Honor. |
| 24 | THE COURT:  So there's no dispute that a sentence of |
| 25 | life imprisonment plus ten years is mandatory in this case.  I |

20

J37VHUNS

1    have nonetheless considered the sentencing factors set forth at

2    18, United States Code, Section 3553(a).  Those factors

3    include, but are not limited to the nature and circumstances of

4    the offense and the personal history and characteristics of the

5    defendant.

6            Judges are also required to consider the need for the

7    sentence imposed to reflect the seriousness of the offense,

8    promote respect for the law, provide just punishment for the

9    offense, afford adequate deterrence to criminal conduct,

10   protect the public from future crimes of the defendant, and

11   avoid unwarranted sentencing disparities, among other things.

12           I've seen and heard about a lot of criminal activity

13   in my day, including a fair amount of violence, but I haven't

14   seen anything like this before.  In particular, I haven't seen

15   anything like this total and complete lack of respect for human

16   life.

17           Mr. Hunter, once a former soldier in the U.S.

18   military, turned into a mercenary.  He planned and committed

19   truly horrific crimes, ones involving kidnapping, torture, and

20   murder.  He was the leader of the kill team that killed

21   Catherine Lee and aimed to kill many more.  And he did it for

22   one thing:  Money.  It was as simple as that.

23           I don't think I need to review further the evidence.

24   We have the trial record; and I stated my basis for denying the

25   Rule 29 motion back in October.

1          But I will say though that last night I rewatched the

2     videos just mentioned that were introduced at trial in which

3     Mr. Hunter talked about the mercenary business with prospective

4     recruits about assassinations, about kidnapping, waterboarding

5     and more.  And I think, more than anything else, what I was

6     struck by was how matter-of-fact it was.  Bonus work, ninjas,

7     how much you get paid, and for what.  There was no apparent

8     angst or hesitation, no disgust, no remorse, no regret.  It was

9     a business, plain and simple.

10          And frankly, it's hard to believe, watching it, that

11    what you're talking about is shooting people and dumping their

12    bodies.  The most emotion shown was pride -- and Ms. Donaleski

13    mentioned this -- pride and engaging in conduct out of a "James

14    Bond movie."

15          But this isn't a movie.

16          Real people's lives were taken and others ruined.  And

17    today a punishment must be imposed for that harm.

18          I've, of course, considered the other issues raised in

19    Mr. Hunter's original sentencing letter and noted today,

20    including, but not limited to, his PTSD and other mental health

21    issues, and I'm ready to impose sentence.

22          Mr. Hunter, could you please rise.

23          It is the judgment of this Court that you be committed

24    to the custody of the Bureau of Prisons for a term of life on

25    Counts One, Two, and Three to run concurrent to one another;

J37VHUNS

1    plus an additional ten years on Count Four, to run

2    consecutively to the three life terms.

3           Although it doesn't seem necessary, I'm going to

4    follow the probation department's recommendation and also

5    impose a term of five years of supervised release to run

6    concurrent on all four counts.  And all standard and mandatory

7    conditions as listed in the PSR on pages 32 and 33 shall apply.

8           You can be seated, if you'd like.

9           Are there any recommendations, Mr. Levine, with

10   respect to facilities to address mental health issues?

11          (Counsel conferred with defendant)

12          MR. LEVINE:  Judge, two things:  One is Mr. Hunter

13   would like to discuss any recommendations as to location after

14   this in connection with --

15          THE COURT:  All right.  Okay.

16          MR. LEVINE:  And the other thing, Judge, is, as you

17   know, Mr. Hunter is already serving a 20-year term.  And he

18   just asked me whether the three life sentences and ten-year

19   sentence you just imposed would run consecutively or

20   concurrently with the 20-year sentence.

21          THE COURT:  Does the government have a position on

22   that?  It seems academic, but --

23          MS. DONALESKI:  We're fine with them running

24   concurrently, your Honor, with the exception of the Count Four,

25   which I believe does need to be consecutive.

1          THE COURT:  By law, Count Four has to be consecutive.

2          So the three life sentences will run concurrent to his

3    existing 20-year sentence.  But the ten-year sentence on Count

4    Four must, by law, be consecutive to all other sentences, and

5    it will be.

6          I decline to impose a fine because the probation

7    department has reported that Mr. Hunter is unable to pay one.

8    I'm required to impose the mandatory special assessment of

9    $400, which shall be paid immediately.

10          Now would the parties like to be heard with respect to

11    forfeiture?  We obviously have the government's letter on that

12    from March 1st.

13          (Counsel conferred with defendant)

14          THE COURT:  So Mr. Levine, as you know, the government

15    is seeking forfeiture in the amount of $53,500, and is seeking

16    the eight firearms that were recovered as substitute assets for

17    that $53,500.

18          Would you like to be heard?

19          MR. LEVINE:  Yes, your Honor.

20          I received the government's letter dated March 1st, at

21    Document 681, where they seem to lay out -- specify how they

22    come up with that amount of money.  However, I don't see a

23    connection between much of that and the actual charges of

24    conviction in this case.  For example, on page 5, they talk

25    about being paid a monthly salary of $4500 in June 2008,

24

J37VHUNS

1  exchange for mercenary work, including supposedly grenading

2  people's houses, smuggling weapons.  That's not part of this

3  indictment.  That's not part of the charge.  It's a conviction

4  here.  There's no connection between those proceeds at $4500

5  and the charges here.

6      It should also be noted that not all the work that

7  Mr. Hunter did for Mr. Leroux was even necessarily illegal.

8  And even some of it that might have been illegal in other

9  jurisdictions didn't necessarily violate any United States law.

10  But certainly it wasn't even charged in this indictment.

11      The same with the next point.  The $7,000 in July

12  2008, doesn't say what that's about.

13      Mr. Leroux here was charged really with based on --

14  the charges are really based on the murder of Catherine Lee.

15  That's what they all relate to.  And that occurred in 2012.

16  The planning supposedly started at the end of 2011.  So money

17  that was given to him in 2008, I don't see how that is related

18  at all to the charges of conviction in this case.

19      THE COURT:  The count is a little broader, and the

20  indictment goes back to 2008; correct?

21      MR. LEVINE:  It does.  However, it's talking about --

22  it still comes down to the killing of Catherine Lee.  And if

23  you remember, the only way the United States had jurisdiction,

24  under the government's theory and what the jury must have

25  found, but was hotly disputed, was that Mr. Hunter supposedly

J37VHUNS

1    had come to the United States in 2011 to meet with Mr. Samia

2    and Stillwell personally.  And they went through great pains

3    basically saying the Department of Homeland Security has bad

4    records and Korean Airlines has good records.  And it was still

5    about that's how they have jurisdiction.

6           So things that happened in 2008 and any planning to do

7    anything in 2008 wasn't really part of this.  They may put that

8    in the indictment and try to broaden the scope and put as

9    many -- make the date ranges as broad as possible, but what it

10   comes down to is that last sentence, which is about resulting

11   in the shooting death of Catherine Lee.  And that's really what

12   the trial was really about, even though they put in evidence of

13   everything under the sun.

14           THE COURT:  That was Count One.

15           Let me just get out the indictment.

16           MR. LEVINE:  Count Two charges from in or about

17   2011 --

18           THE COURT:  Right.  Let's take a look at Count Three.

19   I don't have the indictment in front of me.  Let me get it.

20           (Pause)

21           THE COURT:  I think your reading the indictment too

22   narrowly, but let me just get it in front of me.

23           Can I ask, do you have a sense of how much the eight

24   firearms are worth?

25           MS. DONALESKI:  I don't, your Honor.

1          The process, as I understand it, is that the marshals

2     service will assign a value to the firearms, and then that

3     amount will be deducted from the forfeiture amount.

4          So to the extent the firearms are worth more than the

5     forfeiture amount, there's a process by which the property can

6     be returned.  But if they are worth less than the forfeiture

7     amount, the forfeiture amount will simply be credited whatever

8     the firearms are worth, and then the defendant will still owe

9     the remainder of the forfeiture amount.

10          And your Honor, I'd like to be heard on the points

11     that Mr. Levine raised.

12          THE COURT:  Yes.  Absolutely.

13          Just give me one second.  I just want to get the

14     indictment in front of me.

15          And Mr. Levine, if there is anything else you want to

16     say before I hear from the government, I'm happy to hear you

17     out.

18          MR. LEVINE:  Yes, Judge.

19          Count Three also goes back to 2008 and up to 2014.

20     But, again, they may have put that in the indictment, but the

21     actual evidence at trial and what the charge actually boiled

22     down to and what the U.S. had jurisdiction over, importantly,

23     was really what happened in 2011 and 2012, which is the murder

24     of Catherine Lee.  That's all he was really on trial for when

25     it boiled down to it.

1          Talking about him being paid by Leroux for nonspecific

2     things in 2008, when some of the work he was doing -- much of

3     the work -- most of the work he was doing for Mr. Leroux, was

4     either legal or, even if illegal, was not a crime against the

5     United States.  And so to just say that he would have to

6     forfeit every penny he ever got from Leroux in 2008 I think is

7     incorrect.

8          It also refers to $15,000 paid in July 2011 for the

9     murder of Noemi Edillor.  Again, her name came up a lot; that

10     name came up a lot during the trial.  But in terms of what the

11     U.S. had jurisdiction over, it seemed to have been limited to

12     the murder of Catherine Lee.  It seemed that -- it appeared to

13     me from reading everything that I read that the other murder

14     was really more like 404(b) evidence, but they weren't actual

15     charge-of-conviction evidence relevance.

16          The murder charges specify Catherine Lee.  They don't

17     make any mention of Ms. Edillor.  So I don't think that that

18     $15,000 is subject to forfeiture either.  The U.S. doesn't have

19     jurisdiction over that murder.  He wasn't charged with that

20     murder.  He wasn't convicted of that murder.

21          Much of what I've said otherwise about smuggling money

22     into the country had nothing to do with the charges here that

23     were specific, as I said, to the murder of Catherine Lee.  It

24     wasn't about -- he wasn't charged with that money laundering or

25     for bringing money in like that.  A lot of this was part of

J37VHUNS

everything that Leroux talked about; a lot was allowed in as

evidence at trial, but it wasn't elements of the charge of

conviction.  And it's not something for which he was convicted

for which the U.S. had jurisdiction over.  So I object to how

they came up with that amount.  I don't agree with that amount

of 53,000 and change.

THE COURT:  All right.  Thank you.

Would you like to be heard?

THE DEFENDANT:  Your Honor, may I speak?

THE COURT:  Yes.

THE DEFENDANT:  The government is seeking forfeiture

asset substitution in reference to the firearms.

THE COURT:  Correct.

THE DEFENDANT:  You previously ruled that my

co-defendant's firearms be returned to them.  That was in

October, at my arraignment, 2017.  They didn't receive -- I

mean they didn't request asset forfeiture substitution for my

codefendants, and you didn't order that to them.

In addition, $130,000 was seized by the government in

Thailand in cash.  So if they want asset forfeiture, they could

take that 53,000 from that 130,000.

The Supreme Court has previously ruled that firearms

will not be confiscated; it will be returned to my family, and

Mr. Levine has the case here.  So I don't see how there's a

substitution of forfeiture is even applicable when they seized

J37VHUNS

1    the $130,000 in cash.  That's not included in their memorandum

2    of these funds that they are talking about.

3           Second of all, my co-defendant's weapons were returned

4    to them.  You ruled on that.  So my weapons should be returned

5    to my family.  And I don't mean weapons.  Excuse me for that.

6    But in the military they call them weapons.  I mean the

7    firearms, as well as the ballistic vest that was used for work

8    as a defense contractor for the Department of State.  I bought

9    those before any criminal activity took place.  As well as all

10   the other items that they seized from my house on the search

11   warrant which have not been returned to this date.  They

12   submitted a memorandum to you months ago and nothing has been

13   returned.

14          THE COURT:  Would you like to be heard in response?

15          MS. DONALESKI:  Yes, your Honor.

16          First, as your Honor hinted and is quite clear both

17   from the trial and from the indictment, the government charged

18   Mr. Hunter in Counts One and Three with engaging in a

19   long-running conspiracy to murder and kidnap abroad.  Count One

20   is the murder-for-hire conspiracy that starts in 2008, and

21   Count Three is the conspiracy to murder and kidnap abroad that

22   also starts in 2008.

23          In your Honor's Rule 29 opinion, your Honor made a

24   specific finding that Mr. Hunter joined this conspiracy in

25   2008.  The government introduced extensive evidence, email

J37VHUNS

correspondence showing Mr. Hunter back in the United States

recruiting for the kill team, corresponding with Adam Samia,

corresponding with David Smith about jobs abroad.  And the

government also introduced testimony from Leroux and Vamvakias,

noting that when you joined this team, you knew that you were

joining because you were recruited for a specific skill set:

The ability to kill on demand, to torture on demand.

        The government also introduced evidence of Mr. Hunter

describing actions that he took:  Fire bombing, shooting Steve

Hahn, kidnapping another individual, all of which took place in

2008 and 2009.  So the defendant was both charged explicitly

with this behavior, convicted of this behavior.  The government

properly introduced evidence of this conspiracy back through

2008.  And your Honor has made findings noting that the

defendant's participation in the charged conspiracies began in

2008.

        For all of these reasons, it is entirely appropriate

for your Honor to find that the money that the government has

shown by a preponderance that the defendant received as part of

his mercenary work for Leroux, his supervision of the kill

team, his engaging in violent acts on behalf of Leroux, was

part of the charged offenses for which the defendant has been

convicted at trial.

        THE COURT:  Why don't you walk through the various

payments.  So we have two $15,000 payments in January 2012, in

1   July 2011; a $12,000 payment in June 2011; $7,000 in July 2008;

2   and the 4500 in June 2008.

3          Why don't you just walk through with respect to each

4   of them how these payments were payments in connection with the

5   crime.

6          MS. DONALESKI:  Yes, your Honor.

7          And I'll just note, we didn't include the entire

8   universe of payments that we believe Mr. Hunter received; we

9   only limited it to documentary proof introduced at trial.

10          THE COURT:  I'll just note that you presented evidence

11   at trial indicating, as well, that Mr. Hunter smuggled hidden

12   cash proceeds of his criminal conduct into the United States as

13   well; but that you're not seeking any of those amounts, which

14   are harder to identify.

15          MS. DONALESKI:  Exactly, your Honor.

16          So first, I'm referring to the motion page 5, the

17   first bullet point.  So we have an email which is Government

18   Exhibit 4035, which is the salary list for June 2008, listing

19   that Mr. Hunter was due a salary of $4500.

20          At this time, Mr. Hunter was in Africa.  And the

21   Thailand video describes Mr. Hunter's activities in Africa.  So

22   during that time he fire-bombed a house, he shot Steve Hahn in

23   the hand.  The government's evidence showed that when you were

24   part of this organization, you joined knowing that you were

25   needed to kidnap as needed, to murder as needed.  That's why

1   the government's evidence proved that the defendant joined the

2   conspiracies charged in Count One and Three in 2008.

3              So we've also referenced Leroux's testimony that

4   between 2008 and 2009, the typical salary that he paid was

5   $5,000.  So again, that corroborates the actual email documents

6   showing what Mr. Hunter was paid.

7              And then we've cited to the transcript describing

8   Mr. Hunter's work in Africa during this time.  And again your

9   Honor reviewed Mr. Hunter's passport, which showed that he was

10  in Africa, including with Adam Samia, during this time in 2008

11  and 2009.

12             The next bullet point is an email, including a salary

13  list for July 2008 of $7,000.  And we've cited to the

14  transcript, again, Leroux, I believe, and Vamvakias, describing

15  both the typical salary and then what was happening in Africa

16  in 2008 and 2009, when Mr. Hunter was there.  And finally,

17  we've cited to the Thailand video, again, where Mr. Hunter

18  describes the actions he took in Africa on behalf of the Leroux

19  organization.

20             Next, in June 2011, this is when Mr. Hunter has become

21  the leader of the kill team.  We introduced email

22  correspondence between Mr. Hunter and Adam Samia, discussing,

23  I'm the leader of the team right now.  We introduced testimony

24  from Vamvakias and Leroux corroborating that Mr. Hunter had

25  become the leader of the kill team by this time, in the summer

J37VHUNS

1    of 2011.  And the salary bump represents that he is the leader.

2    $12,000 represented that he was the leader of the kill team,

3    and he was responsible for recruiting mercenaries and

4    supervising them in killing -- his first victim is Noemi

5    Edillor.

6         So that's our next bullet point, in July 2011.

7         And I referenced earlier in this hearing the email,

8    Here's your fucking proof.  That was a forward from Mr. Hunter

9    to Mr. Leroux attaching the news article about Ms. Edillor's

10   murder, which was in July 2011.  And the salary bump that he

11   receives, the $3,000 bonus, Mr. Leroux testified that that was

12   a bonus that Mr. Hunter received as a success payment for

13   successfully supervising the team that murdered Ms. Edillor.

14   We've attached -- or we've cited to the Thailand video where

15   Mr. Hunter describes his role in the Edillor murder as well.

16        And then finally, the $15,000 salary in January 2012,

17   in connection with his supervision of the Lee murder.  There

18   was the email where Mr. Hunter is identified as being owed the

19   salary of $15,000.  We also introduced evidence from Mr. Leroux

20   testifying that he did, in fact, pay Mr. Hunter the salary in

21   connection with his supervision of the kill team in January

22   2012.  And we also introduced testimony from Mr. Vamvakias

23   identifying the pseudonym that Mr. Hunter used in that email

24   salary list.  I believe it was JaRule.  Both Mr. Vamvakias and

25   Mr. Laroux testified that JaRule was, in fact, Mr. Hunter.

1          Then finally we've cited to the Thailand video again,

2     in which Mr. Hunter describes supervising the kill team of

3     Samia and Stillwell in their murder of Catherine Lee.

4          THE COURT:  I think for all of those reasons and as

5     noted in my Rule 29 decision, I think on page 8, the government

6     has presented sufficient evidence that Mr. Hunter received at

7     least $53,500 in salary payments for the crimes described in

8     Counts One through Three of the indictment.

9          Can you respond, Ms. Donaleski, to the allegation that

10    $130,000 was seized and never returned to Mr. Hunter?

11         MS. DONALESKI:  Your Honor, my understanding is that

12    the money -- may I have one moment?

13         (Counsel conferred)

14         MS. DONALESKI:  The money was seized by the Tais, the

15    Tai law enforcement officers that arrested Mr. Hunter, and kept

16    by the Tai authorities.  The DEA was never in possession of it.

17         I'll also note that in connection with Mr. Hunter's

18    previous sentencing, Judge Swain ordered forfeiture up to

19    $450,000, of which Mr. Hunter has not paid a cent.  So there is

20    an outstanding forfeiture, oral forfeiture order, from Judge

21    Swain as well.

22         THE COURT:  All right.

23         I am going to ask you to look into the $130,000

24    seizure.  And I'd like a letter by the end of the month, if you

25    can get it by then.  I want you to reach out immediately, but I

1    understand that may take time.  But I'm going to ask that you

2    get it to me by March 31st.  And of course, copy Mr. Levine and

3    Mr. Hunter with respect to the $130,000 seizure.

4                 THE DEFENDANT:  Your Honor?

5                 THE COURT:  Yes.

6                 THE DEFENDANT:  If I may say one thing.

7                 The government seized the video from the Tai police in

8    Thailand.  They could have seized the cash in Thailand as well.

9    So if there's 130,000 and they say 53 is owed, then there's a

10   excess, should be returned to me.

11                THE COURT:  I'm asking the government to look into

12   that.

13                THE DEFENDANT:  And therefore, there is no reason for

14   asset substitution on the firearms.  There's no basis for it.

15                THE COURT:  Well, look, it sounds like you already

16   have -- I think it's a $450,000 forfeiture order before Judge

17   Swain, in any event.

18                But putting that aside, right now I've asked the

19   government to look into the seizure of the $130,000, and we're

20   going to hear what happened to that.  So it may be that with

21   respect to this case the substitute assets don't need to be

22   applied.  But we're going to find that out.

23                MR. LEVINE:  Judge, just one thing regarding the

24   forfeiture by Judge Swain.

25                In the sentencing minutes, after there's discussion

J37VHUNS

1 about the defense -- not being forfeiture by consent, and the

2 defense taking issue with how the number was reached, in the

3 end, Mr. Lockard, AUSA Lockard, says, That's one of the issues

4 we want to work out and make sure that the mechanics work out

5 in a manner that is appropriate and don't unfairly benefit or

6 detriment any particular defendant; but that it is the idea

7 that this joint and several liability, the other individual

8 joint and several obligations, will be capped at a certain

9 level, and that's part of the calculation we'll be going

10 through.

11     And the Court says:  All right.  So I will say that he

12 will be ordered to forfeit the proceeds of his crimes in an

13 amount to be determined up to $450,000.  And the liability will

14 be joint and several with those of his codefendants.

15     THE COURT:  All right.

16     MR. LEVINE:  I don't know whether the amount was ever

17 actually determined.

18     THE COURT:  Did anything happen after that?

19     I saw that you wrote Judge Swain a letter on February

20 22nd.  I don't know if she signed that.  I don't know if

21 anything happened before that.  Obviously a lot of time went by

22 in between.

23     MS. DONALESKI:  Yes, your Honor.  We submitted a

24 proposed order to Judge Swain.  At Judge Swain's request we

25 conferred with the defense.

J37VHUNS

1          Mr. Levine accurately read the transcript.  Judge

2     Swain did order forfeiture up to $450,000; an order just was

3     never submitted.  So we submitted that order.  We are working

4     on that with defense counsel, and we intend to put in a

5     submission in front of Judge Swain.

6          Again, my understanding was that the Tais seized the

7     money.  To the extent Mr. Hunter wants to raise that issue with

8     the Tais, he's welcome to.  To the extent he wants to use that

9     money towards the previous forfeiture order, he's also welcome

10    to.

11         What we're asking your Honor to do is to issue this

12    preliminary order which is the beginning of the step of a

13    process.

14         THE COURT:  I am going to begin the process, but I

15    still want you to look into the seizure of the money and get

16    confirmation as to what happened to it and if it can be applied

17    either to Judge Swain's forfeiture order or to this one, to the

18    extent that there's any issue with the forfeiture order before

19    Judge Swain.

20         MS. DONALESKI:  Understood, your Honor.

21         MR. LEVINE:  Judge, just to be clear, Judge Swain

22    seemed to have capped the possibility of forfeiture at

23    $450,000.  But she specifically said that it will be ordered,

24    proceeds of his crimes, in an amount to be determined up to

25    $450,000, which is not the same as ordering forfeiture of

1   $450,000.  As far as I know, the government never submitted

2   anything saying how they came up with that amount and how much

3   of it is attributable to Mr.  --

4           THE COURT:  I'm not going to weigh in today on the

5   forfeiture order that has been submitted to Judge Swain.  It

6   seems like negotiations are ongoing and we'll see what happens.

7   And then you'll let me know.

8           With respect to this case, I am ordering forfeiture in

9   the amount of $53,500.  I do have before me the declaration of

10  Special Agent Stephen Casey attesting that the government has

11  been unable to locate any assets held by Mr. Hunter other than

12  the substitute assets identified in the proposed preliminary

13  order of forfeiture.  And I do find by a preponderance of the

14  evidence that Mr. Hunter is liable in that amount, the $53,500

15  in proceeds traceable to his violations of Counts One through

16  Three of the indictment.  And I find that, as a result of his

17  actions, these proceeds cannot be located upon the exercise of

18  due diligence; and that Mr. Hunter must order -- excuse me,

19  must forfeit the substitute assets listed in the proposed

20  preliminary order of forfeiture.

21          I do want to, though, build in time just to confirm

22  the $130,000.

23          So how can we do this?  Forfeiture needs to be ordered

24  at the time of sentencing, and so I have ordered it.  But with

25  respect to the substitute assets, this is an ongoing process,

J37VHUNS

1   right?  And so if, in fact, the United States government is

2   able to retrieve the $130,000, to the extent it hasn't already,

3   can we put -- I understand there's maybe an issue with respect

4   to if that money should go to the forfeiture order before Judge

5   Swain, but that's undecided and that's before her.  But there's

6   time to figure this process out; is that right?

7          MS. DONALESKI:  Yes, your Honor.

8          Directing your attention to paragraph 7 of the

9   proposed order, it builds in a timeline for -- the government

10  must publish this notice on its website and will provide copies

11  of the notice to the interested third parties.  The interested

12  third parties then have, I believe it is, 60 days to file a

13  petition in front of your Honor.  And then the government will

14  respond to the petition.

15         So there is a timeline built into this order by which

16  your Honor will adjudicate any third-party claims.  To the

17  extent that Mr. Hunter is able to come up with money to put

18  towards the order, this is only a preliminary forfeiture order;

19  it's not the final order, which the government will, of course,

20  submit to your Honor after the claims have been adjudicated.

21         THE COURT:  All right.

22         So I am going to sign this order which will become

23  part of the judgment.  As I said, we're still going to look

24  into the $130,000.

25         Is the government seeking restitution?

1          MS. DONALESKI:  No, your Honor.

2          THE COURT:  All right.

3          So that's my sentence.

4          Does either side know of any legal reason, other than

5     what's been previously stated, why this sentence cannot be

6     imposed?

7          MS. DONALESKI:  No, your Honor.

8          MR. LEVINE:  No, your Honor.

9          I just want to point out Mr. Hunter referred to a

10    Supreme Court case; I know he's referred to it several times on

11    other occasions we've been here.  The case to which he is

12    referring is *Henderson v. United States*, 135 S.Ct. 1780 (2015).

13    In that case the government wasn't seeking forfeiture; they

14    were simply saying, We can't give the guns -- this person his

15    firearms back because he's a convicted felon, and he'd be

16    automatically guilty of a felony.

17         THE COURT:  Does that suggest that firearms can't

18    constitute substitute assets in a situation like this?

19         MR. LEVINE:  Not in my opinion, your Honor, which is

20    why I didn't cite it.  I know that Mr. Hunter has been bringing

21    it up both with me and with your Honor.

22         THE COURT:  Right.

23         This is not a situation, Mr. Hunter, where your

24    firearms are being seized by virtue of the conviction; they are

25    being seized and used as substitute assets in light of the

J37VHUNS

1    forfeiture order.  So I just want to make that clear for the

2    record.

3          I also want to make clear that you have a right to

4    appeal your conviction and sentence.  If you do choose to

5    appeal, the notice of appeal must be filed within 14 days of

6    the Judgment of Conviction.  If you're not able to pay for the

7    cost of an appeal, you may apply for leave to appeal *in forma*

8    *pauperis*, which simply means that court costs such as filing

9    fees will be waived.  If you request, the Clerk of Court will

10   prepare and file a notice of appeal on your behalf.

11         Are there any underlying indictments against

12   Mr. Hunter that need to be dismissed?

13         MS. DONALESKI:  Not that I'm aware of; but to the

14   extent they exist, the government moves to dismiss them.

15         THE COURT:  They will be dismissed.

16         Are there any other applications at this time with

17   respect to the sentencing?

18         MR. LEVINE:  No, your Honor.

19         THE COURT:  All right.  Thank you.

20         We're adjourned.

21                         *    *    *

22

23

24

25